# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF AMERICA, PO Box 30715 Billings, MT 59107 | Case No.    20-2552 |
| *Plaintiff*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, 1400 Independence Ave., SW Washington, DC 20250, and | |
| SONNY PERDUE, in his official capacity as Secretary of the United States Department of Agriculture, 1400 Independence Ave., SW Washington, DC 20250, | |
| *Defendants*. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This action stems from amendments made to the federal Beef Checkoff program—a federal program that requires independent ranchers to pay assessments that subsidize the speech of the federal government, as well as others—by the United States Department of Agriculture ("USDA").

2.      Plaintiff Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of America ("R-CALF") is the nation's largest cattle trade association that exclusively represents independent cattle producers.

3.      R-CALF has long advocated—both in and out of court, on behalf of itself and its members—for Beef Checkoff funds to be administered in a manner that benefits independent, domestic producers.

4.      The federal Beef Checkoff program is a compelled subsidy that can only be used to fund speech and is therefore "unconstitutional under any level of scrutiny." *R-CALF v. Perdue*, 2017 WL 2671072, at *7 (D. Mont. June 21, 2017) (addressing the Beef Checkoff program) (citing *United States v. United Foods, Inc.*, 553 U.S. 405, 410 (2001)). However, when the compelled subsidy funds "government speech" it can survive because "[u]nlike private speech, government speech remains 'subject to democratic accountability'" and is exempt from First Amendment review. *Id.* at *5 (quoting *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 563 (2005)). Whether a compelled subsidy funds "government speech turns on whether government officials exercise 'effective control' over the speech." *Id.*

5.      Therefore, in considering the Beef Checkoff program, the Supreme Court held the portion of the assessment that funds federally controlled entities administering the program is constitutional because they produce government speech. *Johanns*, 544 U.S. at 563-64.

6.      However, a portion of the checkoff's assessment on producers, including R-CALF's members—instead of going to the federal entities—funds the speech of state-based entities—many of which are private, i.e.,  not established by federal or state statute but privately incorporated. Frequently these entities (referred to as "qualified state beef councils" and abbreviated as "QSBCs") have used checkoff funds to promote speech which favors corporate consolidation in the beef industry that harms independent cattle producers; and to pay for advertisements that make no effort to distinguish domestic beef from other beef, which harms domestic producers that produce a superior product consumers would favor. Moreover, R-CALF has seen that much of the money retained and used by state beef councils under the federal Beef Checkoff program gets funneled to the National Cattlemen's Beef Association and other entities that further the interests of meat packing companies, not ranchers.

7.      On May 2, 2016, R-CALF brought an as-applied First Amendment suit alleging that—insofar as proceeds from assessments on producers are retained by private state-based entities and used to pay for speech—the federal Beef Checkoff program amounts to a government-compelled subsidy of private speech of a private entity, and is therefore unconstitutional under the First Amendment of the United States Constitution. *R-CALF v. Perdue*, No. CV-16-41-GF-BMM-JTJ, Dkt. No. 1 (D. Mont. May 2, 2016).

8.      This challenge resulted in a preliminary injunction because the district court found the Government's control over these private state-based entities was likely insufficient to render their speech "government speech." In other words, the statutes and regulations governing the federal Beef Checkoff program were insufficient to ensure speech funded by the private state-based entities was government speech and thus the compelled subsidy of their speech was subject to the First Amendment and did not pass the necessary scrutiny. *R-CALF v. Perdue*, 2017

WL 2671072, at *2, *6. The Ninth Circuit affirmed the preliminary injunction. *R-CALF v. Perdue*, 718 Fed. Appx. 541 (9th Cir. Apr. 9, 2018).

9.      Before proceeding to summary judgment, however, USDA entered into Memoranda of Understanding ("MOUs") with 20 "qualified state beef councils" in the following states: Colorado, Florida, Hawaii, Indiana, Kansas, Maryland, Montana, Nebraska, Nevada, New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, and Wisconsin.

10.     On information and belief, USDA has entered into identical MOUs with all qualified state beef councils that are private entities, in addition to some state beef councils created through state statutes.

11.     This case concerns every MOU USDA has entered into with state beef councils.

12.     Through the MOUs, USDA substantively amended the federal Beef Checkoff program to turn the state beef councils' speech into "government speech." Prior to the MOUs, none of the specific statements of the state beef councils were subject to USDA's pre-approval.

13.     Now, among other things, the MOUs require USDA to pre-approve the state beef councils' speech before the speech is disseminated.

14.     Thus, the MOUs substantively amended the existing regulatory scheme and gave USDA enforcement power over the state beef councils (and indeed created new obligations for the state beef councils).

15.     Prior to the MOUs there was no legislative basis for USDA to exercise control over the state beef councils in this way.

16.     The district court found that the MOUs provided sufficient control over the speech of the private state beef councils to render that speech "government speech," and thus

bring this aspect of the federal Beef Checkoff program in line with the First Amendment. *R-CALF v. Perdue*, No. CV-16-41-GF-BMM-JTJ, Dkt. No. 147 (D. Mont. May 2, 2016).

17.     However, despite substantively amending an existing regulatory scheme, USDA failed to utilize the notice-and-comment procedures required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553.

18.     This has deprived R-CALF and its members the ability to advance alternative and/or additional reforms to the federal Beef Checkoff program such as adding provisions to the program that (a) grant USDA the ability to appoint or remove board members of the state beef councils; (b) give USDA the ability to review the state beef councils' oral speech; (c) prevent the state beef councils' from funding private third-party speech USDA never reviews; (d) prevent the state beef councils from sharing staff and facilities with other private third-parties; and (e) require a USDA official to participate in the business meetings of the state beef councils.

19.     As a result, USDA has also failed to provide a reasoned explanation for the revisions made to the federal Beef Checkoff program by the MOUs. The MOUs do not state any purpose for their adoption and do not address how the amendments would impact aspects of the program for which R-CALF, its members, and others have long sought reform. In fact, the MOUs fail altogether to acknowledge, let alone provide a reasoned explanation for, the significant changes the MOUs made to the agency's existing regulations and policy.

20.     As such, R-CALF and its members have been prevented from providing feedback on substantive amendments to the federal Beef Checkoff program and have and continue to be harmed by arbitrary and capricious changes to a program for which R-CALF's members are forced to fund and for which R-CALF has diverted substantial resources advocating for reform.

21.     Since the adoption of the MOUs, R-CALF has diverted resources to educate its membership and the public about the MOUs, including their failure to provide Government controls over the state beef councils that would better ensure their checkoff funded speech does not harm the interests of R-CALF and its members.

22.     Accordingly, R-CALF respectfully requests that the MOUs be declared unlawful and vacated on the grounds that they were adopted "without observance of procedure require by law," and are "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706.

## II.     JURISDICTION AND VENUE

23.     This action arises under the APA, 5 U.S.C. § 701, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331.

24.     Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(e).

25.     Declaratory relief is appropriate under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

26.     Injunctive relief is appropriate under 28 U.S.C. § 2202, 5 U.S.C. § 706, and Federal Rule of Civil Procedure 65.

## III.     PARTIES

*Plaintiff*

27.     Plaintiff R-CALF is a nonprofit, membership-based organization headquartered in Montana. R-CALF is the largest cattle industry trade organization in the United States whose voting members are comprised exclusively of independent, domestic cattle producers. Its voting members are located in 44 states and the District of Columbia. R-CALF's voting members

include cow-calf operators, cattle backgrounders, and feedlot operators. Voting members pay dues and have equal voting rights in electing R-CALF's directors and setting R-CALF's policies.

28.     R-CALF's mission focuses on ensuring the continued viability of independent, domestic cattle producers. On behalf of its members, R-CALF engages in regular advocacy and education efforts to advance its mission. R-CALF focuses on educating ranchers and consumers about positions that will increase the profitability of independent, domestic ranchers such as developing: (a) rigorous import standards to protect the domestic cattle herd from foreign animal diseases, (b) country-of-origin labeling that will allow consumers to more easily select domestic beef, and (c) trade and marketing policies that advantage domestic producers.

29.     Unfortunately, in order to fully represent its members' interests, R-CALF must also work against programs that threaten independent, domestic ranchers, including the federal Beef Checkoff program. Because of the misuses of Beef Checkoff funds within the federal Beef Checkoff program, starting in 2010 R-CALF listed as one of its priorities stopping the use of checkoff funds by unaccountable entities.

30.     R-CALF has seen that Beef Checkoff expenditures by state beef councils are frequently used to promote the type of speech to which R-CALF objects, including speech that promotes corporate consolidation in the beef industry and advertisements that make no effort to distinguish domestic beef from other beef. Moreover, R-CALF has seen that much of the money retained and used by the state beef councils under the federal Beef Checkoff program goes to the National Cattlemen's Beef Association and other entities that advocate for corporate consolidation in the beef industry, which threatens independent ranchers. Additionally, R-CALF's members are threatened by efforts to treat all beef as equal or that fail to distinguish between where and how beef is produced. R-CALF believes strongly that consumers should and

would prefer domestic beef produced in compliance with the United States' rigorous standards over other beef that is not, if they were empowered to make that distinction.

31.     Therefore, R-CALF has met with executive branch and congressional personnel and provided written comments to advocate that USDA reorient expenditures of Beef Checkoff funds.

32.     In addition, R-CALF engages in educational efforts about the program. For example, R-CALF gives presentations across the nation—at any forum to which it is invited and can attend—regarding how federal Beef Checkoff funds are taken from independent producers and used by unaccountable state beef councils.

33.     The work against the use of Beef Checkoff funds by unaccountable state beef councils has significantly drained R-CALF's resources. R-CALF has a small staff, and education efforts regarding the use of Beef Checkoff funds by state beef councils has had a significant effect on R-CALF's resources. R-CALF estimates the presentations themselves have at times consumed 60% of its resources.

34.     After the district court in the District of Montana granted its preliminary injunction, R-CALF was freed of having to focus so much energy on the misuse of Checkoff funds and expanded its other advocacy work substantially, including starting a new initiative to highlight the failure of antitrust laws to protect cattlemen and women against consolidation.

35.     However, since USDA entered into the MOUs at issue, R-CALF has seen its resources drained in order to educate ranchers and consumers about the MOUs and their failure to adequately protect R-CALF and its members' interests. For instance, R-CALF has added to its presentations materials regarding how the MOUs allow for unaccountable state beef councils to funnel money obtained through producer assessments to third party organizations (such as the

8

National Cattlemen's Beef Association and the United States Meat Export Federation). These third party organizations then use that money to fund speech that promotes consolidation in the beef industry, which harms independent, domestic producers. Likewise, R-CALF educates the public on the MOUs' failure to ensure the state beef councils remain democratically accountable to ranchers. In addition to its presentations, R-CALF has produced social media videos about the MOUs, discussed the MOUs on radio programs, and allotted time during its annual convention to discuss the MOUs in order to educate ranchers and consumers. In particular, R-CALF has devoted time to educate ranchers about how the MOUs are unlawful. In addition, R-CALF has met with executive branch and congressional personnel to educate decision makers about the MOUs and R-CALF and its members' objections.

36.     The organizational policies R-CALF's members have chosen to support include R-CALF's work to reform provisions of the federal Beef Checkoff program. R-CALF's members include cattle producers who have raised and currently raise cattle in their respective states—which include every state where there is a state beef council that has entered into the MOUs at issue except Hawaii and Vermont—and pay the Checkoff there.

37.     R-CALF's members' livelihoods as independent, domestic producers are threatened by speech that promotes consolidation, treats all beef as equal and/or that fails to distinguish between where and how beef is produced. R-CALF's members believe that consumers should and would prefer domestic beef produced in compliance with the United States' rigorous standards over other beef that is not, if they were empowered to make that distinction. Moreover, as independent producers, R-CALF's members desire the speech funded by the Beef Checkoff program to be lawful and accountable to producers.

38.     USDA's failure to provide notice-and-comment prevented R-CALF and its members from ensuring the program R-CALF's members are forced to fund is lawful and accountable to producers. Indeed, by failing to follow the procedural requirements of the APA, R-CALF and its members were prevented from raising their objections to the MOUs. This includes R-CALF and its members objections that even under the MOUs USDA lacks the ability to appoint or remove board members of the state beef councils; USDA lacks the ability to review the state beef council's oral speech; the state beef councils' can continue to fund private third-party speech USDA never reviews; the state beef councils continue to share staff and facilities with other private third-party advocacy organizations thereby effectively funding those organizations; and USDA officials are not required to participate in the business meetings of the state beef councils. Moreover, because USDA has not demonstrated it considered any of these objections, R-CALF's members are being forced to fund a program that is the product of the arbitrary and capricious changes made by the MOUs.

39.     R-CALF and its members seek an opportunity to provide feedback on the MOUs' amendments to the federal Beef Checkoff program to ensure the program is not used to promote speech that is against R-CALF and its members interests.

40.     R-CALF brings this lawsuit on behalf of itself and its members.

*Defendants*

41.     Defendant USDA is an agency within the meaning of the APA, 5 U.S.C. § 701. USDA operates under the supervision and direction of the Secretary of USDA.

42.     Defendant Sonny Perdue is the Secretary of USDA and is sued in his official capacity only.

## IV.     BACKGROUND

43.     The federal Beef Checkoff program is a creation of the Beef Promotion and

Research Act ("Beef Act") which was passed by Congress in order to "financ[e]…and carry[]

out a coordinated program of promotion and research designed to strengthen the beef industry's

position in the marketplace and to maintain and expand domestic and foreign markets and uses

for beef and beef products." 7 U.S.C. §§ 2901(b), 2904.

44.     Pursuant to the Beef Act, in what is known as the "Beef Order," the Secretary of

Agriculture ("the Secretary") promulgated regulations for the Beef Checkoff program. 7 U.S.C.

§§ 2901(b), 2903; 7 C.F.R. Pt. 1260.

45.     Under the Beef Checkoff program, domestic cattle producers must pay $1 per

head of cattle sold to finance "a coordinated program of promotion and research designed to

strengthen the beef industry's position in the marketplace and to maintain and expand domestic

and foreign markets and uses for beef and beef products." 7 U.S.C. §§ 2901(b), 2904(8)(C).

46.     The Beef Checkoff Act and Order created two "administrative" entities to manage

the Beef Checkoff at the federal level: the Cattlemen's Beef Promotion and Research Board

("Beef Board"), and the Beef Promotion Operating Committee ("Beef Committee"). 7 U.S.C.

§ 2904(1)-(5); 7 C.F.R. §§ 1260.141-1260.151, 1260.161-1260.169. The Beef Board reviews and

approves the Beef Committee's budget, and is responsible for certifying state beef councils as

"qualified state beef councils" empowered to collect and use Beef Checkoff funds. 7 U.S.C.

§ 2904(4)(C); 7 C.F.R. § 1260.181. The Beef Committee develops the "plans or projects of

promotion and advertising, research, consumer information, and industry information, which

shall be paid for with assessments collected by the [Beef] Board." 7 U.S.C. § 2904(4)(B).

47.     The Secretary may remove any member of either the Beef Board or Beef

Committee. 7 C.F.R. § 1260.213. The Secretary approves the budget set by the Beef Board. 7

U.S.C. §§ 2904(4)(C), (9). A representative of the Secretary attends all Beef Board meetings.

The Secretary also approves all plans and projects developed by the Beef Committee. 7 C.F.R.

§ 1260.169. All of the Beef Committee's proposed promotional messages are reviewed by

USDA officials both for substance and for wording, and some proposals are rejected or rewritten

by USDA. *Johanns*, 544 U.S. at 561.

48.     Distinct from these two federal administrative entities are the state beef councils.

State beef councils are also entities that "conduct[] beef promotion, research, and consumer

information and/or industry information programs" with checkoff dollars. 7 C.F.R.

§ 1260.181(a); *see also* 7 U.S.C. § 2902(14); 7 C.F.R. § 1260.115.

49.     To become a "qualified" state beef council a state beef council must be "certified

by the [Beef] Board." 7 C.F.R. § 1260.181(b). This requires merely that a state beef council

submit a 10-page form to the Beef Board. The Beef Act and Beef Order require that once

certified, a state beef council "furnish the Board with an annual report by a certified public

accountant of all funds remitted to such council pursuant to this subpart and any other reports

and information the Board or Secretary may request." 7 C.F.R. § 1260.181(b)(6). The Beef

Board also requires qualified state beef councils to (a) provide the Beef Board an annual

marketing plan that outlines their planned activities; and (b) approximately twice a decade,

submit to a compliance review by the Board to assess compliance with the Beef Act, Beef Order,

and certain Beef Board guidelines. *See* 7 C.F.R. § 1260.181. Qualified state beef councils are

authorized to collect the Beef Checkoff assessment in their state, on behalf of the Beef Board. 7

C.F.R. § 1260.181(a).

50.     Qualified state beef councils are allowed to keep up to half of all money collected

and, by the terms of the statute and regulations, can use that money to fund whatever speech they

choose so long as it is consistent with the general terms of the Beef Act and Beef Order, that the money be used to promote beef.

51.     Under the statutes and regulations, the Government has no regular contact with the state beef councils, and no one reviews the councils' specific speech.

52.     In summary, under the statutes and regulations, the state beef councils are allowed to siphon off 50 cents of every dollar the Government forces ranchers to pay and can use the Beef Checkoff money for speech that "strengthen[s] the beef industry's position in the marketplace" in any manner the councils deem appropriate, so long as they do not run afoul of the statute's prohibitions that checkoff money cannot be used to "influenc[e] governmental policy or action, or to fund plans or projects which make use of any unfair or deceptive acts or practices including unfair or deceptive acts or practices with respect to the quality, value or use of any product that is a competitor to beef." 7 C.F.R. § 1260.181(b)(1), (4), (7).

53.     No provision of the Beef Act or Order empowers the Secretary or any other federal officer to appoint or remove members of the state beef councils. *See* 7 U.S.C. § 2904; 7 C.F.R. § 1260.181.

54.     The federal government does not appoint, remove, or determine the selection procedures for the staff or directors of the state beef councils.

55.     Because of the Beef Act and Order's failure to ensure the Beef Checkoff program is constitutional, R-CALF brought its as-applied First Amendment suit challenging the federal Beef Checkoff under the First Amendment on May 2, 2016. R-CALF alleged that since the federal Beef Checkoff program allows for assessments on producers to be retained by private state beef councils (particularly the Montana Beef Council, which was on the only council at issue at the time) and used by these private entities to pay for speech that the program amounted

to a government-compelled subsidy of private speech of a private entity, and was therefore

unconstitutional under the First Amendment. *R-CALF v. Perdue*, No. CV-16-41-GF-BMM-JTJ,

Dkt. No. 1 (D. Mont. May 2, 2016).

56.     The district court found that the Montana Beef Council was likely not sufficiently

controlled by the Government to render its speech "government speech" and granted a

preliminary injunction. *R-CALF v. Perdue*, 2017 WL 2671072, at *2, *6. The Ninth Circuit

affirmed the preliminary injunction noting that USDA "does not appoint any members of the

Montana Beef Council (MBC), does not have pre-approval authority over the MBC's

advertising, and may only decertify after an action has been taken." *R-CALF v. Perdue*, 718 Fed.

Appx. 541, 542 (9th Cir. Apr. 9, 2018).

57.     Subsequent to the district court granting the preliminary injunction, two things

occurred: (1) the lawsuit was expanded to include 14 additional states where a private entity that

is not a creature of federal or state law collects and retains half of producers' assessments under

the federal Beef Checkoff program (Montana, Hawaii, Indiana, Kansas, Maryland, Nebraska,

Nevada, New York, North Carolina, Pennsylvania, South Carolina, South Dakota, Texas,

Vermont, and Wisconsin); and (2) USDA entered into Memoranda of Understanding ("MOUs")

with the private state beef councils in all 15 states encompassed in the expanded litigation and 5

other state beef councils (Colorado, Florida, Oklahoma, Tennessee, and Virginia).

58.     On information and belief, USDA has entered into MOUs with every state beef

council that is a private entity, i.e., an entity privately incorporated under its state law or a

subsidiary of another private corporation organized under the laws of its state.

59.     The case continued through discovery and summary judgment where the district

court ultimately concluded that while its earlier decision on the preliminary injunction—that the

14

Beef Act and Order provided insufficient controls over the private state beef councils, such that

the federal Beef Checkoff program was likely unconstitutional—was correct, that under the

MOUs the district court found USDA now has "significant discretion to approve or reject any

and all QSBC promotional activities. QSBCs agree to submit to USDA for pre-approval any and

all promotion, advertising, research, and consumer information plans and projects. QSBCs also

must provide USDA with advance notice of any QSBC board meetings and allow a USDA

official to attend. USDA may direct the Beef Board to de-certify the QSBC if the QSBC fails to

comply with the MOU. " *R-CALF v. Perdue*, No. CV-16-41-GF-BMM-JTJ, Dkt. No. 147, at 5

(D. Mont. March 27, 2020) (citations omitted).

60.     Prior to USDA entering into the MOUs with the state beef councils at issue, none

of the specific statements of the state beef councils were subject to USDA's pre-approval and

USDA could not de-certify a state beef council prior to their speech being disseminated.

61.     The MOUs, however, "gave USDA broad new authority over any potential

speech that the beef councils might produce," thereby "provid[ing] sufficient control of qualified

state beef councils' speech for that speech to qualify as government speech and thus not run

afoul of the First Amendment." *Id*. at 2.

62.     Most critical in these finding were that "under the MOUs …, USDA now retains

complete final approval over all QSBC ads. This final approval gives USDA the option to

exercise its authority to decertify a QSBC *before* the QSBC ever gets the chance to disseminate

advertisements." *Id*. at 13-14 (emphasis in original) (quotations omitted); *see also id.* at 16

("Under the MOUs, QSBCs agree to submit to USDA 'for pre-approval any and all promotion,

advertising, research, and consumer information plans and projects, which [USDA] shall review

and approve or reject.' The QSBCs also agree 'to submit for pre-approval … any and all

potential contracts or agreements to be entered into by [a QSBC] for the implementation and

conduct of plans or projects funded by checkoff funds.'") (citations omitted). Thus, under the

MOUs, "QSBCs face the choice of getting USDA approval or not speaking at all." *Id*. at 16.

63.     In summary, through the MOUs, USDA substantively amended the federal Beef

Checkoff program to now require USDA's final approval of the state beef councils' speech

(including all private state beef council speech) *before* the speech is disseminated. Prior to the

MOUs, the statutory and regulatory scheme required only that the state beef councils provide

information about their use of Checkoff funds *after* having already disseminated the speech. The

MOUs, however, gave USDA enforcement power over the state beef councils (and indeed

created new obligations for the state beef councils). Thus, the MOUs provided USDA

enforcement authority over the state beef councils where there was previously no legislative or

regulatory basis for USDA to do so and rendered the speech of the private state beef councils

"government speech," i.e., ensuring the speech of the private state beef councils is constitutional

under the First Amendment.

64.     On information and belief, USDA has entered into identical MOUs with all

qualified state beef councils that are private entities not created by state or federal law. Thus, the

amendment to the statutory and regulatory scheme—while promulgated through separate

documents—amended the administration of the federal Beef Checkoff program writ large. That

is, due to the MOUs all private state-based entities that administer the federal Beef Checkoff

program must now get final approval from USDA for all speech created with assessments

producers are required to pay into the program *before* they speak.

65.     The district court in Montana found that this significant amendment to the federal

Beef Checkoff program was sufficient to bring it in line with the Constitution.

16

66.     However, despite the MOUs' substantive amendments to an existing statutory and regulatory scheme, USDA failed to utilize the notice-and-comment procedures required by the APA in promulgating them. 5 U.S.C. § 553.

67.     Likewise, USDA failed to provide a reasoned explanation for the revisions made to the federal Beef Checkoff program by the MOUs; failed to acknowledge, let alone provide a reasoned explanation for, the significant changes the MOUs made to the agency's existing regulations and policy; and failed altogether to consider important factors.

68.     For example, USDA failed to demonstrate it considered controls over the state beef councils' speech that are absent in the statutes and regulations that R-CALF highlighted in its First Amendment challenge, such as: USDA's inability to appoint or remove board members of the state beef councils; the state beef councils' ability to fund private third-party speech USDA never reviews; and USDA's failure to review the state beef council's oral speech. Likewise, in amending the program, USDA did not address how the amendments would impact aspects of the program for which R-CALF, its members, and others have long sought reform, such as: that much of the speech of the state beef councils and the private third-party entities they contribute checkoff funds to promotes consolidation within the beef industry; and much of this speech fails to distinguish between domestic beef and other beef, which harms independent producers. In other words, USDA failed to demonstrate it considered factors important to ensuring the federal Beef Checkoff program is accountable to producers.

69.     In addition, USDA has not demonstrated it considered amending the regulatory scheme to eliminate the private state beef councils now subject to the MOUs. That is, rather than institute the administrative costs and burdens of the MOUs, USDA could have fixed the

constitutionality of the Beef Checkoff by amending the program to eliminate the involvement of these private entities in administering checkoff funds altogether.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### USDA Failed to Comply with APA Rulemaking Procedures

70.     The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

71.     Agency actions are both final and legislative rulemakings when they carry the force of law. Agency actions carry the force of law when the answer to either of the following two questions is in the affirmative: (1) when, in the absence of the actions, there would not be an adequate legislative basis for enforcement action; or (2) when the rule effectively amends a prior legislative rule. *American Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). Here, the answers to both questions are in the affirmative. First, without the MOUs, USDA is neither empowered to review the speech and de-certify the private state beef councils *before* the speech is disseminated. Thus, in the absence of the MOUs, there would be no adequate legislative basis for USDA to de-certify the state beef councils before their speech is disseminated. The MOUs provide USDA this authority, which the district court in Montana found was necessary to ensure the constitutionality of the program. Second, the MOUs effectively amend the Beef Order, which is itself a legislative rule. For example, through the MOUs, USDA substantively amended the federal Beef Checkoff program to now require USDA's final approval of the state beef councils' speech *before* the speech is disseminated. Prior to the MOUs, the statutory and regulatory scheme required only that the state beef councils provide information about their use of Checkoff funds *after* having already disseminated the speech.

18

72.     Thus, USDA's MOUs with the state beef councils at issue constitute rulemaking within the meaning of the APA, 5 U.S.C. § 551(4), (5), and are therefore subject to the APA's notice-and-comment requirements, 5 U.S.C. § 553.

73.     The MOUs were enacted without complying with the APA's notice-and-comment requirements (and indeed are not available to the general public). Thus, USDA acted without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706.

74.     The MOUs do not qualify as "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" exempt from notice and comment under 5 U.S.C. § 553(b)(3)(A). Unlike the MOUs, these exempt actions do not alter parties' rights and obligations under the law. By contrast, the MOUs are substantive rules that alter the parties' rights and obligations under the law; amend existing legislative rules that were adopted through notice and comment and codified in the Code of Federal Regulations; adopt new positions inconsistent with existing regulations or policy; and otherwise effect a substantive change in existing regulations or policy because, at minimum, the MOUs create new requirements for the state beef councils to use Checkoff money for speech that are not present in either the Beef Act or Order.

75.     Absent "good cause" for not doing so, USDA was required to provide notice of its proposal, an opportunity for public comment, and an explanation of the rule ultimately adopted, *see* 5 U.S.C. § 553(b), (c)—none of which it has done.

76.     USDA has made no reasoned "good cause" finding for failing to follow the APA's procedural requirements here, nor could it.

77.     Because USDA entered into the MOUs without complying with the APA's notice-and-comment requirements, the MOUs are unlawful and must be vacated.

78.     USDA's failure to provide notice and comment and publish the MOUs adversely affects R-CALF and its members because it prevents R-CALF and its members from providing feedback on substantive amendments to the federal Beef Checkoff program for which R-CALF's producer members are forced to fund and for which R-CALF has diverted substantial resources advocating for reform.

79.     R-CALF and its members have a statutory right to notice of USDA's substantive regulatory changes and a statutory right to provide comment on such regulatory actions. 5 U.S.C. § 553(c).

80.     USDA's failure to follow the APA's procedural requirements should be declared unlawful and the MOUs should be vacated or enjoined. Absent these remedies, R-CALF and its members will continue to be harmed by USDA's failure to provide notice and comment in entering into the MOUs at issue.

81.     R-CALF has no other adequate remedy at law to address this violation.

## SECOND CAUSE OF ACTION
### USDA Acted Arbitrarily and Capriciously

82.     The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

83.     USDA's MOUs with the private state beef councils mark the consummation of USDA's decisionmaking process. USDA has entered into MOUs with every private state beef council administering the checkoff. The MOUs create uniform requirements for these entities to remain "quailed state beef councils." Moreover, the legal consequences of USDA's action are clear as the state-based entities at issue must abide by the MOUs additional terms or face the consequence of not speaking at all. Thus, the MOUs at issue constitute final agency action within the meaning of the APA, 5 U.S.C. § 551(13).

84.     Agency action that is not the product of reasoned decisionmaking is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency that "entirely fail[s] to consider an important aspect of the problem" before it has acted in an arbitrary and capricious manner. *Id*. To satisfy that core requirement of reasoned decisionmaking, an agency must "cogently explain why it has exercised its discretion in a given manner." *Id*. at 48 .

85.     As such, the MOUs are arbitrary and capricious agency action within the meaning of the APA, 5 U.S.C. § 706, because in entering into the MOUs, USDA has failed to provide a reasoned explanation for the changes made to the federal Beef Checkoff program; failed altogether to acknowledge that certain revisions reflect changes in existing agency regulations and policy (and likewise failed to provide any explanation for those changes); and failed altogether to demonstrate it considered important factors, as outlined above in paragraphs 67-69.

86.     USDA's arbitrary and capricious agency action, which created substantive amendments to the federal Beef Checkoff program—to which R-CALF's producer members are subject and for which R-CALF has diverted substantial resources advocating for reform—has and will continue to adversely affect R-CALF and its members.

87.     R-CALF and its members have a statutory right to rulemaking based on reasoned explanations that acknowledge the revisions contained therein, that consider important factors, and that is otherwise free of arbitrary and capricious decision making. 5 U.S.C. § 706.

88.     USDA's arbitrary and capricious actions in entering into the MOUs at issue should be declared unlawful and the MOUs should be vacated or enjoined. Absent these remedies, R-CALF and its members will continue to be harmed by USDA's unlawful conduct.

89.     R-CALF has no other adequate remedy at law to address these violations.

## REQUESTS FOR RELIEF

Wherefore, Plaintiff respectfully requests the following relief:

1.      An order vacating and setting aside the MOUs USDA entered into with the state beef councils at issue;

2.      A declaration that the MOUs USDA entered into with the state beef councils at issue are unlawful;

3.      An order awarding Plaintiff its costs and attorney's fees; and

4.      Any and all other such relief as the Court may deem appropriate.

Dated this 11th day of September 2020.

Respectfully submitted,

PUBLIC JUSTICE, P.C.

*/s/ David S. Muraskin*

DAVID S. MURASKIN (DC Bar No. 1012451)
1620 L Street, NW Suite 630
Washington, D.C. 20036
(202) 861-5245
dmuraskin@publicjustice.net

KELLAN SMITH (CA Bar No. 318911)*
Public Justice, P.C.
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8209
ksmith@publicjustice.net

*Counsel for Plaintiff*

*\*Kellan Smith's application for admission to this Court is currently pending and scheduled to take place September 14, 2020 having received confirmation from the Court's attorney admissions office that they are in receipt of all his admission materials.*