**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, <br><br> *Defendants*. | Civil Action No. 20-2552 (RDM) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case concerns the administration of the Beef Checkoff Program, a federal initiative that, among other things, funds generic advertising of beef products through mandatory assessments on cattle sales and imports.  Plaintiff Ranchers-Cattlemen Action Legal Fund ("R-CALF") brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, against the U.S. Department of Agriculture ("USDA") and the Secretary of Agriculture.[1]  In its complaint, R-CALF alleges that the USDA substantively amended the Beef Checkoff Program in violation of the APA by entering into certain agreements (known as "Memoranda of Understanding" or "MOUs") with the Qualified State Beef Councils that help administer the program rather than engaging in notice-and-comment rulemaking under 5 U.S.C. § 553.  Dkt. 1 at 5 (Compl. ¶ 17).  The case is now before the Court on the USDA's motion to dismiss for lack of jurisdiction and for failure to state a claim, Dkt. 11, in which the USDA argues that R-CALF

---

[1]  For ease of reference, the Court refers to Defendants collectively as the USDA, except where otherwise indicated.

lacks standing to challenge the MOUs and that R-CALFs claims are precluded by earlier litigation in the District of Montana, Dkt. 11-1 at 2–3.

For the reasons set forth below, the Court concludes that R-CALF has adequately alleged the elements of associational standing and, accordingly, will **DENY** USDA's motion to dismiss for lack of jurisdiction.  But that conclusion merely resolves the USDA's *facial* challenge to the adequacy of R-CALF's complaint; it does not resolve the *factual* question whether R-CALF actually has standing.  Because the Court must (or, at least, is inclined to) resolve that question before proceeding to the USDA's preclusion defense, the Court will **DENY** without prejudice USDA's motion to dismiss for failure to state a claim and will **ORDER** further briefing (and discovery, if necessary) concerning the factual basis for R-CALF's associational standing.

## I. BACKGROUND

The Beef Checkoff Program is a federal initiative that promotes the marketing of "beef and beef products" using funds collected through a mandatory assessment on cattle sales and imports.  7 U.S.C. § 2901(b).  The program was established in the Beef Promotion and Research Act of 1985 ("Beef Act"), Pub. L. No. 99-198, § 1601, 99 Stat. 1354, 1597–1606 (codified at 7 U.S.C. § 2901–2911), which Congress enacted with the goal of "carrying out a coordinated program of promotion and research designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for beef and beef products."  7 U.S.C. § 2901(b).

The Beef Act directed the USDA to implement the statute's substantive provisions through a "beef promotion and research order," 7 U.S.C. § 2903(b), which USDA promulgated in July 1986.  *See* Beef Promotion and Research Order ("Beef Order"), 51 Fed. Reg. 26,132 (July 18, 1986) (codified at 7 C.F.R. pt. 1260); *see also* 7 U.S.C. § 2904 (setting forth the

"required terms" of the beef promotion and research order).  Together, the Beef Act and the Beef Order establish the Beef Checkoff Program and provide for its funding through a one-dollar-per-head-of-cattle "checkoff" or assessment, 7 U.S.C. § 2904(8)(A); 7 C.F.R. 1260.172(a), "on all cattle sold in the United States and on cattle, beef, and beef products imported into the United States," 7 U.S.C. § 2901(b).

The Beef Act and Beef Order created two national entities to administer the program under USDA oversight: the Cattlemen's Beef Promotion and Research Board ("Beef Board") and the Beef Promotion Operating Committee ("Operating Committee").  7 U.S.C. § 2904(1)–(5); 7 C.F.R. §§ 1260.141, 1260.161.  In addition, Congress contemplated a role for certain beef-promotion entities operating at the state level, known as Qualified State Beef Councils, or QSBCs.  *See* 7 U.S.C. §§ 2904(8), 2905.  A QSBC is a "beef promotion entity" that (1) is either "authorized by State statute" or "organized and operating within a State;" (2) "receives voluntary assessments or contributions;" (3) "conducts beef promotion, research, and consumer and industry information programs;" and (4) is "certified by the [Beef Board] . . . as the beef promotion entity in such State."  7 C.F.R. § 1260.115; *see also id.* § 1260.181 (setting forth the requirements for the Beef Board to certify a QSBC).  QSBCs perform several functions in support of the Beef Checkoff Program, including serving as liaisons between the Beef Board and state cattle producers, 7 U.S.C. § 2905; collecting the one-dollar-per-head checkoff assessments on the Beef Board's behalf, 7 U.S.C. § 2904(8); 7 C.F.R. § 1260.172(a); electing, as a group, half the members of the Operating Committee, 7 C.F.R. § 1260.161(a); *id.* § 1260.112; and conducting beef promotion, research, and consumer and industry information programs, *id.* § 1260.181(a).

To foster the QSBCs' operations, the Beef Act and Beef Order permit cattle producers to divert up to 50 cents per head of cattle from their checkoff assessment to their local QSBC. 7 U.S.C. § 2904(8)(C); 7 C.F.R. § 1260.172(a)(3).  In practice, the USDA has permitted QSBCs to retain 50 cents of every checkoff dollar they collect and to forward the rest to the Beef Board. *See* Beef Promotion and Research, 84 Fed. Reg. 20,765, 20,766 (May 13, 2019).  Cattle producers, however, may opt out of this arrangement and elect to have their entire assessment sent to the federal program. *Id.* at 20,767.  The Beef Order also places limits on how QSBCs may spend the funds they receive: specifically, QSBCs must conduct or fund "plans or projects for promotion, research, consumer information and industry information, with respect to beef and beef products," 7 C.F.R. § 1260.169(a), intended to "strengthen the beef industry's position in the marketplace," *id.* § 1260.181(b)(1).  QSBCs may "[n]ot use council funds collected pursuant to [the Beef Checkoff Program] for the purpose of influencing governmental policy or action, or to fund plans or projects which make use of any unfair or deceptive acts or practices including unfair or deceptive acts or practices with respect to the quality, value or use of any competing product." *Id.* § 1260.131(b)(7).  This case concerns the funds that the QSBCs obtain through the checkoff program, and in particular the uses to which the QSBCs put those funds.

When it comes to challenging aspects of the Beef Checkoff Program, this is not R-CALF's first rodeo.  The story of this litigation begins in the District of Montana, four years before the filing of the complaint in this action.  In 2016, R-CALF sued the USDA and the Secretary in the District of Montana, arguing that the Beef Checkoff Program violated the First Amendment insofar as it permitted QSBCs to retain a portion of cattle producers' checkoff assessments and to use that money to fund speech with which R-CALF's members disagreed. Dkt. 1 at 3 (Compl. ¶ 7); *see* Complaint, *R-CALF v. Perdue*, No. 16-CV-41 (D. Mont. May 2,

4

2016) (Dkt. 1).  Eventually, R-CALF obtained a preliminary injunction based, in part, on the district court's conclusion that "the Government's statutorily authorized control over the [QSBCs] appears inadequate to transform [QSBC] advertising into government speech."  *R-CALF v. Perdue (R-CALF I)*, No. 16-CV-41, 2017 WL 2671072, *7 (D. Mont. June 21, 2017).  Concluding that the mandatory assessments were thus used, in part, to fund private speech, the district court "enjoined [the USDA] from continuing to allow the Montana Beef Council to use the assessments that it collects under the Beef Checkoff Program to fund its advertising campaigns, unless the payer provides prior affirmative consent authorizing the [QSBC] to retain a portion of the payer's assessment," *id.* at *8.  The Ninth Circuit affirmed, holding that the district court had not abused its discretion in granting the preliminary injunction.  *R-CALF v. Perdue (R-CALF II)*, 718 F. App'x 541, 542 (9th Cir. 2018).

After the district court issued the preliminary injunction, but before the case proceeded to summary judgment, the USDA began entering into Memoranda of Understanding ("MOUs") with QSBCs across the country.  Dkt. 1 at 4 (Compl. ¶ 9).  These MOUs, which R-CALF alleges are "identical" for each QSBC, *id.* (Compl. ¶ 10), increase the USDA's oversight over QSBCs' use of funds acquired through the Beef Checkoff Program.  The MOUs grant the Secretary the power to "review[] and approve[] the QSBCs' budgets and marketing plans;" permit "government officials [to] participate in QSBC board meetings at which promotional and funding decisions are made;" and "allow the Secretary to decertify a noncompliant QSBC, thereby terminating its access to checkoff funds."  *R-CALF v. Vilsack (R-CALF IV)*, 6 F.4th 983, 986–87 (9th Cir. 2021).  Significantly, they also grant the Secretary pre-approval authority over "any and all promotion, advertising, research, and consumer information plans and projects" undertaken by QSBCs, *id.* at 986, as well as over "all contracts" QSBCs make with third parties

to produce advertisements and promotional materials, and "any plans or projects" developed under those contracts, *id.* at 987.  The MOUs do not require pre-approval, however, of "noncontractual transfers of checkoff funds to third parties to produce promotional materials." *Id.* (emphasis added).  Instead, "recipients of these transfers" need only "identify their expenditures in an annual accounting" and "promot[e] beef without being unfair, deceptive, or political." *Id.* "The MOUs allow the Secretary to decertify a noncompliant QSBC, thereby terminating its access to checkoff funds." *Id.*

At summary judgment, the USDA and defendant-intervenor QSBCs argued that, as a result of the MOUs, the federal government exerted sufficient control of the QSBC speech to remedy any First Amendment deficiency in the program.  *See R-CALF v. Perdue (R-CALF III)*, 449 F. Supp. 3d 944, 951–56 (D. Mont. 2020).  The district court agreed, concluding that the MOUs provide the USDA with "significant discretion to approve or reject QSBC speech . . . such that QSBC speech constitutes government speech." *Id.* at 955.

The Ninth Circuit affirmed.  *R-CALF IV*, 6 F.4th at 991.  Invoking the Supreme Court's decision in *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560–61 (2005)—which upheld the national aspects of the Beef Checkoff Program against a First Amendment attack—the Ninth Circuit concluded that QSBC speech financed using checkoff funds counted as government speech because it was "effectively controlled" by the USDA.  *R-CALF IV*, 6 F.4th at 988 (quoting *Johanns*, 544 U.S. at 560).  It held, in particular, that "[p]romotional campaigns by QSBCs and contracted third parties subject to the Secretary's pre-approval are . . . plainly government speech" because the MOUs ensure USDA has "final approval authority over every word used in every promotional campaign." *Id.* at 989.  The Ninth Circuit further held that the payments QSBCs make to third party organizations are "effectively controlled" by the

government, even though they are not subject to USDA pre-approval, because the USDA ultimately has the "ability to control [that] speech." *Id.* at 990. In this regard, the court stressed that the USDA reviews and approves annual budgets and proposals of QSBCs' "anticipated expenses and disbursements" and "general description[s] of the proposed promotion . . . programs contemplated;" receives advanced notice of all QSBC board meetings, which allows the government to "participat[e] . . . in any discussions about payments to third parties;" "control[s] . . . the flow of assessment funds to the QSBCs;" and, in the final analysis, may wield "the threat of decertification under the MOUs and the regulations if [USDA] disapproves of the use of those funds. *Id.*

On September 11, 2020, six months after the district court in Montana granted summary judgment in favor of the USDA and defendant-intervenor QSBCs, R-CALF brought the present action against the USDA and the Secretary. *See* Dkt. 1 (Compl.). In its complaint, R-CALF alleges that the USDA "acted without observance of procedure required by law," 5 U.S.C. § 706(D), when it entered into the MOUs because those agreements "substantively amended the existing regulatory scheme . . . without complying with the APA's notice-and-comment requirements." Dkt. 1 at 4, 19 (Compl. ¶¶ 14, 73). R-CALF also alleges that the MOUs are "arbitrary and capricious," 5 U.S.C. § 706(A), because the regulatory changes they introduced were "not the product of reasoned decisionmaking." Dkt. 1 at 21 (Compl. ¶ 84). R-CALF, accordingly, asks the Court for an order "vacating and setting aside the MOUs . . . at issue" and "a declaration that the MOUs . . . are unlawful." *Id.* at 22 (Compl.).

On November 20, 2020, the USDA moved to dismiss R-CALF's complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim under Rule 12(b)(6). Dkt. 11. That motion is now before the Court.

## II.  ANALYSIS

According to USDA, two aspects of this case compel a dismissal.  First, USDA argues that R-CALF lacks standing to challenge the legality of the MOUs because neither R-CALF, nor its members, can plausibly allege an injury in fact traceable to the MOUs.  Dkt. 11-1 at 8.  Second, USDA contends that R-CALF is precluded from bringing its claims in this litigation, because it "already had a chance to bring its challenges to the MOUs" during the parties' prior litigation "before the Montana district court," yet chose not to do so.  *Id.*

The Court begins, as it must, with standing.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  "Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'"  *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (en banc)).  Because "defect[s] of standing" constitute "defect[s] in subject matter jurisdiction," *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), a challenge to standing is properly raised on a motion to dismiss under Rule 12(b)(1).

At the motion to dismiss stage, a challenge to the plaintiff's standing "may take one of two forms."  *Hale v. United States*, No. 13-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015).  First, a Rule 12(b)(1) motion "may raise a 'facial' challenge to the Court's jurisdiction."  *Id.*  A facial challenge asks whether the complaint alleges facts sufficient to establish the court's jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Owner-Operator Indep. Drivers Ass'n v. Dep't of Transp.*, 879 F.3d 339, 346–47 (D.C. Cir. 2018).  To survive a motion to dismiss, the plaintiff must plausibly allege the "three elements" that comprise the "irreducible constitutional minimum of standing": injury in fact, causality, and redressability.  *Lujan*, 504 U.S. at 560–61.  That is, the plaintiff must plausibly allege (1) a "concrete,"

"particularized," and "actual or imminent" "invasion of a legally protected interest" that is (2) "fairly traceable to the challenged action of the defendant" and (3) "likely" to be "redressed by a favorable decision." *Id.* at 560–61 (quotation marks and citations omitted); *Humane Soc'y of U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). In this posture, the Court must accept the factual allegations of the complaint as true, *Erby v. United States*, 424 F. Sup. 2d 180, 182 (D.D.C. 2006), but also assess the "plausibility" of the plaintiff's standing allegations in light of the relevant context and the Court's "judicial experience and common sense," *Humane Soc'y of U.S.*, 797 F.3d at 8 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

"Alternatively, a Rule 12(b)(1) motion may raise a 'factual' challenge to the Court's jurisdiction." *Hale*, 2015 WL 7760161, at \*3. When a motion to dismiss is framed in this manner, the Court "may not deny the motion . . . merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant" but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). The Court "has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," so long as it "afford[s] the nonmoving party an ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984) (citations omitted).

Here, the USDA's motion to dismiss raises only a facial challenge to R-CALF's standing allegations. Throughout its opening brief, the USDA repeatedly argues that R-CALF "has failed to *allege* . . . standing." Dkt. 11-1 at 15 (emphasis added). The USDA does not contest R-CALF's allegations of harm *as a matter of fact*; rather, it "credit[s] th[ose] allegation[s]" and maintains that, *as a matter of law*, they do not "establish injury in fact," *id.* at 18. And, in its

reply, USDA acknowledges that "while economic injuries of the type suggested by R-CALF . . . could potentially be cognizable, R-CALF's complaint does not *sufficiently allege* any . . . specific economic injuries caused by the MOUs."  Dkt. 14 at 12 (emphasis added).  Because the USDA only challenges the "*legal* sufficiency" of R-CALF's standing in this motion, *Phoenix Consulting, Inc.*, 216 F.3d at 40 (emphasis added), the Court will treat its motion to dismiss as a facial challenge.  As a result, at least for present purposes, the Court will "accept the allegations of the complaint as true" and will "construe 'the complaint in the light most favorable to the non-moving party.'"  *Hale*, 2015 WL 7760161, at *3 (quoting *Erby*, 424 F. Supp. 3d at 182).

A membership-based trade association like R-CALF can establish standing in one of two ways: it can assert "associational standing" to sue on behalf of its members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on its own behalf, *see People for Ethical Treatment of Animals v. USDA (PETA)*, 797 F.3d 1087 (D.C. Cir. 2015).  Here, R-CALF attempts to satisfy both standards.  The Court will first address associational standing and will then turn to organizational standing.

## A.     Associational Standing

Even when it is not itself injured, "an association may have standing solely as a representative of its members."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  To plead associational standing, a plaintiff must plausibly allege that (1) the plaintiff has at least one member who "would otherwise have standing to sue in [her] own right," (2) "the interests" the association "seeks to protect are germane to [its] purpose," and (3) "neither the claim asserted nor the relief requested required the participation of [the] individual members in the lawsuit."  *Hunt*, 432 U.S. at 343.  The USDA does not dispute that R-CALF has alleged facts sufficient to satisfy the second and third elements of the *Hunt* test, *see* Dkt. 11-1 at 14–17; Dkt. 13 at 13 n.4,

10

and the Court (which must satisfy itself that it has jurisdiction) agrees that neither element poses an obstacle to standing at this stage of the proceeding. The Court, accordingly, will focus on whether R-CALF has alleged enough to satisfy the first element—that at least one member of the association has standing to sue in her own right.

In its motion to dismiss, the USDA presses two arguments why R-CALF has failed to satisfy this element: first, it claims that the complaint "does not identify specific members who are allegedly injured by the MOUs," Dkt. 11-1 at 15; and second, it argues that R-CALF does not allege an injury that is either "traceable to the MOUs," or "redressable by the relief R-CALF seeks here of vacating and setting aside the MOUs," Dkt. 11-1 at 16. Although a close question, the Court is persuaded the R-CALF has alleged enough—although just enough—to carry its modest burden at this early stage of the proceeding.

1.      *R-CALF's Identification of Specific Members*

Under the first element of the *Hunt* test, "plaintiff-organizations [must] make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Various decisions from this district, however, disagree about whether a plaintiff-association is required to name a specific member at the pleading stage to satisfy the first element of the *Hunt* test or whether it is enough to allege facts supporting a plausible inference that an unnamed (but identifiable) member has or will suffer a cognizable harm. The general "requirement" that standing be supported at the summary judgment stage by "affidavits . . . *naming* the affected members" is uncontroversial. *Id.* at 498–99 (emphasis added). Whether the equivalent is required to survive a facial challenge to the sufficiency of the plaintiff's complain is unsettled.

At least four decisions in this district have required a plaintiff-association to identify an injured member by name at the motion to dismiss stage.  *See Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 298–99 (D.D.C. 2018); *Western Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 69–70 (D.D.C. 2013); *Californians for Renewable Energy v. U.S. Dep't of Energy*, 860 F. Supp. 2d 44, 48 (D.D.C. 2012); *Common Cause v. Biden*, 909 F. Supp. 2d 9, 21 n.6 (D.D.C. 2012).  But at least two other decisions have declined to do so.  *Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 46 n.7 (D.D.C. 2019); *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012); *see also Building & Constr. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc*., 448 F.3d 138, 145 (2d Cir. 2006) ("But the defendants cite to no authority—nor are we aware of any—that supports the proposition that an association must 'name names' in a complaint in order properly to allege injury in fact to its members.").

This conflict may arise from two, distinct strands of the Supreme Court's standing jurisprudence and from the difference between factual and facial motions to dismiss for lack of standing.  On the one hand, the decisions that require the plaintiff-organization to name its injured member typically point to the Supreme Court's command in *Summers v. Earth Island Institute* that "plaintiff-organizations make *specific allegations* establishing that at least one identified member ha[s] suffered or [will] suffer harm," 555 U.S. at 498 (emphasis added).  On the other hand, the decisions that have eschewed a naming requirement at the motion to dismiss stage have relied on the Supreme Court's statement in *Lujan v. Defenders of Wildlife* that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim,'" 504 U.S. at 561 (alternation in original)

(quoting *Lujan v. Nat'l Wildlife Found.*, 497 U.S. 871, 889 (1990)).  *Compare, e.g.*, *Conf. of State Bank Supervisors*, 313 F. Supp. 3d at 298 (naming requirement), *with Ass'n of Am. Physicians & Surgeons, Inc.*, 901 F. Supp. 2d at 31 (no naming requirement).

Any tension between *Summers* and *Lujan* dissipates, however, when the Court focuses on the distinction between factual challenges and facial motions to dismiss for lack of standing. Although *Summers* stresses the need specifically to identify at least one injured member, it does so in the context of cases where standing had been assessed at summary judgment or where the district court had before it "affidavits" for the purposes of establishing standing.  555 U.S. at 498–99 (discussing *Lujan*, 504 U.S. at 563; *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972); and *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990)).  And elsewhere in the opinion, the Court addresses the need for "individual affidavits" in certain cases to help "assure itself that some [organizational] members" will be harmed.  *Id.* at 499.  Indeed, in *Summers* itself, the district court had entered final judgment invalidating five regulations.  *Id.* at 492.  *Lujan*, in contrast, stressed that standing must be assessed "with the manner and degree of evidence required at the success stages of the litigation," and observed that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" and that "general allegations" are often sufficient.  504 U.S. at 561.

The *Summers* Court's emphasis on "affidavits" suggests that the requirement for "specific allegations" to "identify" a member who is harmed, and any corollary requirement to name specific members, applies only to factual challenges to standing and to later stages of the litigation, such as summary judgment.  When presented with a factual challenge to standing, courts routinely consider affidavits and other evidence, and courts at times permit jurisdictional discovery.  *See Phoenix Consulting, Inc.*, 216 F.3d at 40; *Prakash*, 727 F.2d 1179–80; *see also*

*Public Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6 (D.D.C. 2018); *Public Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60 (D.D.C. 2019).  Similarly, when the D.C. Circuit considers standing, it often does so in the context of direct petitions for review of agency action, where the D.C. Circuit requires the petitioner to "supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review," unless "the petitioner's standing is . . . self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 196 (D.C. Cir. 2002).

But facial challenges brought under Rule 12(b)(1) are different.  When a motion to dismiss poses a facial challenge to standing, courts generally operate "in a manner similar to a motion to dismiss under Rule 12(b)(6)," *Hale*, 2015 WL 7760161, at *3, and so do not consider material outside the allegations in the pleadings.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).  Since the USDA has not contested the factual basis for the Court's standing in its motion to dismiss, the Court must take R-CALF's allegations to be true and must also "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (alternation in original) (quotation marks omitted).

Here, R-CALF has alleged that its "members are comprised exclusively of independent, domestic cattle producers," Dkt. 1 at 6 (Compl. ¶ 27), and that certain QSBC speech funded using checkoff assessments "promotes corporate consolidation in the beef industry and . . . make[s] no effort to distinguish domestic beef from other beef," *id.* at 7 (Compl. ¶ 30), and, in so doing, "harms independent, domestic producers," *id.* at 9 (Compl. ¶ 35); *see also id.* at 3, 7, 9 (Compl. ¶¶ 6, 30, 37).  These allegations, although general, sufficiently plead that at least one of R-CALF's members—if not most of its members—have suffered an injury from the speech R-CALF identifies: they are "independent, domestic producers" who are allegedly harmed by

14

advertisements that fail to distinguish between "domestic beef" and imported beef or speech that promotes consolidation.

R-CALF will, of course, be required to show more at "successive stages of the litigation," *Arpaio*, 797 F.3d at 19 (quoting *Lujan*, 504 U.S. at 561), including naming, in affidavits or declarations, specific members who have been harmed by the MOUs R-CALF challenges, *see Council of Parent Attorneys & Advocates, Inc.*, 365 F. Supp. 3d at 46 n.7.  Ultimately, the Court must satisfy itself not just that R-CALF has plausibly alleged standing, but also that it, in fact, has standing.  *See Steel Co.*, 523 U.S. at 95 ("[E]very federal appellate court has a special obligation to satisfy itself . . . of its own jurisdiction." (alteration in original) (quotation marks omitted)).  But at least for now, R-CALF can survive a facial challenge to its standing without identifying specific, injured members by name in its complaint.

> 2.     *R-CALF Members' Injury*

That brings us to the nature of the injury R-CALF alleges its members have suffered and will suffer as a result of the challenged MOUs.  The Court notes at the outset that the harm associated with the challenged conduct—*i.e.*, that the "USDA failed to utilize the notice-and-comment procedures required by the [APA]," Dkt. 1 at 5 (Compl. ¶ 17)—is a "procedural injury."  *Summers*, 555 U.S. at 496.  Standing alone, procedural injuries are not enough to establish an injury in fact.  As the Supreme Court explained in *Summers v. Earth Island Institute*, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *Id.*

With this in mind, R-CALF identifies two interests that, in its view, are sufficiently concrete to establish an injury in fact beyond a violation of a procedural right.  Unlike in the Montana district court litigation, neither of those injuries implicates the First Amendment rights

of any of its members; R-CALF does not allege any First Amendment injury in this case,[2] nor

could it do so.  That is because the Ninth Circuit has held that the MOUs that R-CALF seeks to

set aside actually prevent R-CALF's members from suffering any First Amendment wrong.

Hence, success in this case would not avert a First Amendment wrong and, indeed, it might

inflict one.  Given this constraint, R-CALF asserts that its members will suffer two financial

harms.  Those alleged harms arguably arise from promotional activities of QSBCs, but they have

no constitutional—or free speech—underpinnings.

First, R-CALF asserts that "payers into a program," such as R-CALF's members, "have a

financial interest in its proper administration and thus suffer an economic injury-in-fact if it is

not properly administered."  Dkt. 13 at 14 (citing Dkt. 1 at 3 (Compl. ¶ 6)).  Second, R-CALF

claims that its members have suffered and will continue to suffer "financial injury" from the

MOUs because "money taken and used by the state councils due to the MOUs" goes to fund

speech (1) that "promote[s] 'consolidation in the beef industry,' which drives down prices and

thereby financially 'threatens independent ranchers,'" Dkt. 13 at 16–17 (quoting Dkt. 1 at 7–8

(Compl. ¶ 30)), and (2) that makes "no effort to distinguish between domestic beef from other

beef, which harms domestic producers," Dkt. 1 at 9 (Compl. ¶ 37); *see* Dkt. 13 at 16.

R-CALF's first argument—*i.e.*, that its members "have a financial interest in its proper

administration and thus suffer an economic injury-in-fact if it is not properly administered"—is

---

[2] *See* Dkt. 11-1 at 16 ("Unlike in its Montana suit, R-CALF raises no First Amendment claim
and therefore asserts no First Amendment injury based upon speech with which it disagrees.");
Dkt. 13 at 13 (responding that "it does not follow that a plaintiff seeking to establish a violation
of the APA's notice-and-comment procedures needs to separately raise a First Amendment
claim, or that the APA violation can only be actionable if it produces a First Amendment harm,"
but not arguing that R-CALF has asserted a First Amendment harm); *see also id.* ("[T]he
Complaint makes clear the MOUs are causing R-CALF's independent rancher members injuries
*other than* First Amendment harms." (emphasis added)).

unconvincing.  Dkt. 13 at 14.  For this proposition, R-CALF invokes two precedents:  *Resolute Forest Products, Inc. v. USDA*, 130 F. Supp. 3d 81 (D.D.C. 2015), and *United States v. United Foods, Inc.*, 533 U.S. 405 (2001).  Neither is helpful.  *Resolute Forest Products* concerned an array of constitutional and APA challenges to the USDA's administrative order implementing the Softwood Lumber Checkoff Program (*i.e.*, the counterpart to the Beef Order here).  The Court concluded that the plaintiff's injury in fact was "straightforward" because the plaintiff "ha[d] been paying assessments under the [Softwood Lumber Checkoff] Order," and it was challenging the lawfulness of that order.  *Id.* at 90.  As the Court explained, "a judgment voiding the order would alleviate Plaintiff's alleged injury," *id.*—that is, making payments pursuant to an invalid order.  Here, in contrast, the MOUs do not require R-CALF members to pay the assessments at issue, nor do they impose any other obligations on cattle producers.  They, instead, impose obligations on the QSBCs and the Secretary.

 *United Foods* is unhelpful for two reasons.  First, the Supreme Court's decision does not discuss standing.  Second, that omission is unsurprising because the plaintiff's standing was self-evident and premised on grounds that have no bearing on the present case.  There, unlike here, the plaintiff challenged a checkoff program—and, in particular, the imposition of mandatory assessments used to fund promotional activity—on the ground that the program violated the plaintiff's First Amendment rights.  533 U.S. at 408-09.  Whether framed in terms of the financial loss (payment of the assessments) or constitutional injury (compelled speech in violation of the First Amendment), the plaintiff asserted a cognizable injury in fact.  Here, in contrast, R-CALF does not challenge the Beef Act, the Beef Order, or the statutory assessments, and it does not assert any constitutional injury.

At one level, the Court understands the First Amendment implications of the present suit. R-CALF had made progress with respect to its First Amendment challenge in the Montana litigation and, indeed, had obtained a preliminary injunction before the USDA and QSBCs entered the MOUs.  *R-CALF I*, 2017 WL 2671072, at *8.  And it lost the case after the MOUs were adopted.  *R-CALF III*, 449 F. Supp. 3d at 955.  One might reasonably wonder, then, whether R-CALF might plausibly allege that it has standing because a win before this Court might allow the association to return to court in Montana or elsewhere to renew its challenge to the state-administered portion of the Beef Checkoff Program based on the theory that it had successfully advanced before the MOUs were adopted.  But that approach suffers from a number of difficulties.  Most notably—and dispositively—R-CALF does not make this argument, and the complaint contains no allegations that would permit the Court to reach the issue.  That, moreover, is presumably no accident.  R-CALF made a decision not to pursue that approach— perhaps because it would invite the preclusion argument that the USDA now presses or because the argument faces other difficulties.  Those difficulties, moreover, are substantial.  For one thing, the theory involves substantial speculation about what the USDA and the courts would do if the MOUs are set aside.  And, for another thing, it is far from clear that R-CALF could assert a First Amendment injury here, in a case in which the association seeks to set aside the very MOUs that the Ninth Circuit has held *cured* any First Amendment problem.

Without a First Amendment injury, then, R-CALF is left to press the amorphous theory that its members have a financial interest in the proper administration of a program that they help fund.  It offers no support, however, for that sweeping theory of standing, and the D.C. Circuit rejected a similar claim to standing in *Humane Society of the United States v. Perdue*, 935 F.3d 598, 604 (D.C. Cir. 2019).  In that case, a pork farmer who paid assessments pursuant to the Pork

Checkoff Program sought, as here, to challenge an aspect of the management of the checkoff program: he "oppose[d] the misuse of checkoff funds . . . for the purpose of influencing legislation," because he "believe[d] those efforts [we]re harmful to [him] and other independent farmers." *Id.* at 603 (quotation marks omitted) (third alteration in original).  The D.C. Circuit concluded that the farmer did not "explain how his pork business [wa]s harmed by lobbying to promote the pork industry." *Id.* at 604.  That left him with a theory of standing similar to that at issue here—namely, that he suffered an injury in fact merely because he paid into the checkoff program and opposed the use of those funds for lobbying.  The D.C. Circuit was unpersuaded, explaining that such a "theory of injury . . . falls short" because it "predicate[s] [the plaintiff's] Article III standing on a 'mere interest in a problem or an ideological injury,'" *id.* at 604, and "[a]n 'interest in the proper administration of the laws' is canonically 'nonconcrete,'" *id.* (quoting *Summers*, 555 U.S. at 497).  The farmer's asserted injury based on his "general opposition to the [Pork] Council's lobbying and the government's funding of it . . . declares 'only a generally available grievance about government,' which 'does not state an Article III case or controversy.'" *Id.* (quoting *Lujan*, 504 U.S. at 573–74).

That reasoning applies with equal force to R-CALF's first theory of injury, which merely asserts a right to sue any time a plaintiff who pays into a government program disagrees with the way those funds are used.  R-CALF's first theory, accordingly, fails as a matter of law.

R-CALF's second theory of standing relies on a concept of injury that the D.C. Circuit approved in *Humane Society*, and, accordingly, it is more promising.  Relying on *Humane Society*, R-CALF argues that a "payer into a checkoff program can allege an 'economic injury' by showing that the challenged activity 'diminished [his] return on investment' or 'reduced [his]

bottom line.'"  Dkt. 13 at 16 (quoting *Humane Society*, 935 F.3d at 602–03).  In its complaint, R-CALF alleges that QSBCs

> [f]requently . . . have used checkoff funds to promote speech which favors corporate consolidation in the beef industry that harms independent cattle producers; and to pay for advertisements that make no effort to distinguish domestic beef producers from other beef which harms domestic producers that produce a superior product consumers would favor.  Moreover, . . . much of the money retained and used by state beef councils under the federal Beef Checkoff program gets funneled to the National Cattlemen's Beef Association and other entities that further the interest of meat packing companies, not ranchers.

Dkt. 1 at 3 (Compl. ¶ 6); *accord id.* at 7, 9 (Compl. ¶¶ 30, 37).  Paragraph 35 adds that "the MOUs allow for unaccountable state beef councils to funnel money obtained through producer assessments to third party organizations . . . [that] then use that money to fund speech that promotes consolidation in the beef industry, which harms independent, domestic producers."  *Id.* at 8–9 (Compl. ¶ 35).  Finally, the complaint alleges facts sufficient to connect the asserted violations of the APA to these asserted harms.  Paragraph 38, for example, alleges that "R-CALF and its members were prevented from raising their objections to the MOUs," including the absence of USDA review of QSBC's "oral speech" and certain "third-party speech" funded with assessments, *id.* at 10 (Compl. ¶ 38), and Paragraph 68 alleges that the "USDA failed to demonstrate [that] it considered controls over the state beef councils' speech" or how the MOUs would affect "the speech of the state beef councils and the private third-party entities they . . . fund[] to promote[] consolidation within the beef industry," which "harms independent producers," *id.* at 17 (Compl. ¶ 68).

Taken as true, the facts alleged in the complaint are enough to survive a facial challenge to R-CALF's standing.  R-CALF alleges a particularized, concrete interest its members possess separate and apart from their interest in notice-and-comment rulemaking—*i.e.*, that speech allowed by the MOUs "threaten[s]" the "livelihoods" of independent, domestic ranchers, *id.* at 9

(Compl. ¶ 37), by "favor[ing] corporate consolidation in the beef industry" and "mak[ing] no effort to distinguish domestic beef from other beef," *id.* at 3 (Compl. ¶ 6).  And, it further alleges that the asserted violations of the APA prevented R-CALF and its members from commenting on these issues before the USDA adopted the MOUs and relieved the USDA of the responsibility to offer reasoned responses to their concerns.  *Id.* at 10 (Compl. ¶ 38).  Drawing all reasonable inferences in R-CALF's favor, R-CALF alleges that its members suffer a financial injury as a result of QSBC speech.

   For its part, the USDA does not dispute that the financial injuries R-CALF alleges might suffice under Article III; it admits that "economic injuries of the type suggested by R-CALF's second category could potentially be cognizable."  Dkt. 14 at 12.  But USDA insists that R-CALF's allegations are too "vague" and also fail to establish causation and redressability.  *Id.* at 17.  In short, according to the USDA, the "complaint does not sufficiently allege any such specific economic injuries caused by the MOUs" and "does not contain any allegation linking the MOUs to any particular speech."  *Id.* at 12.

   The Court is unpersuaded.  In the context of a facial challenge, the court will "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (alternation in original) (quoting *Lujan v. Nat'l Wildlife Found.*, 497 U.S. 871, 889 (1990)).  R-CALF alleges that QSBCs engage in speech that harms the financial interests of independent, domestic farmers, and it explains how its members are injured: the speech "favors corporate consolidation in the beef industry" and "make[s] no effort to distinguish domestic beef from other beef."  Dkt. 1 at 3 (Compl. ¶ 6).

   The USDA is also wrong to suggest that the complaint fails to tie this speech to the MOUs.  "Establishing causation in the context of a procedural injury requires showing two

21

causal links": (1) "one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement]," and (2) "one connecting that substantive decision to the plaintiff's particularized injury." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017) (alterations in original) (quoting *Fla. Audobon Soc'y*, 94 F.3d at 668). "[W]ith respect to the first link," the plaintiff "need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result." *Id.* Rather, "[a]ll that is necessary is to show that the procedural step was connected to the substantive result." *Id.* (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)).

These requirements are satisfied here. R-CALF alleges that the MOUs might have contained more favorable provisions had the USDA promulgated them through notice-and-comment rulemaking. It avers, for example, that if it and its members had been given "the opportunity to participate in rulemaking" and if the USDA "ha[d] before it all relevant information," *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011), the USDA might have prevented QSBCs from using checkoff dollars to fund speech that, according to R-CALF, is harmful to the financial interests of its members. *See* Dkt. 1 at 17, 20 (Compl. ¶¶ 68, 69, 78).

As to the second link, Paragraph 35 of the complaint alleges that the MOUs, as currently written, "allow" QSBCs "to fund speech that promotes consolidation in the beef industry." Dkt. 1 at 8–9 (Compl. ¶ 35). USDA takes issue with that characterization, insisting that "the MOUs do not expand what the QSBCs are 'allowed' to do, but rather [only] clarify the relationship between [the] USDA and the QSBCs." Dkt. 14 at 18. But that argument goes beyond the face of the complaint. The USDA, moreover, overstates the distinction between the "relationship

between [the] USDA and the QSBCs" and the substantive decisions made by the QSBCs with input from the USDA.  As the Ninth Circuit observed in *R-CALF IV*, the MOUs establish a detailed system pursuant to which the USDA approves and oversees QSBC speech, so much so that, under the MOUs, the USDA "effectively control[s]" QSBC speech.  6 F.4th at 986–88.  It is not a leap too far to assume, at this early stage of the proceeding, that the structure and extent of that oversight could have affected the substance of the speech at issue and, in particular, its effect on independent, domestic producers.

The USDA's redressability argument founders because, "in a case alleging a procedural injury," courts "'relax the redressability and imminence requirements' of standing."  *Ctr. for Biological Diversity*, 861 F.3d at 182.  To establish redressability in this context, a plaintiff need show only that, if the agency were to follow the proper procedures, there is "at least [a] possibility that it could reach a different conclusion."  *Id.* at 185.  Here, the complaint points to additional "controls over state beef councils' speech" that the USDA might have considered had it engaged in a notice-and-comment rulemaking, including limiting "the state beef councils' ability to fund private third-party speech USDA never reviews" and reviewing "the state beef council[s'] oral speech."  Dkt. 1 at 17 (Compl. ¶ 68).  Although perhaps more of a stretch, R-CALF also plausibly alleges that, had the USDA employed the notice-and-comment process, the Department might have been persuaded to abandon the funding of speech by QSBCs altogether.  *Id.* at 17–18 (Compl. ¶ 69).

For these reasons, the Court rejects the USDA's facial challenge to R-CALF's associational standing.  The Court does so, however, with an important caveat: although R-CALF's allegations suffice to survive a *facial* motion to dismiss, R-CALF will face a far more substantial hurdle at the next stage of the proceeding, when it will bear the burden of proving that

at least one named member has suffered or will suffer a concrete injury in fact that is fairly

traceable to the procedural wrongs alleged in the complaint and that a favorable decision is likely

to redress such injury.  That may prove to be a tall order in the context of this case, where R-

CALF does not allege that any of its members have suffered a constitutional injury and where it

will not be easy to demonstrate that the challenged conduct has—or will—cause any of its

members to suffer a nonspeculative, financial harm.  That question, however, is for another day.[3]

## B.     Organizational Standing

Although the Court need not reach R-CALF's alternative argument—that it has

organizational standing—in light of the preceding analysis, the Court will briefly address the

question to streamline further proceedings in this matter.  Article III requires an organization

suing in its own right, like any individual plaintiff, "to show actual or threatened injury in fact

that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court

decision."  *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quotation

marks omitted).  "An organization must allege more than a frustration of its purpose because

frustration of an organization's objectives 'is the type of abstract concern that does not impart

standing.'"  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting

*Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).  In this

---

[3] In its opening brief, the USDA suggests that R-CALF may be required to establish
associational standing on a state-by-state basis, because the agency actions at issue—the
MOUs—were entered into separately with each QSBC.  *See* Dkt. 11-1 at 17 n.3; *see also* Dkt. 13
at 11 n.2.  This raises the possibility that R-CALF will need to identify at least one member who
is harmed for each MOU.  Resolving this issue now would be premature, however, because the
Court has no record before it as to the financial effects of QSBC speech on R-CALF's members,
much less any evidence about whether QSBC speech causes any cognizable harm beyond the
borders of the relevant state.  In addition, the parties have not addressed whether a particularized
nexus is needed to challenge an MOU—that is, may a producer from State A, who did not pay
assessments in State B, challenge an MOU governing QSBC speech in State B?

circuit, "organizations that allege that their activities have been impeded" have standing, while "those that merely allege that their mission has been compromised" do not. *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

To satisfy the injury in fact requirement, an organization must establish that it "has suffered a 'concrete and demonstrable injury to [its] activities.'" *PETA*, 797 F.3d at 1093 (quoting *Equal Rts. Ctr.*, 633 F.3d at 1138). R-CALF contends that it has suffered such an injury because, "since USDA entered into the MOUs at issue, R-CALF has seen its resources drained in order to educate ranchers and consumers about the MOUs and their failure to adequately protect R-CALF and its members' interest." Dkt. 1 at 8 (Compl. ¶ 35). R-CALF claims, for example, that it has "added to its presentation materials regarding how the MOUs allow for unaccountable state beef councils to funnel money obtained through producer assessments to third party organizations . . . [that] then use that money to fund speech . . . which harms independent, domestic producers." *Id.* at 8–9 (Compl. ¶ 35). R-CALF also alleges that it "educates the public on the MOUs' failure to ensure the state beef councils remain democratically accountable to ranchers" and "has produced social media videos about the MOUs, discussed the MOUs on radio programs, and allotted time during its annual convention to discuss the MOUs in order to educate ranchers and consumers," including "to educate ranchers about how the MOUs are unlawful." *Id.* at 9 (Compl. ¶ 35).

Even accepting R-CALF's allegations as true, the caselaw in this circuit forecloses this theory of standing. In *Food & Water Watch*, the D.C. Circuit held that a consumer-advocacy organization lacked standing to challenge the implementation of regulations that permitted employees of poultry-processing establishments to take a more active role in the inspection process. 808 F.3d at 921. The plaintiff-organization had alleged (1) that its "primary purpose[]"

was "to educate the public about food systems that guarantee safe, wholesome food," (2) that allowing the USDA's poultry inspection regulation to go into effect would require the organization to "increase the resources that it spends on educating the general public and its members that the [new] rules do not allow for the inspection of poultry product" in a manner consistent with federal statutes, and (3) that the organization would have to "spend time and money on increasing its efforts to educate members of the public that just because a poultry product has a USDA inspection legend does not mean that it is not adulterated and is wholesome." *Id.* at 920. The D.C. Circuit was unpersuaded, concluding that the plaintiff "alleged nothing more than an abstract injury to [the organization's] interests that is insufficient to support standing." *Id.* at 921. The plaintiff's allegations failed, the court explained, because "nothing . . . indicate[d] that [the plaintiff's] organizational activities ha[d] been perceptibly impaired in any way." *Id.* The plaintiff, for example, "d[id] not allege that the [regulations] limit[ed] its ability to seek redress for a violation of law," nor did it "allege that the USDA's action restrict[ed] the flow of information that [it] use[d] to educate its members." *Id.* Most significantly for present purposes, *Food & Water Watch* held that "spend[ing] resources educating . . . members and the public" about new regulations is not enough to establish an injury in fact. *Id.* Simply put, "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Id.* at 920 (quoting *Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434).

R-CALF's theory of organizational standing closely resembles the failed arguments in *Food & Water Watch*. R-CALF alleges that, since the MOUs came into being, it has expended resources "educat[ing] ranchers and consumers about the MOUs and their failure to adequately

protect R-CALF and its members' interest."  Dkt. 1 at 8 (Compl. ¶ 35).  This statement mirrors

the standing allegations in *Food & Water Watch*, where the plaintiff argued that it would have to

"increase the resources that it spends on educating the general public and its members" that the

new regulations did not comply with federal statutes and inadequately protected their interest in

"food systems that guarantee safe, wholesome food."  808 F.3d at 920.

   R-CALF contends that *Food & Water Watch* is inapplicable because R-CALF alleges

that the MOUs "subject[] [it] 'to operational costs beyond those normally expended'" and that "it

took steps in response to the unlawful MOUs it would not have otherwise taken."  Dkt. 13 at 25

(quoting *Food & Water Watch, Inc.*, 808 F.3d at 920).  But the plaintiff in *Food & Water Watch*

unsuccessfully pressed similar allegations.  It alleged, for example, that it undertook educational

efforts it would not have otherwise taken and, as a result, would have "to *increase* the resources

it spends on educati[on]."  808 F.3d at 920 (emphasis added).  In this respect, R-CALF

misapprehends the meaning of the beyond-normal-operational-costs theory of injury.  This test

originated in *National Taxpayers Union*, where the D.C. Circuit held that a plaintiff organization

lacked standing because "there [wa]s no evidence that [the challenged law] subjected [the

plaintiff-organization] to operational costs beyond those normally expended to review, challenge,

and educate the public about revenue-related legislation."  68 F.3d at 1434.  *National Taxpayers

Union* demonstrates that, to succeed on a beyond-normal-operational-costs theory, an

organization must allege that some aspect of the challenged action (here, adopting the MOUs)

makes the organization's educational efforts concerning that particular action *more difficult to

achieve*, thereby requiring "operational costs beyond those normally expended to . . . educate"

about matters that might relate to the organization mission.  *Id.*  A plaintiff-organization can

make this showing by alleging, for example, that some aspect of the challenged action

"perceptibly impaired" its ability to provide educational services. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *accord PETA*, 797 F.3d at 1095 (finding standing where the agency's "denial of access to . . . information . . . perceptibly impaired [the organization's] ability . . . to educate the public" (quotation marks omitted)); *see also Food & Water Watch, Inc.*, 80 F.3d at 920–21. But it is not enough for an organization simply to allege that it has taken action it otherwise might not have. If that were the rule, an organization would "be able to secure a lower standard for Article III standing," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), any time a government policy conflicted with its mission, simply by incurring new expenses to educate others about the policy.

Therefore, the Court concludes that R-CALF has failed to plausibly allege organizational standing.

**C.    Res Judicata**

The USDA urges the Court to dismiss R-CALF's complaint under Rule 12(b)(6) on the ground that R-CALF's claims are precluded by the final judgment in the Montana litigation. There is considerable uncertainty, however, about whether a federal court may resolve a *res judicata* defense before it is satisfied that it has Article III jurisdiction over a case. In *Steel Co. v. Citizens for a Better Environment*, the Supreme Court rejected the erstwhile practice of some federal courts of "assuming" "hypothetical jurisdiction" to address straightforward, non-jurisdictional issues in order to avoid reaching more difficult jurisdictional questions. 523 U.S. at 94. Quoting *Ex parte McCardle*, the Court explained: "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* (quoting 74 U.S. (7 Wall.) 506, 514 (1868)).

Although the D.C. Circuit has yet to consider the question, the Eighth Circuit and at least a handful of district courts have read *Steel Co.* to mean that "[f]ederal courts generally must address Article III subject-matter jurisdiction before reaching . . . *res judicata*," which is "a non-jurisdictional question." *In re Athens/Alpha Gas Corp.*, 715 F.3d 230, 235 (8th Cir. 2013); *see also, e.g.*, *Park v. Bank of Am., N.A.*, 92 F. Supp. 3d 976, 982 (S.D. Cal. 2015); *Harrison v. Robinson Rancheria Band of Pomo Indians Bus. Council*, No. 13-cv-1413, 2013 WL 5442987, at *5 (N.D. Cal. 2013).  Not every court agrees, however.  Most notably, the First Circuit has held that a federal court may bypass a difficult question of subject-matter jurisdiction to dismiss an action on *res judicata* grounds.  *Penobscot Nation v. Ga.-Pac. Corp.*, 254 F.3d 317, 324–25 (1st Cir. 2001).  As the First Circuit explained, "[t]he *Steel Co.* limitation is fundamentally an objection to deciding 'the merits,'" and that "concern that is not implicated" by "conclud[ing] that [a prior] judgment . . . would prevent the district court from affording any different relief." *Id.*

Determining the precise contours of the *Steel Co.* rule is no easy task.  On the one hand, the majority opinion quotes *McCardle* for the broad proposition that federal courts must address jurisdiction before all other matters.  *Steel Co.*, 523 U.S. at 94.  But the majority also acknowledged that "some [Supreme Court] cases . . . have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question." *Id.* at 101.  Only five justices joined the majority opinion, moreover, and two of those justices, Justices O'Connor and Kennedy, wrote separately to clarify the limited reach of the decision.  As Justice O'Connor, joined by Justice Kennedy, explained,

> I . . . agree with the Court's statement that federal courts should be certain of their jurisdiction before reaching the merits of a case.  As the Court acknowledges . . . several of our decisions "have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question."  The

> opinion of the Court adequately describes why the assumption of jurisdiction
> was defensible in those cases, and why it is not in this case.  I write separately
> to note that, in my view, the Court's opinion should not be read as cataloging an
> exhaustive list of circumstances under which federal courts may exercise
> judgment in "reserv[ing] difficult questions of . . . jurisdiction when the case
> alternatively could be resolved on the merits in favor of the same party."

523 U.S. at 110 (O'Connor, J., concurring) (citations omitted).  Nothing in *Steel Co.*, then,

directly answers the question whether a court may consider a claim preclusion defense while it is

still uncertain of its subject-matter jurisdiction, and neither the D.C. Circuit nor any judge on this

Court has had occasion to address that issue.

Given the unsettled state of the law on this question, the Court will postpone addressing

the USDA's claim preclusion defense until after the parties submit evidence and more complete

briefing addressing the Court's jurisdiction.  Even if courts may, at times, sidestep difficult

jurisdictional questions where "(1) the merits question is more readily resolved, and (2) the

prevailing party on the merits would be the same as the prevailing party were jurisdiction

denied," *Steel Co.*, 523 U.S. at 93, the Court is unpersuaded that this is such a case.  Here, the

preclusion issue is no more straightforward than the jurisdictional issue, and resolution of the

preclusion issue in advance of the jurisdictional issue would also require the Court to resolve a

difficult question of first impression in this jurisdiction regarding the reach of the judicial power.

The jurisdictional issue, moreover, is not a difficult one—it is simply underdeveloped at this

early stage of the litigation, where the parties have offered no evidence in support of their

respective positions.  And, finally, it is far from clear that the same party is likely to prevail on

the jurisdictional and claim preclusion issues.  At least based on the information currently before

the Court, it appears that R-CALF has a high hill to climb with respect to jurisdiction, while the

USDA may find it difficult to demonstrate that this action—which involves a procedural

challenge to the USDA's adoption of the MOUs—"share[s] the same nucleus of facts" with the

Montana litigation—which involves a First Amendment challenge to the Beef Act and Beef Order, *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004) (quotation marks omitted).

The Court, accordingly, concludes that the most prudent and straightforward way to adjudicate this case is for the parties to develop the facts relevant to standing and to provide the Court with further submissions—whether framed as cross-motions for summary judgment on the question of standing or as a factual motion to dismiss pursuant to Rule 12(b)(1)—regarding that threshold question.  The Court will, therefore, deny the USDA's motion to dismiss on grounds of claim preclusion, but will do so without prejudice to renew that motion should the Court conclude that R-CALF has standing to sue.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' motion to dismiss for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6), Dkt. 11, is hereby **DENIED** without prejudice.  In light of the Court's remaining concerns about its subject-matter jurisdiction, the Court will convene the parties for a status conference to set a schedule for further proceedings relating to standing.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 29, 2021

31