## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF AMERICA, | Case No. 1:20-cv-02552-RDM |
| *Plaintiff*, | |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, and | **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | |
| *Defendants*. | |

# TABLE OF CONTENTS

I.   R-CALF's Members Have Standing Based on the MOUs' Authorization of Generic
     Checkoff Advertising ................................................................................................. 3

  A.   R-CALF's Members Have an Injury-in-Fact Under the Competitor Standing
       Doctrine........................................................................................................................ 3

    1.   USDA Misstates the D.C. Circuit's Requirement that Government Action "Directly"
         Increase Competition Against the Plaintiff...................................................................... 4

      i.    Generic Checkoff Advertising Expands the Pool of Competitors by Homogenizing
            Consumers' Perceptions of Domestic and Imported Beef........................................... 7

      ii.   Generic Checkoff Advertising Exposes R-CALF's Members to Injurious Price
            Competition by Suppressing Consumers' Willingness to Pay for Beef .................... 9

    2.   USDA Overreads the Requirement that a Plaintiff be a "Direct and Current"
         Competitor ................................................................................................................... 12

      i.    The Beef and Cattle Markets Cannot Be Separated.................................................. 13

      ii.   The Relevant Market is National and International in Scope .................................... 14

    3.   Dr. Dimofte Meets the Rule 702 Standard, but Dr. Kaiser Does Not.......................... 16

      i.    Dr. Dimofte's Evidence is Reliable ......................................................................... 17

      ii.   Dr. Kaiser's Testimony Does Not Establish a Genuine Factual Issue..................... 23

  B.   R-CALF's Members' Injuries Are Traceable to the MOUs ........................................... 28

    1.   The MOUs Authorize the Generic Advertising Causing Injury ................................... 28

    2.   Without the MOUs, the Beef Checkoff Program Would Otherwise Allegedly Be
         Illegal as Unconstitutional Compelled Speech ........................................................... 31

    3.   Causation is Measured by Comparing What the Agency Did and Should Have Done . 33

  C.   R-CALF's Members' Injuries Are Redressable ............................................................ 35

    1.   R-CALF's Members Would See At Least Partial Relief from a Win on the Merits ..... 36

    2.   USDA's Remaining Redressability and Reviewability Arguments Fail ...................... 39

II.  R-CALF Has Standing Because the Checkoff Funds Corporate Advocacy Contrary to Its
     Members' Interests ......................................................................................................... 40

III. Conclusion ...................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Air Excursions LLC v. Yellen*, 66 F.4th 272 (D.C. Cir. 2023) .......................................... 4, 5, 6, 10

*Am. Inst. of Certified Pub. Accounts. v. IRS*, 804 F.3d 1193 (D.C. Cir. 2015).................... 5, 9, 10

*Am. Lib. Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005)............................................................. 13

*Am. Trucking Ass'ns, Inc. v. FMCSA*, 724 F.3d 243 (D.C. Cir. 2013)........................................ 31

*Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822 (D.C. Cir. 2000) .................................................... 29

*\*Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998)
.................................................................................. 28, 29, 31, 32, 33, 34, 35

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ...................................................................... 4, 7

*Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468 (D.C. Cir. 2014) ...................... 32

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) ................................................. 19

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................................... 1

*\*Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493 (D.C. Cir. 1996)................................. 6, 7, 22

*Brown v. Dep't of Educ.*, 600 U.S. 551 (2023)...................................................................... 34, 35

*\*Canadian Lumber Trade All. v. United States*, 517 F.3d 1319 (Fed. Cir. 2008).............. 41, 42, 44

*Church of Scientology of Cal. v. United States*, 506 U.S. 9 (1992)............................................. 37

*Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252 (9th Cir. 2001) ................................... 18

*Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009 (D.C. Cir. 2003)............................................... 30

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)................................................................. 44

*Damon v. Sun Co.*, 87 F.3d 1467 (1st Cir. 1996)......................................................................... 21

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...................................................... 21

*Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250 (D.D.C. 2015) ....................... 31

*Delta Constr. Co. v. EPA*, 783 F.3d 1291 (D.C. Cir. 2015) ................................................... 36, 37

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ............................................... 1

*Internet Fin. Servs., LLC v. Law Firm of Larson-Jackson, P.C.*, 310 F. Supp. 2d 1
(D.D.C. 2004)............................................................................................................................ 18

*Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*, 311 F. Supp. 3d 187 (D.D.C. 2018)................. 37

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298 (2012)............................................... 42

*\*La. Energy & Power Auth. v. FERC*, 141 F.3d 364 (D.C. Cir. 1998) ...................................... 5, 10

*Larson v. Valente*, 456 U.S. 228 (1982) ............................................................. 36, 39

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ................................................ 27, 32

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................ 30, 31, 37

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988) .................................. 21

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ................................................ 12

*Mobile Relay Assocs. v. FCC*, 457 F.3d 1 (D.C. Cir. 2006) ...................................... 6

*Nat. Res. Def. Council v. EPA*, 755 F.3d 1010 (D.C. Cir. 2014) ................... 14, 31, 38

*Nat'l Ass'n of Mut. Ins. Cos. v. HUD*, __ F. Supp. 3d __, 2023 WL 6142257
(D.D.C. Sept. 19, 2023) .................................................................................. 37

*Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7 (D.D.C. 1999) ..................... 34, 39

*New World Radio, Inc. v. FCC*, 294 F.3d 164 (D.C. Cir. 2002) .................................. 14

*Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017) ............................... 30, 31, 32, 33

*Organic Trade Ass'n v. USDA*, 370 F. Supp. 98 (D.D.C. 2019) ............................... 7, 8, 9

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.v.*,
69 F. Supp. 3d 175 (D.D.C. 2014) ................................................................... 18

*PSSI Glob. Servs., LLC v. FCC*, 983 F.3d 1(D.C. Cir. 2020) ........................... 6, 11, 14

*R-CALF v. Perdue*, 718 F. App'x 541 (9th Cir. 2018) ............................................... 33

*R-CALF v. Perdue*, No. CV-16-41, 2017 WL 2671072 (D. Mont. June 21, 2017) ..................... 33

*R-CALF v. USDA*, 573 F. Supp. 3d 324 (D.D.C. 2021) ............................................... 33

*R-CALF v. Vilsack*, No. CV-16-41, 2021 WL 461691 (D. Mont. Feb. 9, 2021) ..................... 33

*Save Jobs USA v. Dep't of Homeland Sec.*, 942 F.3d 504 (D.C. Cir. 2019) .................... 5, 12

*Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270 (W.D.N.Y. 2019) .................. 18, 19

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ...................................................... 31, 32

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010) ........................................ 5, 6, 7, 9, 41

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011) ............................................. 40

*Simon v. Republic of Hungary*, 77 F.4th 1077 (D.C. Cir. 2023) .................................. 42

*State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015) ............................ 6

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ....................................................................................... 12

*Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) .................. 5, 10

*Teton Hist. Aviation Found. v. Dep't of Def.*, 785 F.3d 719 (D.C. Cir. 2015) ............................ 39

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ........................................................ 40

*U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326 (D.C. Cir. 2002) .................................... 5, 10

*United States v. $17,900.00 in U.S. Currency*, 859 F.3d 1085 (D.C. Cir. 2017)........................ 18

*United States v. H&R Block, Inc.*, 831 F. Supp. 2d 27 (D.D.C. 2011) ................................ 18, 25

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) .................................................... 37

*Waterkeepers Chesapeake v. FERC*, 56 F.4th 45 (D.C. Cir. 2022).................................... 39

*Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27 (D.D.C. 2003) .................................... 21

*Wheaton Coll. v. Sebelius*, 703 F.3d 551 (D.C. Cir. 2012)............................................ 39

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ........................................................ 32

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) .................................... 35

*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019).................................... 39

**Statutes**

5 U.S.C. § 553(e) .................................................................................... 34

5 U.S.C. § 701(a)(1) ................................................................................ 40

5 U.S.C. § 701(a)(2) ................................................................................ 40

5 U.S.C. § 702 ...................................................................................... 40

5 U.S.C. § 704 ...................................................................................... 40

7 U.S.C. § 2901(a)(4) .............................................................................. 13

7 U.S.C. §§ 182(2), 192–95 ........................................................................ 38

Consol. Appropriations Act, 2016, Pub. L. No. 114-113, § 759, 129 Stat. 2242, 2284–85
  (2015) .......................................................................................... 45

**Rules**

Fed. R. Evid. 702 ................................................................................ 4, 16

Congress established the Beef Checkoff program to help the United States cattle and beef industry. But the Department of Agriculture and Secretary Vilsack (together, "USDA" or "the agency") allow the program to operate in a way that hurts those same domestic ranchers and cattle producers. In an effort to avoid the merits of a challenge to the agency's failure to consider comments on the Beef Checkoff's rules, USDA contests the standing of the Ranchers-Cattlemen Action Legal Fund ("R-CALF") — an association of the kind of domestic cattle producers whom Congress intended the Checkoff to benefit. But there is no genuine dispute of material fact. USDA injures R-CALF's members by allowing the Checkoff to fund advertising that homogenizes R-CALF's members' products with cheaper imported beef and reduces consumers' willingness to pay for beef. The agency also concedes it allows Checkoff funds to support advocacy groups that fund similar ads and campaign against R-CALF's members' interests. Any and all of this establishes R-CALF's standing.

The agency confusingly intermixes the standing elements to make the issues seem more complicated than they are. But a straightforward application of the familiar three-part standing inquiry resolves this stage of the litigation in R-CALF's favor.[1]

*Injury*. Part I.A explains R-CALF's members' injury-in-fact under the competitor standing doctrine. As R-CALF's expert, Dr. Dimofte, showed, generic Checkoff advertising causes consumers to view those members' products as homogenous with imported beef and

---

[1] USDA does not contest that the issues in this lawsuit are "germane" to R-CALF's purpose, that the relief sought — a rulemaking — does not require the participation of R-CALF's individual members, nor that R-CALF has satisfied the zone of interests test. *See* Dkt. 45-2 at 21, 46–47 (Pl.'s Mem. in Supp. Mot. for Partial Summ. J. ("R-CALF Opening Br.")); Dkt. 52-1 at 21 (Defs.' Opp'n to Pl.'s Mot. for Partial Summ J. & Mem. in Supp. Defs.' Cross-Mot. for Partial Summ. J.). Therefore, the parties agree that if R-CALF's members have standing, R-CALF can proceed on their behalf. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997).

reduces consumers' willingness to pay for beef. This establishes a competitive injury under longstanding D.C. Circuit precedent. The agency objects that Dr. Dimofte's evidence is neither relevant nor material, but those arguments misread R-CALF's theory of the case and substitute decontextualized buzzwords for precedents' true holdings. USDA also contends that Dr. Dimofte's analysis is too unreliable to be admissible. To the contrary, Dr. Dimofte's testimony easily satisfies Federal Rule of Evidence 702. The scattershot admissibility arguments the agency levels at Dr. Dimofte better describe the testimony of its own rebuttal expert, Dr. Kaiser, whose opinions and analysis are not admissible and thus do not matter for summary judgment.

*Traceability.* Part I.B draws the causal link between those competitive injuries and the memoranda of understanding (MOUs) at issue here. The MOUs cause R-CALF's members' injuries because they authorize harmful conduct that would otherwise allegedly be illegal as unconstitutionally compelled speech. A primary theme of USDA's brief is that the MOUs "authorize" nothing because they impose no substantive limits on generic beef advertising. But the existence of the MOUs is a but-for cause of the harmful advertising. And it is precisely USDA's *failure* to impose any substantive guardrails on the content of Checkoff advertising that permits the homogenizing advertising causing injury here. This traceability theory fits comfortably within the D.C. Circuit's caselaw — a body of precedent the agency all but ignores.

*Redressability*. Part I.C shows that R-CALF has established redressability in this procedural injury case. USDA claims the injury is not redressable because other actors or contingencies might also injure R-CALF's members. But these contentions collapse under the principle that a judicial remedy need not redress a plaintiff's every injury for that plaintiff to have standing.

Moreover, even if Checkoff advertising did not exist, Part II demonstrates R-CALF's standing based on the Checkoff's funding of the National Cattlemen's Beef Association (NCBA) and U.S. Meat Export Federation (USMEF), which not only fund their own generic advertising, but also advocate for policies adverse to R-CALF's members' interests. USDA must ask this Court to split from the Federal Circuit to avoid the conclusion that this too causes injury.

Accordingly, this Court should conclude that R-CALF has standing, grant its motion for partial summary judgment, and deny USDA's cross-motion.

I.    **R-CALF's Members Have Standing Based on the MOUs' Authorization of Generic Checkoff Advertising**

R-CALF's members have standing in their own right to challenge the MOUs because: (A) generic Checkoff advertising homogenizes consumer perceptions of domestic and imported beef and suppresses consumers' willingness to pay for beef, creating a competitive injury for R-CALF's members; (B) the MOUs authorize generic Checkoff advertising that would otherwise allegedly be illegal as unconstitutionally compelled speech; and (C) if USDA proceeded through notice-and-comment, those members could convince USDA to require that Checkoff advertising distinguish the products of domestic cattle and beef producers.[2]

A.  *R-CALF's Members Have an Injury-in-Fact Under the Competitor Standing Doctrine*

R-CALF's expert's testimony establishes that generic Checkoff advertising homogenizes consumer perceptions of domestic and imported beef and reduces consumer willingness to pay for beef. USDA asserts that Dr. Dimofte's evidence is neither relevant nor material, *see, e.g.*, Dkt. 51-1 at 82–84, 91–92 (Defs.' Resp. to Pl.'s SUF ¶¶ 193, 195–96, 210), but these arguments

---

[2]    USDA caricatures R-CALF's standing theory through a pictograph, *see* Dkt. 52-1 at 36, that relies on tangents inconsistent with a wide variety of standing law, as detailed below through the application of the established tripartite standing framework. *See* Attachment A (cross-referencing where each argument raised in USDA's pictograph is addressed herein).

fundamentally misapprehend the competitor standing doctrine. Initially, the agency asserts that the ads do not "directly" increase competition against R-CALF's members, but its arguments wrongly ascribe totemic importance to out-of-context phrases pulled from the D.C. Circuit's caselaw, the proper application of which illustrates R-CALF's standing. *See* Part I.A.1. Next, USDA contends that R-CALF's members are not "direct and current" competitors, but this too overreads the caselaw and implausibly asserts that R-CALF's members — U.S. cattle producers — do not compete with foreign cattle and beef producers. *See* Part I.A.2.

USDA also argues that Dr. Dimofte's analysis is so unreliable that it is inadmissible. But as Part I.A.3 demonstrates, the agency's effort to nitpick Dr. Dimofte's expert evidence fails to establish a factual issue as to his reliability. In contrast, as the agency tacitly admits by sequestering its rebuttal expert to the last few pages of its brief, *see* Dkt. 52-1 at 52–55, its expert's cavalier approach to statistical analysis and rampant mistakes — several of which are of a kind he admitted render his testimony unreliable — mean his critiques of Dr. Dimofte and his own analysis are themselves inadmissible. *See generally* Fed. R. Evid. 702(c)–(d).

1. USDA Misstates the D.C. Circuit's Requirement that Government Action "Directly" Increase Competition Against the Plaintiff

The agency argues that R-CALF has failed to demonstrate that "the challenged agency action directly increases competition" and has merely alleged "a skewed playing field." *See* Dkt. 52-1 at 11–12 (quoting *Air Excursions LLC v. Yellen*, 66 F.4th 272, 280 (D.C. Cir. 2023) (cleaned up)); *see also id.* at 28–31. These arguments reduce precedent to buzzwords. A faithful reading of the caselaw confirms that R-CALF's injury satisfies the D.C. Circuit's standard.

Begin where the parties agree. A government action that "directly 'enlarge[s] the pool of competitors'" constitutes a sufficiently direct increase in competition. *See* Dkt. 52-1 at 30 (quoting *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015)). Thus, the D.C. Circuit has found

standing when, for example, existing market participants must compete against more applicants for grant funding, *Sherley v. Sebelius*, 610 F.3d 69, 73–74 (D.C. Cir. 2010); against more tax preparers to provide tax preparation services, *Am. Inst. of Certified Pub. Accounts. v. IRS*, 804 F.3d 1193, 1197–99 (D.C. Cir. 2015) ("*AICPA*"); or against more workers for positions in the tech industry, *Save Jobs USA v. Dep't of Homeland Sec.*, 942 F.3d 504, 508–12 (D.C. Cir. 2019).

In addition to its pool-of-competitors cases, the D.C. Circuit has also long "recognized that price competition is injurious competition." *Air Excursions LLC*, 66 F.4th at 281. Importantly, the court has never held that *how* a government action exposes a plaintiff to price competition matters. Some cases involve the government removing price regulations on a competitor. *See, e.g.*, *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367–68 (D.C. Cir. 1998) (FERC allowed competitor energy company to sell electricity at lower prices). Others involve government subsidies that allow a competitor to undercut a plaintiff's prices. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (government subsidization allowed competitor to sell internet services at lower rate). Still others deal with government action that increases the supply of a particular good, thereby depressing prices. *See, e.g.*, *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 93–94 (D.C. Cir. 2002) (holding that sugar growers had standing to challenge agency action that increased supply of sugar "and thereby depressed prices"). However the government causes a plaintiff to compete against lower-priced products, the resulting injury is the same.

The parties also agree that on the other side of the line, competitor standing requires more than just a "skewed playing field." *See* Dkt. 52-1 at 28–31. But the parties diverge on what that means. USDA imbues the phrase with self-serving and unsupported meaning, suggesting that by distinguishing between "direct" effects and those that merely "skew the playing field," the D.C.

Circuit requires courts to ignore some kinds of ascertainable market harms. *See id.* Not so. The "skewing" cases stand for the unremarkable proposition that a plaintiff must show more than just the bare "favorable regulatory treatment of a competitor." *PSSI Glob. Servs., LLC v. FCC*, 983 F.3d 1, 12 (D.C. Cir. 2020). That is, a plaintiff must tie that unfair treatment to competitive harm.

The prototypical "skewing" case in which a plaintiff fails to establish standing involves a "windfall" — usually a direct government transfer of money — to a competitor without proof that "windfall" impacts other market players. *Air Excursions LLC*, 66 F.4th at 280–81; *PSSI*, 983 F.3d at 11–12; *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 13 (D.C. Cir. 2006); *cf. State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (rejecting plaintiff's claim that it had standing to challenge more stringent regulations imposed on a competitor on theory that competitor received a "reputational subsidy" that plaintiff did not show harmed it). These cases make the point that "a bare regulatory windfall [to another] . . . does not necessarily influence the competitor's pricing decisions or otherwise result in increased competition in the industry." *Air Excursions LLC*, 66 F.4th at 281. In short, the competitor standing doctrine requires explaining how the agency's favorable treatment of a competitor increased competition.

USDA also complains that R-CALF has shown only a skewed playing field because it has not provided "evidence showing that market shares among retail beef market competitors are substantially altered by the MOUs." Dkt. 52-1 at 31. But USDA's demand that R-CALF quantify precise retail effects is tantamount to requiring evidence of "lost sales, per se," which the D.C. Circuit has explicitly stated is *not* required for competitor standing. *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499 (D.C. Cir. 1996). "Rather the injury claimed is exposure to competition . . . ." *Id.* Thus, the D.C. Circuit in *Sherley* rejected a nearly identical argument that the plaintiffs, adult stem cell researchers, did not show that "an increase in funding for

embryonic stem cell research requires a diminution in funding for adult stem cell research." 610 F.3d at 73 (cleaned up). In the court's words: "Nor need [a plaintiff] do so." *Id.*

Here, R-CALF has demonstrated its members' increased "exposure to competition," *Bristol-Myers Squibb*, 91 F.3d at 1499, in two ways, either of which constitutes a direct competitive injury. First, by demonstrating that generic Checkoff advertising homogenizes consumers' perceptions of domestic and imported beef, R-CALF has shown that the agency action has expanded the pool of its members' competitors to include producers and importers of foreign beef and cattle. Second, R-CALF has proved injurious price competition by showing that generic Checkoff advertising reduces consumers' willingness to pay for its members' beef.

      i.     *Generic Checkoff Advertising Expands the Pool of Competitors by Homogenizing Consumers' Perceptions of Domestic and Imported Beef*

Befuddlingly, USDA asserts "R-CALF does not argue that USDA has taken any action that has 'enlarged the pool of competitors.'" Dkt. 52-1 at 29 (quoting *Arpaio*, 797 F.3d at 23) (alteration omitted). A casual glance at R-CALF's opening brief refutes this statement. *See* Dkt. 45-2 at 24 ("[G]eneric advertising . . . 'enlarges the pool of [R-CALF's members'] competitors, which will almost certainly cause an injury in fact to them as participants in the same market.'" (quoting *Arpaio*, 797 F.3d at 23) (cleaned up)); *id.* at 26 ("R-CALF's members challenge an agency action that broadened the pool of competitors, and thus increased competition against them."). R-CALF very much argues that by homogenizing consumers' perceptions of domestic and imported beef, generic Checkoff advertising expands the pool of competitors.

Nor is this a particularly novel application of the D.C. Circuit's pool-of-competitors cases. Consider *Organic Trade Ass'n v. USDA*, 370 F. Supp. 3d 98 (D.D.C. 2019), which held that organic livestock producers had standing to challenge the withdrawal of a rule that would have helped consumers differentiate the plaintiffs' products from their competitors'. The rule

would have required producers who wished to label their eggs "organic" to adhere to stricter livestock welfare standards. *Id.* at 106–10. As here, USDA argued the plaintiff could not establish competitor standing because the agency had merely chosen not to act, and such inaction did not directly "enlarge[] the pool of livestock producers" against whom those members must compete and thus did not "itself impose[] a competitive injury." *Id.* at 107. The court rejected this contention. *Id.* Noting that "organic operators . . . compete on the axis of livestock welfare standards," and that withdrawing the rule would inhibit the plaintiffs' members' ability to differentiate their products from lower-cost producers', *Organic Trade Ass'n* explained that USDA had "prevent[ed] a shrinkage of the pool of producers eligible to compete in the organic livestock market, to the detriment of OTA's members." *Id.* at 107–8.

*Organic Trade Ass'n* and this case are thus obvious parallels. Both are instances in which agency action — specifically, its failure to impose stricter regulations — has the effect of lumping the plaintiff's members' products into the same category as their competitors' products produced "at lower costs," *id.* at 108, and making it less likely that consumers will distinguish the plaintiff's members' products at the grocery store.

To the extent one can discern a response to *Organic Trade Ass'n* in the agency's brief, USDA seems to say that case is distinct because that rule "would have required identifiable [competitor] livestock producers to 'exit the organic market'," Dkt. 52-1 at 30, whereas here (reading between the lines), requiring Checkoff advertising to distinguish domestic and imported beef would not bar foreign producers or importers from the market. *Id.* But *Organic Trade Ass'n* noted it was possible competitors might have "come into compliance with" the stricter regulations, and the possibility that "the *number* of competitors [would] stay[] the same" did not

defeat standing. 370 F. Supp. 3d at 108. Because withdrawing the rule forced the plaintiff's

members to compete with undistinguished, cheaper goods, they suffered a competitive injury. *Id.*

It follows that, contra the agency's argument, Dr. Dimofte's evidence regarding generic

Checkoff advertising's homogenizing effect is not just material and relevant; it proves the

competitive injury. Dr. Dimofte found that as compared to Checkoff advertising that

distinguishes between domestic and imported beef, generic Checkoff advertising "has created

consumer perceptions of homogeneity (i.e., lack of differentiation) in the marketplace." Dkt. 45-

1 at 32 (Pl.'s SUF ¶ 180) (quoting Dkt. 43-1 at 20 (Dimofte Rep. ¶ 78(a))). This perception

places domestic beef and cattle producers in the same pool of competition as their foreign

counterparts. As Dr. Dimofte explained, in a homogenous market, "all products are seen as

similar, [so] there is no reason for consumers to consider any product attribute beyond price,

(i.e., consumers are encouraged to purchase the lowest priced beef)." Dkt. 45-1 at 37–38 (Pl.'s

SUF ¶ 211) (quoting Dkt. 43-1 at 29 (Dimofte Rep. ¶ 119)); *see also id.* at 35 (Pl.'s SUF ¶ 200)

(Dr. Dimofte "explained . . . when there is 'perceived homogeneity' in the beef market . . .

'differentiated beef producers are in direct competition with undifferentiated ones for consumer

favor.'" (quoting Dkt. 43-1 at 20 (Dimofte Rep. ¶ 79 n.57))). Dr. Dimofte's evidence

demonstrates that generic Checkoff advertising expands the pool of competitors by combining

two different pools — domestic cattle and beef producers and their foreign counterparts — in the

minds of consumers, a type of competitive injury the D.C. Circuit has long recognized. *See, e.g.*,

*AICPA*, 804 F.3d at 1197–99; *Sherley*, 610 F.3d at 72–74.

ii.    *Generic Checkoff Advertising Exposes R-CALF's Members to Injurious Price
       Competition by Suppressing Consumers' Willingness to Pay for Beef*

Though this Court could stop here, *see* Dkt. 45-2 at 28–31 (R-CALF Opening Br.),

R-CALF has also demonstrated an increase in price competition based on generic Checkoff

advertising's suppressive effect on consumers' willingness to pay for beef, *see id.* at 16, 28–31. USDA argues that R-CALF has not shown such an injury because it has not shown that the agency "lifted any price controls, as would be required to establish competitor standing" on a price competition theory. Dkt. 52-1 at 30. But as explained above, lifting price controls on a competitor is just one way the government can cause injury by driving down prices.

For example, the prices of internet services and sugar were not set by regulation in *U.S. Telecom Ass'n* or *Sugar Cane Growers*; nevertheless, government actions that reduced prices created an injury-in-fact. *See* 295 F.3d at 1330–32; 289 F.3d at 93–94. The point is the "result[]" of the government action, not the mechanism by which the government increases competition. *Air Excursions*, 66 F.4th at 279, 280, 281; *AICPA*, 804 F.3d at 1197 (focusing on the "result of the challenged government action"). And that makes sense — a dollar in economic injury from the removal of a price floor, *see, e.g.*, *La. Energy*, 141 F.3d at 367–68, and a dollar in economic injury from a government-caused glut of a commodity good, *see, e.g.*, *Sugar Cane Growers*, 289 F.3d at 93–94, each cost the injured party the same amount of money.

Here, as Dr. Dimofte's study demonstrates, the "result of the challenged government action," *AICPA*, 804 F.3d at 1197, is "a depressive effect," *Sugar Cane Growers*, 289 F.3d at 93–94, "on consumer willingness-to-pay and therefore on beef prices in the U.S.," Dkt. 45-1 at 32 (Pl.'s SUF ¶ 179) (quoting Dkt. 43-1 at 17 (Dimofte Rep. ¶ 64)). Specifically, Dr. Dimofte's meta-analysis found "that the current, generic Beef Checkoff ads did not improve willingness to pay relative to no beef advertising," but that the modified Checkoff ads "significantly improved

willingness to pay relative to both no beef advertising and the current Beef Checkoff ads." Dkt. 45-1 at 34 (Pl.'s SUF ¶ 193) (citing Dkt. 43-1 at 27 (Dimofte Rep. ¶ 116)).[3]

Dr. Dimofte's conclusions are particularly compelling because they are consistent with the agency's own recent findings. When beef products are labeled "Product of USA" — *i.e.*, when consumers can differentiate domestic and imported beef — consumers are willing to pay more than when the same products do not have such a label. *See* Dkt. 45-1 at 8 (Pl.'s SUF ¶ 43). The agency does not dispute the accuracy of its own findings. *See* Dkt. 51-1 at 14 (Defs.' Resp. to Pl.'s SUF ¶ 43). Rather, USDA argues that this evidence is immaterial because this case does not involve labeling requirements. *Id.* That misses the forest for the trees. This case *does* involve consumers' ability to distinguish domestic and imported beef and what happens when consumers are unable to do so. USDA's findings corroborate Dr. Dimofte's conclusions that when domestic beef is differentiated, consumers are willing to pay more, which benefits beef producers.

In sum, R-CALF has shown far more than simply "the favorable regulatory treatment of a competitor . . . caus[ing] a skewed playing field." *PSSI*, 983 F.3d at 11–12. This is not a case in which the government has bestowed some benefit on a competitor, untethered to any economic effects on a plaintiff. Here, R-CALF has standing because (i) generic Checkoff advertising

---

[3]     The agency misrepresents Dr. Dimofte's testimony on this point. *See* Dkt. 52-1 at 31–32 n.7. USDA claims that "Dr. Dimofte ultimately concluded that there was no statistically significant difference in willingness to pay between consumers shown a normal beef checkoff ad and consumers shown the [adjusted] ad." *Id.* (citing Dkt. 52-10 at 101 (Dimofte Dep. at 100:24– 25)). In reality, the cited segment of Dr. Dimofte's deposition says that the *national survey* did not find a statistically significant difference. *See* Dkt. 52-10 at 101 (Dimofte Dep. at 100:21) (asking about "the National Consumer Protection Study"). But nothing in his testimony contradicts the *meta-analysis* of all six surveys, which found precisely the difference in willingness to pay that the agency claims Dr. Dimofte did not. *See* Dkt. 45-1 at 34 (Pl.'s SUF ¶ 193). Nor does it contradict Dr. Dimofte's explanation that meta-analysis can provide "more precise overall estimates that more closely approximate the overall population effects." *Id.* (Pl.'s SUF ¶ 191).

expands the relevant pool of competitors to include foreign producers and importers, and (ii) exposes R-CALF's members to price competition by suppressing consumers' willingness to pay.

2.  USDA Overreads the Requirement that a Plaintiff be a "Direct and Current" Competitor

The agency contends that even if generic Checkoff advertising affects the national retail market for beef, R-CALF's members are not "direct and current" competitors in that national retail market. Dkt. 52-1 at 12, 32–34. R-CALF's members do not sell beef at retail, USDA notes, and so are not competing in "the market where *beef products are sold to consumers*." *Id.* at 32. Moreover, the agency argues that R-CALF's "members' geographic markets for cattle sales are regional, not national," and R-CALF has not shown any localized economic effect. *Id.* at 33.

Both arguments suffer the same fatal flaw: They "overread[] [the D.C. Circuit's] 'direct and current competitor' formulation, which simply distinguishes an existing market participant from a potential — and unduly speculative — participant." *Save Jobs USA*, 942 F.3d at 510; *see also Mendoza v. Perez*, 754 F.3d 1002, 1013 (D.C. Cir. 2014) (cautioning against "too narrow a view of what qualifies as participating in the . . . market"). R-CALF's members do not merely have the "potential" to compete against foreign producers and importers. *Save Jobs USA*, 942 F.3d at 510. They compete against those foreign firms today.[4]

---

[4]    In addition to these arguments, USDA asserts that one of R-CALF's members, Gary Hendrix, is not actually a member. *See* Dkt. 52-1 at 22 & n.3, 33 n.8; Dkt. 51-1 at 9–10 (Defs.' Resp. to Pl.'s SUF ¶ 31). USDA's quarrel appears to be that Mr. Hendrix is not a rancher, but a person who produces and sells domestic beef. Thus, the agency believes, he cannot qualify as a "cattle producer" for purposes of R-CALF membership. *See* Dkt. 52-1 at 33 n.8. But it is neither USDA's nor this Court's job to police R-CALF's interpretation of its own standards for membership; it is enough that there is uncontroverted testimony that Mr. Hendrix is a member. *See* Dkt. 45-1 at 6 (Pl.'s SUF ¶ 31) (first citing Dkt. 45-4 at 43 (Hendrix Decl. ¶ 1); and then citing Dkt. 45-4 at 3 n.1 (Bullard Decl. ¶ 4 n.1)); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) ("Where, as here, an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates."). In any case, this dispute is entirely irrelevant. An association need only demonstrate "that at least one member" has standing. *Am.*

i.      *The Beef and Cattle Markets Cannot Be Separated*

The agency apparently misses the irony of its argument that R-CALF's members lack standing because they do not sell beef to consumers at retail. Dkt. 52-1 at 32–33. The premise of Checkoff advertising is that increasing consumer demand for beef will benefit ranchers and cattle producers. *See* 7 U.S.C. § 2901(a)(4) (noting that "the maintenance and expansion of existing markets for beef and beef products are vital to the welfare of beef producers"). By claiming that retail sales of beef bear no relation to R-CALF's members' pocketbooks, USDA's argument boils down to asserting that the program it oversees is an exercise in futility.

In any case, as R-CALF's statement of undisputed material facts notes, and as USDA does not dispute, the agency *itself* has previously found that retail beef and cattle prices are linked. *See* Dkt. 45-1 at 3 (Pl.'s SUF ¶ 14) ("As USDA has explained: 'The demand for livestock is derived from the demand for meat. Knowing retail prices and price spreads from farm to retail gives us a clearer picture of what factors drive the demand for livestock.'" (quoting Dkt. 45-6 at 9 (Pl.'s SUF Ex. 3 at 9))); Dkt. 51-1 at 5 (Defs.' Resp. to Pl.'s SUF ¶ 14) ("Undisputed."); *see also* Dkt. 45-1 at 3 (Pl.'s SUF ¶ 13) (citing study that concluded "increases in retail beef demand are transferred to the farm level prices"); Dkt. 51-1 at 5 (Defs.' Resp. to Pl.'s SUF ¶ 13) ("Undisputed."). Presumably, USDA does not dispute its own findings here because doing so would fly in the face of economic logic. Firestone, for example, would suffer from a ban on the sale of cars, even though tires and cars are distinct goods. This is even more true with cattle and beef, where one cannot exist without the other.

But even if one could separate the market for retail beef and cattle, the agency is still wrong. USDA never disputes that R-CALF's members are "direct and current" competitors in

---

*Lib. Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005). USDA does not contest that R-CALF's other identified members are, in fact, members, so Mr. Hendrix's membership is moot.

the market in which they sell cattle to meatpackers. If consumers see no difference between imported and domestic beef, packers have an obvious incentive to source cheaper imported cattle rather than R-CALF's members' cattle. Dkt. 45-2 at 10, 27 (R-CALF Opening Br.); *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) (explaining that it is "a hardly-speculative exercise in naked capitalism" to predict that firms will "take advantage of" opportunity to source cheaper input products (cleaned up)). That is a competitive harm constituting an injury-in-fact, well before any beef hits the grocery store shelves. Thus, that R-CALF's members do not work behind the deli counter is neither here nor there.

    ii.    *The Relevant Market is National and International in Scope*

    Next, USDA argues that R-CALF must show competition in the local geographic areas where R-CALF's members live. Dkt. 52-1 at 33, 51. But the cases the agency relies on involved isolated markets. *See, e.g.*, *PSSI*, 983 F.3d at 11–12; *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170–72 (D.C. Cir. 2002). In *New World*, a radio station operating in Washington, D.C., challenged a license issued to a putative competitor in Pocomoke City, on the Eastern Shore of Maryland. 294 F.3d at 166. The court held that the petitioner lacked standing because it could not "allege that granting [the license in] *Pocomoke City* will, standing alone, financially injure New World's position in the *Washington, D.C.* marketplace." *Id.* at 171 (cleaned up). Similarly in *PSSI*, satellite operators who provided "little to no service" in the U.S. market and instead operated "almost exclusively abroad" could not challenge a competitor's license in the United States. 983 F.3d at 6, 11. Thus, these cases do not limit all competition to local markets, but merely explain that where putative "competitors serve distinct geographic markets," the alleged competitive "harm is too speculative" to constitute an injury. *Id.* at 11.

    Those facts are a far cry from the beef and cattle market in which R-CALF's members compete. It is of course accurate that R-CALF's members sell their cattle close to their homes.

But thanks to refrigeration and modern transportation, the beef and cattle market is national and international in scope. *See, e.g.*, Dkt. 45-1 at 5 (Pl.'s SUF ¶ 29) (explaining that R-CALF's members understand themselves to be "competing with the overall supply of cattle including cattle born and raised in other countries and imported to the United States"); Dkt. 45-4 at 14 (Wright Decl. ¶ 10) ("[T]he price I can receive for my cattle is largely determined by overall supply. This includes imported cattle and beef."); Dkt. 45-4 at 31 (Meyer Decl. ¶ 10) (explaining that "the presence of foreign beef products *in the United States market* suppresses the price that I can otherwise achieve with cattle" (emphasis added)).

Indeed, USDA itself treats the beef and cattle market as national. *See, e.g.*, Dkt. 45-1 at 11–12 (Pl.'s SUF ¶¶ 64–67) (describing USDA study on effect of increased Brazilian beef imports on U.S. beef market as a whole); *id.* at 12 (Pl.'s SUF ¶¶ 68–70) (describing USDA study of Canadian cattle imports on U.S. cattle market as a whole). So too does its expert, Dr. Kaiser — though for unrelated reasons described *infra*, his testimony is inadmissible. *See* Pl.'s Resp. to Defs.' SUF at 27 (Pl.'s Add'l Facts ¶ 12) (citing Dkt. 43-2 at 12–14 (Kaiser Rep. ¶ 30) (citing various studies of the "national" data regarding the "U.S. beef industry")). Thus, unlike *New World* and *PSSI*, the agency's assertion that R-CALF's members compete in purely local markets ignores market realities. Beef is simply not like the balkanized regional markets at issue in cases like *PSSI* and *New World*.

USDA disputes the materiality of R-CALF's members' beliefs that they compete in a national market. *See* Dkt. 51-1 at 8–9 (Defs.' Resp. to Pl.'s SUF ¶ 29). But because R-CALF's members could competently testify, based on their experiences as businesspersons in the cattle and beef sector, that they operate in a market shaped by national and international supply and

demand, their beliefs are plainly material to USDA's argument that only local factors matter when R-CALF's members sell their cattle.[5]

But even indulging USDA's implausible contention that this national market is really a collection of autarkic local markets — that the only beef sold in Nebraska is Nebraska beef — R-CALF still has standing. There is no dispute that QSBCs run generic Checkoff ads in their respective states. *See* Dkt. 51-1 at 41, 45, 47–48, 51 (Defs.' Resp. to Pl.'s SUF ¶¶ 108, 114, 120, 126). And Dr. Dimofte's analysis confirms that generic ads have a predictable effect on consumers' perceptions of beef as a homogenous commodity and on their willingness to pay for beef. *See* Dkt. 45-1 at 34–35 (Pl.'s SUF ¶¶ 193, 195–97). So, ads in hypothetical localized markets would still harm R-CALF's members who operate in those markets.

3.  Dr. Dimofte Meets the Rule 702 Standard, but Dr. Kaiser Does Not

In addition to trying to recast the law to avoid Dr. Dimofte's findings, USDA contends that none of Dr. Dimofte's evidence is admissible because his analysis is too unreliable. Dkt. 52-1 at 44–50; *see also* Fed. R. Evid. 702(c)–(d). The agency's attacks on Dr. Dimofte reprint, generally without citing, Dr. Kaiser's critiques. During discovery, however, the foundation for Dr. Kaiser's critiques and his regression analysis crumbled. Under Rule 702, Dr. Dimofte's opinions and supporting evidence are admissible. But Dr. Kaiser's opinions are not.

---

[5]     The parties agree that the scope of relief (*i.e.*, whether the court could vacate all the challenged MOUs or only those MOUs signed by the QSBCs in the states where Plaintiff's members reside) is not currently before the court. *See* Dkt. 45-2 at 6 n.1; Dkt. 51-2 at 22 n.3. Nevertheless, because USDA provides a lengthy footnote on remedy, *see* Dkt. 52-1 at 22 n.3, R-CALF notes that vacatur of each challenged MOU is appropriate for many of the same reasons that R-CALF's members do not compete in purely local markets. The U.S. beef and cattle market extends across state lines; cattle prices in Nebraska are affected by beef demand in New York, so a cattle producer in Nebraska has standing to challenge government action that suppresses New Yorkers' demand for steak. Further, it is not disputed that Checkoff dollars collected under the MOUs are used for national advertising. Dkt. 45-1 at 25 (Pl.'s SUF ¶ 132); Dkt. 51-1 at 54 (Defs.' Resp. to Pl.'s SUF ¶ 132). Again, the scope of remedy is not currently before this Court, and R-CALF will provide more fulsome briefing on that issue at the appropriate time.

i.    *Dr. Dimofte's Evidence is Reliable*

The agency contends Dr. Dimofte's opinions are unreliable: (1) because of "leading

questions and statements" and how the survey defined a "commodity," *see* Dkt. 52-1 at 46, 47–

48; (2) because of Dr. Dimofte's assertedly contradictory finding that consumers' "perceived

importance of beef source . . . was very high," *id.* at 46; (3) because Dr. Dimofte did not examine

"any actual or real-world consumer behavior," *id.* at 48–49; and (4) because Dr. Dimofte did not

explain how he arrived at estimates of consumers' overall willingness to pay in his national and

state surveys, *id.* at 49. None of these arguments holds water.

1.    Regarding the purportedly leading questions and statements and the survey's

(accurate) definition of a commodity, the agency presents no evidence that Dr. Dimofte's survey

design is somehow invalid under the prevailing norms of the field, nor that any putative

shortcoming in his survey design invalidates the underlying results (other than Dr. Kaiser's

critiques, which are themselves inadmissible, *see infra*). On the other hand, Dr. Dimofte testified

he "conducted the six studies in a manner consistent with the scientific standards of [his]

profession . . . [and] adhere[d] to the factors cited in the Federal Judicial Center's *Manual for*

*Complex Litigation*," that "[t]he methodology employed in designing, coding, conducting, and

analyzing the six studies conducted for this case is reliable, valid, and representative of those

used in marketing research science and practice," and that he "drew from [his own] expertise and

considered" various scholarship in "designing, coding, conducting, and analyzing the six

studies." Pl.'s Resp. to Defs.' SUF at 25–26 (Pl.'s Add'l Facts ¶ 2) (citing Dkt. 43-1 at 8

(Dimofte Rep. ¶¶ 24–26)); *see also* Dkt. 43-1 at 9–11 (Dimofte Rep. ¶¶ 31–43) (explaining

various aspects of survey design intended to avoid biased results).

In essence, the agency is attempting to substitute counsel's argument for evidence

controverting Dr. Dimofte's testimony as to the study's foundation and consistency with

accepted research standards. It cannot do so. *See Internet Fin. Servs., LLC v. Law Firm of Larson-Jackson, P.C.*, 310 F. Supp. 2d 1, 4 (D.D.C. 2004) ("Arguments of counsel do not substitute for evidence that establishes a genuine issue of material fact.").

Moreover, *even if* this Court were to agree that the wording of Dr. Dimofte's survey were somehow problematic, such "concerns about the wording and methodology of the survey . . . go to the weight, not the admissibility, of the evidence." *United States v. H&R Block, Inc.*, 831 F. Supp. 2d 27, 32 (D.D.C. 2011); *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263–64 (9th Cir. 2001) (similar). Indeed, the only case the agency cites from this circuit for the principle that flawed survey questions "indicate[] the unreliability of the [expert's] opinions," *see* Dkt. 52-1 at 46, found that such "concerns" did *not* "necessitate[] exclusion [of the survey] under Rule 702 and *Daubert*." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.v.*, 69 F. Supp. 3d 175, 211 n.11 (D.D.C. 2014). Of course, it is hornbook law that courts are not to weigh evidence or make credibility determinations on summary judgment. *See United States v. $17,900.00 in U.S. Currency*, 859 F.3d 1085, 1091 (D.C. Cir. 2017). Thus, because any concerns raised by the agency at most go to weight, not admissibility, they have no bearing on the summary judgment analysis here — although for the reasons stated below, following summary judgment, Dr. Dimofte's testimony will be the only admissible expert testimony produced by either party. And as explained elsewhere, his results are supported by numerous studies, including the agency's own, so the court will be able to grant summary judgment for Plaintiffs based on the existing record.[6]

---

[6]     The only case the agency cites in which a court excluded a survey at summary judgment, *Saxon Glass Technologies, Inc. v. Apple Inc.*, 393 F. Supp. 3d 270 (W.D.N.Y. 2019), dealt with errors much graver than any the agency asserts Dr. Dimofte made. *See* Dkt. 52-1 at 46 (citing *Saxon Glass*). *Saxon Glass* involved, in addition to questions that were indisputably leading, a survey that "had an insufficient sample size and failed to use a control." 393 F. Supp. 3d at 287.

2.    The agency contends that Dr. Dimofte's finding that "the perceived importance of beef source was very high" across all groups in the national study is both cherry-picked and contradicts his other evidence, Dkt. 52-1 at 46, but beyond these bald assertions, USDA fails to explain why it believes this to be the case.

On cherry-picking, the agency complains that Dr. Dimofte reported results for this question only for the national study, but not for any of the state surveys. *Id.* at 47. But the hallmark of cherry-picking is to report only those results *favorable* to a party. *See, e.g.*, *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (cited by USDA). A finding that consumers' baseline views on the importance of beef source are already high is not obviously favorable to either party. Indeed, Dr. Dimofte's inclusion of such non-favorable data strongly suggests he is *not* cherry-picking his facts. Moreover, the agency's complaint is that Dr. Dimofte did not "report the results for this question" in his expert report. Dkt. 52-1 at 47. But the agency received all of Dr. Dimofte's data during discovery. *See* Pl.'s Resp. to Defs.' SUF at 26 (Pl.'s Add'l Facts ¶ 4) (citing Dkt. 43-3 at 53–54 (Kaiser Dep. 204:19–206:14)). If the agency thought the state-level data on this point mattered, they and their expert were free to ask Dr. Dimofte

---

Here, the agency does not assert that Dr. Dimofte's sample size (over 1,000 across all six studies, as compared to "only 40 participants" in *Saxon Glass*) is insufficient. *Compare* Dkt. 45-1 at 31, 33 (Pl.'s SUF ¶¶ 169, 182–86), *with* 393 F. Supp. 3d at 287. Nor is there any dispute that Dr. Dimofte's analysis included a control group. *See* Dkt. 45-1 at 30 (Pl.'s SUF ¶ 168); Dkt. 51-1 at 68–69 (Defs.' Resp. to Pl.'s SUF ¶ 168) (not disputing accuracy of statement that Dr. Dimofte included "a *control* condition where consumers saw no beef advertisements"). Indeed, *Saxon Glass* went on to *deny* a motion to exclude a different survey which "used an appropriate sample size, separated participants into a control group and a test group, and at least somewhat comported with standard survey design," even despite the court's concern about that survey's "somewhat leading" question. 393 F. Supp. 3d. at 291. Thus, even indulging USDA's baseless critiques of Dr. Dimofte's survey design, the agency's own authority compels the conclusion that this does not render his analysis inadmissible.

about that issue and to conduct and present their own analysis. That they chose not to do so reveals their effort to create smoke without fire.

The agency also fails to explain what contradiction it believes there to exist between Dr. Dimofte's finding that "there was effectively not much more room for [consumers'] beliefs [as to the importance of beef source] to improve after the Beef Checkoff ads" and his findings that viewing an adjusted Checkoff ad made consumers more likely to view domestic beef as a distinct good from imported beef and more willing to pay for beef. *See* Dkt. 43-1 at 17–18, 27 (Dimofte Rep. ¶¶ 66, 68, 116). The importance consumers place on the source of their beef *in general* is a distinct question from whether they distinguish between *particular* different sources of beef and how much they are willing to pay for beef. There is no contradiction.

3.    USDA's complaint that Dr. Dimofte conducted a consumer survey rather than tracking real-world consumer behavior again seeks to substitute agency's counsel's self-serving arguments for actual expert evidence. *See* Dkt. 52-1 at 48–49, 51; Dkt. 51-1 at 82 (Defs.' Resp. to Pl.'s SUF ¶ 193). As Dr. Dimofte explained, "[m]uch of the applied social research enterprise employs survey research for the measurement of respondent perceptions, attitudes, and behaviors." Pl.'s Resp. to Defs.' SUF at 26 (Pl.'s Add'l Facts ¶ 3) (citing Dkt. 43-1 at 9 (Dimofte Rep. ¶ 32)). And it is not disputed "that hypothetical consumer surveys are 'regularly done' in 'the marketing literature.'" *See* Dkt. 51-1 at 108 (Defs.' Resp. to Pl.'s SUF ¶ 243) (quoting Kaiser Dep. 102:5–12) (disputing materiality but not accuracy). Indeed, as discussed below, even the agency's own expert conceded that the fact that companies perform consumer surveys indicates that these profit-seeking entities consider them valuable, *see* Pl.'s Resp. to Defs.' SUF at 27–28 (Pl.'s Add'l Facts ¶ 13) (citing Dkt. 43-3 at 24 (Kaiser Dep. at 86:7–10, 86:15–87:5)), and himself suggested an "auction" type of experiment that bears no resemblance to how

shoppers actually buy groceries, Dkt. 45-1 at 40 (Pl.'s SUF ¶ 227); Pl.'s Resp. to Defs.' SUF at

28 (Pl.'s Add'l Facts ¶ 14) (citing Dkt. 43-3 at 23 (Kaiser Dep. 85:3–8)). The fact that consumer

surveys have "general acceptance" within the relevant literature weighs heavily in favor of

reliability here. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993).

      USDA's evidence-free disagreements with generally accepted marketing research

methodology differ wildly from the grievous defects in a case like *McGlinchy v. Shell Chemical

Co.*, 845 F.2d 802 (9th Cir. 1988), on which they rely. *Id.* at 806–07 (one damages expert

attributed "all [projected] . . . future lost profits to acts of" the defendant, but "did not relate the

loss to specific acts [of the defendant] and . . . added that the cause of the decline in sales

theoretically could have been anything," and another damages expert first arrived at a projected

future sales figure before working backwards to determine a predicted sales growth rate); Dkt.

52-1 at 48 (citing *McGlinchy*). This case is far closer to another decision USDA cites, *Damon v.

Sun Co.*, 87 F.3d 1467 (1st Cir. 1996), in which an opposing party's critiques of "perceived flaws

in" an expert's testimony did *not* mean the expert lacked a sufficient basis for his opinions. *Id.* at

1474–75; Dkt. 52-1 at 48 (citing *Damon*).[7]

---

[7]    USDA misstates one of the cases it cites on page 48 of its brief. *Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27, 32 (D.D.C. 2003), did not, as the agency claims "exclud[e] expert opinions constituting nothing more than 'fanciful extrapolation based on a factually inaccurate premise.'" *See* Dkt. 52-1 at 48 (alterations omitted). The quoted language refers to the "*plaintiffs* . . . engag[ing] in fanciful extrapolation" by misreading a product manual to find a death rate that was not there and projecting that death rate across all sales of the allegedly defective device. 259 F. Supp. 2d at 32 (emphasis added). The court explicitly stated that it did *not* resolve motions to exclude the plaintiffs' proffered experts. *See id.* at 31 n.4. In any case, Dr. Dimofte's testimony bears no resemblance to the testimony of the experts in *Webster*, a products liability case. The first expert in *Webster* "relied on" the second; and the second expert testified that he was unaware "of anything that is specifically defective with the" product in question. *Id.* at 31.

Finally, the agency's gripe that Dr. Dimofte did not prove actual lost sales ignores the D.C. Circuit's holding that in a competitor standing case, "[t]he injury claimed . . . is not lost sales, per se . . . [but] is exposure to competition." *Bristol-Myers Squibb Co.*, 91 F.3d at 1499.

4.      USDA's claim that Dr. Dimofte did not explain how he arrived at estimated precise values for consumers' overall willingness to pay, Dkt. 52-1 at 49–50, is a red herring. To start, R-CALF has demonstrated competitive injury independent of any consumer purchasing decision and without reference to consumer willingness to pay. *See supra* at 7–9. Moreover, this supposedly foundational error never came up at Dr. Dimofte's deposition nor in the agency's expert rebuttal reports. This is likely because the point of ANOVA is that the test is *directional* — it determines the likelihood that there is a statistical difference on some measure between different categories — not the size of any difference, and certainly not the average value of those categories combined. The key point is that Dr. Dimofte's meta-analysis found that there is a greater than 99% chance that the adjusted Checkoff ads "improved willingness-to-pay relative to . . . the current Beef Checkoff ads." Dkt. 45-1 at 34 (Pl.'s SUF ¶ 193); Pl.'s Resp. to Defs.' SUF at 27 (Pl.'s Add'l Facts ¶ 10). The precise estimated mean values of consumers' willingness to pay are statistically immaterial to the ANOVA calculations and legally immaterial to whether R-CALF's members have suffered an injury.[8]

---

[8]      After USDA and R-CALF submitted their opening briefs, Dr. Dimofte discovered that he had made a minor arithmetic error in translating the mean willingness-to-pay into an estimated dollars-and-cents value. Upon discovering this error, Plaintiff submitted a corrected report to USDA pursuant to Fed. R. Civ. P. 26(e). Plaintiff has also attached to this filing a declaration from Dr. Dimofte explaining his revision and why it does not affect the relevant conclusions of his analysis, as well as the corrected report. *See* Pl.'s Ex. 49 (2nd Suppl. Dimofte Decl.); Pl.'s Ex. 50 (Corrected Dimofte Rep.). Specifically, the average estimated willingness to pay for the national survey and for each state survey provided in Dr. Dimofte's initial report was one dollar higher than it should be. For instance, although his initial report estimated national average willingness to pay at $8.38/lb, *see* Pl.'s Resp. to Defs.' SUF at 26–27 (Pl.'s Add'l Facts ¶ 8), the correct amount is $7.38/lb, and Dr. Dimofte's corrected report makes the same adjustment for

ii.    *Dr. Kaiser's Testimony Does Not Establish a Genuine Factual Issue*

USDA attempts to salvage Dr. Kaiser by characterizing R-CALF's arguments as being

that Dr. Kaiser works in a different field and used a different statistical method than Dr. Dimofte.

Dkt. 52-1 at 53–54. Not so. The reason Dr. Kaiser's critiques of Dr. Dimofte's surveys are

inadmissible is because he concedes he has no familiarity with the standards and methods used in

the kind of marketing research Dr. Dimofte performed, and his criticisms were based on "gut

instinct" rather than relevant expert knowledge, data, and experience. Dkt. 45-1 at 42–43 (Pl.'s

SUF ¶¶ 241, 250). And the reason Dr. Kaiser's regression analysis is inadmissible is because Dr.

Kaiser admitted his initial approach lacked the necessary rigor and even his purportedly

corrected regression analysis contained errors of a kind he conceded render his results unreliable.

Dkt. 45-1 at 44, 46–47, 49 (Pl.'s SUF ¶¶ 256–58, 274–75, 290); Pl.'s Resp. to Defs.' SUF at 28

(Pl.'s Add'l Facts ¶ 16) (citing Dkt. 43-3 at 52 (Kaiser Dep. 199:5–200:5)). Indeed, Dr. Kaiser's

willingness to create findings for litigation that he admits he would not pass peer review

undermines his reliability generally. *See* Dkt. 45-1 at 44 (Pl.'s SUF ¶¶ 256–58); Dkt. 43-3 at 56–

57 (Kaiser Dep. 217:14–218:15).

Begin with Dr. Kaiser's lack of familiarity with the relevant issues and techniques. As

Dr. Kaiser admitted, his topical background is in whether the Beef Checkoff program benefits

---

each of the state average willingness to pay estimates. *See* Pl.'s Ex. 50 at 16–17, 21, 22, 23-24, 25, 26 (Dimofte Corrected Rep. ¶¶ 64, 85, 91, 97, 103, 109). Dr. Dimofte's declaration makes clear this minor error does not affect the validity of his analyses, which find that generic Checkoff advertising suppresses willingness to pay and homogenizes consumer perceptions of domestic and imported beef compared to adjusted Checkoff advertising. *See* Pl.'s Ex. 49 at 5 (2nd Suppl. Dimofte Decl. ¶¶ 7–8). Thus, while the agency will likely attempt to compare Dr. Dimofte's correction of merely illustrative numbers with Dr. Kaiser's litany of acknowledged errors, the two have no resemblance. Dr. Kaiser erred in ways he conceded were the kind of mistakes that would invalidate his analysis, and he further admitted the way he performed his analysis was inconsistent with professional standards. *See* Dkt. 45-1 at 46–47, 49 (Pl.'s SUF ¶¶ 274–75, 290); Pl.'s Resp. to Defs.' SUF at 28 (Pl.'s Add'l Facts ¶ 16) (citing Dkt. 43-3 at 52 (Kaiser Dep. 199:5–200:5)); *see generally infra* at I.A.3.ii.

cattle producers *in general* by increasing beef consumption *generally*. He is not familiar with the literature regarding consumer choices among beef products and thus how generic Checkoff advertising might impact domestic cattle producers' sales. *See* Dkt. 45-1 at 45 (Pl.'s SUF ¶ 265) (citing Dkt. 43-3 at 38 (Kaiser Dep. 142:10–14, 143:2–17)); Dkt. 51-1 at 119 (Defs.' Resp. to Pl.'s SUF ¶ 265) (not disputing that Dr. Kaiser admitted that the research with which he is familiar does not address whether the Checkoff helps domestic cattle producers).

He also has no expertise in the approach he was hired to critique. For instance, he was unable to say whether Dr. Dimofte's chosen ANOVA methodology, rather than linear regression, is "the typical statistical measurement for . . . categorical experimental design and behavioral research" because he is "not an expert on marketing studies research" and is "not aware of that literature." Dkt. 45-1 at 43 (Pl.'s SUF ¶ 245) (citing Kaiser Dep. 79:18–80:2); Dkt. 51-1 at 109 (Defs.' Resp. to Pl.'s SUF ¶ 245) (asserting that this Court need not reach Dr. Kaiser's testimony but not disputing Dr. Kaiser's admissions on this point).

Given his unfamiliarity with the relevant issues and techniques, it is unsurprising that Dr. Kaiser's critiques of Dr. Dimofte's survey design — which the agency ventriloquizes throughout its brief — lack sufficient foundation. Dr. Kaiser conceded that he is not an expert on marketing research, which he would need to be to determine if Dr. Dimofte's marketing survey design were problematic. *See* Dkt. 45-1 at 42 (Pl.'s SUF ¶¶ 241–42). He also admitted he did not "run any tests on the language that Dr. Dimofte used" to determine if the survey phrasing injected bias into the results. *See* Pl.'s Resp. to Defs.' SUF at 28 (Pl.'s Add'l Facts ¶ 15) (citing Dkt. 43-3 at 34 (Kaiser Dep. at 126:19–127:7)). An opinion based on this kind of "gut instinct," Dkt. 45-1 at 43 (Pl.'s SUF ¶ 250), rather than "scientific, technical, or other specialized knowledge,"

"sufficient facts or data," and "reliable principles and methods," is inadmissible and therefore cannot create a genuine issue of material fact. Fed. R. Evid. 702.

Dr. Kaiser, like the agency, also argued that Dr. Dimofte should have tracked real-world consumer behavior, rather than performing a consumer survey. Dkt. 45-1 at 40 (Pl.'s SUF ¶ 227). But Dr. Kaiser admitted that he had "no idea" whether "marketing journals require the research submitted to them . . . to perform laboratory tests," and he agreed "companies conduct marketing testing via surveys," which "presumably" "suggests that they think the survey is valuable." Pl.'s Resp. to Defs.' SUF at 27 (Pl.'s Add'l Facts ¶ 13) (citing Dkt. 43-3 at 24 (Kaiser Dep. at 86:7–10, 86:15–87:5)); *see also H&R Block*, 831 F. Supp. 2d at 34 (declining to exclude expert survey in part because "large national companies commonly use similar survey results 'to make business and pricing decisions'" (citation omitted)). Dr. Kaiser also conceded "his objection to the use of hypothetical surveys was that a 'behavioral economist . . . would object to a hypothetical survey.'" Dkt. 45-1 at 43 (Pl.'s SUF ¶ 244). He further "admitted that he is 'not an expert in marketing and in consumer behavioral research,' but in 'behavior economics,' which is 'different.'" *Id.* at 42 (Pl.'s SUF ¶ 241) (quoting Dkt. 43-3 at 27 (Kaiser Dep. at 101:3–7)). And ironically, Dr. Kaiser advocated for "an experimental auction," Dkt. 45-1 at 40 (Pl.'s SUF ¶ 227), which as he admitted, *also* does not occur in the real world. *See* Pl.'s Resp. to Defs.' SUF at 27–28 (Pl.'s Add'l Facts ¶ 14); Dkt. 43-3 at 23 (Kaiser Dep. 85:3–8) (Q: "When did you [last] bid on carrots via auction in your supermarket?" A: "Never." Q: "Any other products you bid on when you went to the supermarket via auction?" A: "No."). Dr. Kaiser's candid obliviousness as to standard methodologies in marketing research (the obvious discipline to study the effects of the Checkoff program's marketing efforts), as well as the internal contradictions of his own critiques, render his opinions so unreliable that they are inadmissible.

Dr. Kaiser's regression analysis purporting to contradict Dr. Dimofte's findings also flunks the standard for admissibility. Dr. Kaiser's initial regression contained myriad errors that render his analysis inadmissible as unreliable under Rule 702(c)–(d). *See* Dkt. 45-2 at 33–35. The government makes little effort to defend this initial regression analysis, *see* Dkt. 52-1 at 53, instead pointing to a supplemental report Dr. Kaiser prepared purporting to correct some (but not all) of these errors, *id.* at 54–55.

But this supplemental report is also too unreliable to be admitted. *See* Dkt. 45-2 at 34–35. For example, on his second try, Dr. Kaiser *excluded* respondents who stated they did not know how much they were willing to pay for beef because their responses were incomplete, but inexplicably and inconsistently *included* respondents who said they had an equivalent "no opinion" on the importance of various beef attributes. Dkt. 45-1 at 46–47, 49 (Pl.'s SUF ¶¶ 274–75, 290); *see also* Dkt. 51-1 at 124–25, 132–33 (Defs.' Resp. to Pl.'s SUF ¶¶ 274–75, 290) (asserting this Court need not reach Dr. Kaiser's expert testimony but not disputing the accuracy of these facts). At his deposition, Dr. Kaiser conceded that improperly constituting "the analysis pool" in this way "would undermine the integrity of the study," "could invalidate the results," and the resulting analysis "wouldn't be accepted in [his] field." Pl.'s Resp. to Defs.' SUF at 28 (Pl.'s Add'l Facts ¶ 16) (quoting Dkt. 43-3 at 52 (Kaiser Dep. 199:5–200:5)). Accounting for such concededly fatal errors, Dr. Dimofte used Dr. Kaiser's methodology but confirmed Dr. Dimofte's original results. *See* Dkt. 45-1 at 49 (Pl.'s SUF ¶ 287); Dkt. 43-5 at 9–11 (Dimofte Suppl. Rep. ¶¶ 22–28); Dkt. 51-1 at 131 (Defs.' Resp. to Pl.'s SUF ¶ 287) (not disputing same).

But even if Dr. Kaiser's supposedly corrected supplemental regression were admissible and infallible (it is neither), R-CALF would have standing. Initially, Dr. Kaiser's supplemental regression concluded only that the adjusted Checkoff advertisement has no statistically

significant effect on consumer willingness to pay. *See* Dkt. 45-1 at 47 (Pl.'s SUF ¶ 276) (citing Dkt. 43-4 at 6 (Kaiser Suppl. Report ¶ 9)); Dkt. 51-1 at 125 (Defs.' Resp. to Pl.'s SUF ¶ 276) (asserting that this Court need not reach Dr. Kaiser's testimony but not disputing the substance of his supplemental report). As explained in Part I.A.1, R-CALF has established a competitive injury based on the homogenization of domestic and imported beef that is independent of any finding about consumers' willingness to pay. *See also* Dkt. 45-2 at 28, 29–30.

Moreover, Dr. Kaiser found the probability that there was *no* difference between the generic and adjusted Checkoff advertisements' effects on willingness to pay to be approximately 6 percent. *See* Dkt. 45-1 at 49–50 (Pl.'s SUF ¶ 291); Dkt. 51-1 at 133 (Defs.' Resp. to Pl.'s SUF ¶ 291) (asserting that this Court need not reach the expert reports but not disputing the accuracy of this characterization). Though technically above the 5 percent threshold Dr. Kaiser relies on for statistical significance, this fails to establish a genuine issue of material fact as to R-CALF's standing. *See* Pl.'s Resp. to Defs.' SUF at 27 (Pl.'s Add'l Facts ¶ 11) (quoting Dkt. 43-5 at 14 n.16 (Dimofte Suppl. Rep. ¶ 38 n.16)) (noting that "[a] .06 level of statistical significance has been often referred to as 'marginally significant' and studies featuring this p-value have often been published in leading scholarly journals."). A reasonable factfinder could not find that a 94 percent chance that generic Checkoff advertising suppresses consumer willingness to pay fails to meet R-CALF's ultimate burden of proof on standing — which, at a mini-trial on jurisdiction, would only be a preponderance-of-the-evidence burden. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Thus, even accepting Dr. Kaiser's regression at face value, there is no genuine factual dispute as to R-CALF's members' injury from generic Checkoff advertising's depressive effect on consumers' willingness to pay for beef.

B. *R-CALF's Members' Injuries Are Traceable to the MOUs*

The agency makes two primary arguments on causation: first, that the MOUs do not impose any substantive standards on Checkoff advertising, and second, that R-CALF cannot prove generic Checkoff advertising would otherwise be illegal. Both arguments run headlong into the legal standard. "[T]he causation requirement for constitutional standing is met when a plaintiff demonstrates [1] that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, [2] if that conduct would allegedly be illegal otherwise." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (en banc). The MOUs "authorize" generic Checkoff advertising by failing to impose substantive restrictions on such ads, *see* Part I.B.1, and generic Checkoff advertising "would allegedly be illegal otherwise," *see* Part I.B.2. Thus, the MOUs cause R-CALF's members' injuries.

The agency also attempts to reframe R-CALF's causation theory as being that the MOUs simply do not help its members, not that the MOUs harm those members. But this too flies in the face of the D.C. Circuit's precedent. Causation is based on the difference between what the agency did and what it could have done, not between what the agency did and the status quo before the agency acted. *ALDF*, 154 F.3d at 441. From this faulty foundation, USDA makes an even more audacious claim: that the MOUs do not cause any injury because R-CALF's members could petition for a rulemaking instead. This position is entirely unsupported by precedent, and if taken seriously would deprive any plaintiff of standing to challenge a rule. *See* Part. I.B.3.

1. The MOUs Authorize the Generic Advertising Causing Injury

The MOUs authorize QSBCs to fund advertising that does not distinguish between domestic and imported beef. USDA objects that the MOUs do not "authorize" anything; rather, the agency contends, they are purely procedural instruments. Dkt. 52-1 at 24–26. But the "entirely procedural" nature of the MOUs, *id.* at 11, 24, is exactly the point. It is the *failure* of

the MOUs to impose any substantive safeguards on the content of Checkoff-funded advertising that causes R-CALF's members' injuries. USDA appears to be arguing that an agency does not "authorize" something by choosing not to forbid it. That is a distinction without a difference. A sign saying "no trucks over 2,500 pounds on bridge" authorizes a 2,400-pound truck to cross.

*ALDF* confirms the common-sense conclusion that declining to impose substantive restrictions on injurious third-party conduct causes injury. The *ALDF* plaintiffs "allege[d] that the [Animal Welfare Act] requires the USDA to adopt specific, minimum standards to protect primates' psychological well-being, and the agency has failed to do so." 154 F.3d at 430. The court agreed that this satisfied causation because under the plaintiffs' theory, "USDA regulations misinterpret the statute by permitting . . . conditions" to persist because the agency failed to forbid them. *Id.* at 442. The D.C. Circuit has thus explained that under "*ALDF* . . . even agency action which *implicitly permits* a third party to behave in an injurious manner offers enough of a causal link to support a lawsuit against the agency." *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 827 (D.C. Cir. 2000) (emphasis added). As in *ALDF*, USDA's failure to impose the plaintiff's proposed substantive requirements authorizes — at a minimum, by "implicitly permit[ting]," *id.* — generic Checkoff advertising.

The agency responds that *ALDF* applies only "if the action in question either explicitly authorizes the conduct or, at a minimum, establishes substantive standards that will apply in a given regulatory context," and "does not . . . hold that an agency action that is utterly silent on the permissible substantive range of conduct in a regulated space may somehow 'itself impose a competitive injury.'" Dkt. 52-1 at 26 (alterations omitted). But nothing in *ALDF* or its progeny draws USDA's purported distinction between an agency action that imposes substantive

restrictions that do not halt injurious third-party conduct, and an agency action that imposes no substantive restrictions at all. Consider just two of the D.C. Circuit's cases applying *ALDF*:

*Consumer Federation of America v. FCC*, 348 F.3d 1009 (D.C. Cir. 2003), found standing where the petitioners requested the FCC require a merging party to allow independent internet service providers to access the merging party's network. *Id.* at 1012. The court explained that "[i]n rejecting these demands" and not imposing the requested substantive requirements on a third party's conduct, "the Commission's order permitted the [allegedly harmful] practices to exist." *Id.* Nothing in *Consumer Federation* turned on the existence or nonexistence of *other* substantive requirements imposed on the merging party. Thus, USDA's effort to distinguish *ALDF* on the grounds that the MOUs impose no substantive restrictions — rather than some but not enough substantive restrictions — ignores how the D.C. Circuit actually applies the rule.

*Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017), involved an agency's authorization of a state energy commission's allegedly unlawful actions. The court explained that the agency authorized the injurious third-party action by "repeatedly sidestepp[ing] the legal issues raised by [the petitioner], thereby acquiescing to the" state commission's conduct. *Id.* at 1074; *see also id.* at 1081 (agency caused the petitioner's injuries by "declin[ing] to preempt" the state commission's unlawful action); *id.* at 1082 (explaining that third party "interpreted FERC's inaction as a green light to continue" its injurious conduct). So too here, where USDA has "repeatedly sidestepped" R-CALF's suggestion to impose limits on checkoff advertising, "thereby acquiescing" to QSBCs' funding of generic Checkoff advertising. *Id.* at 1074

USDA's position is also untenable under Supreme Court precedent. In *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Court held that Massachusetts had standing to challenge the EPA's failure to regulate automobile greenhouse gas emissions. *Id.* at 516–26. Prior to that case,

the EPA had not, in USDA's words, "either explicitly authorize[d] the conduct or, at a minimum, establish[ed] substantive standards that . . . appl[ied] in [the] given regulatory context." Dkt. 52-1 at 26. Indeed, EPA had taken the position that it could not regulate automobile greenhouse gas emissions at all. 549 U.S. at 528–29. It was the absence of any regulations which permitted the injurious polluting third-party conduct, not the absence of some (but not all) such regulations.

Rather than address this line of binding precedent, the agency cites *Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250 (D.D.C. 2015), for its argument that the government does not authorize conduct by enacting standards that fail to forbid such conduct. Dkt. 52-1 at 25–26. But that case says nothing of the sort. *Delta* involved an airline's challenge to a policy that had not yet been used to authorize allegedly injurious third-party conduct. *See* 85 F. Supp. 3d at 266. The court held the plaintiff's claimed injury was not "imminent." *Id.* at 263–69. *Delta* is therefore doubly distinguishable: that case deals with injury-in-fact, not causation; and unlike the challenged policies in *Delta*, the MOUs here have already been relied upon to authorize generic Checkoff advertising. *See, e.g.*, Dkt. 45-1 at 20 (Pl.'s SUF ¶ 108).

2. Without the MOUs, the Beef Checkoff Program Would Otherwise Allegedly Be Illegal as Unconstitutional Compelled Speech

USDA argues that R-CALF cannot definitively prove that absent the MOUs, the Checkoff's funding of generic advertisements would be unconstitutional. *See* Dkt. 52-1 at 27–28. However, under *ALDF*, a plaintiff must show only that the injurious third-party conduct "would *allegedly* be illegal" absent the challenged agency action. *ALDF*, 154 F.3d at 440 (emphasis added); *Nat. Res. Def. Council*, 755 F.3d at 1017 (ditto); *Am. Trucking Ass'ns, Inc. v. FMCSA*, 724 F.3d 243, 248 (D.C. Cir. 2013) (ditto); *Shays v. FEC*, 414 F.3d 76, 92–93 (D.C. Cir. 2005) (ditto); *see also Orangeburg*, 862 F.3d at 1082–83 (finding standing under *ALDF* where plaintiff established "it [was] at least plausible" that authorized conduct would otherwise be illegal); *id.* at

1083 (standing where third party's conduct "might be" unlawful absent agency authorization).

Here, R-CALF has not just alleged that absent the MOUs, generic Checkoff advertising would be

unlawful — it has demonstrated that such an allegation is eminently plausible.

Against this "[a]bundant precedent," *Shays*, 414 F.3d at 92–93, USDA cites three cases,

none of which applies. First, in *Ass'n of American Physicians & Surgeons v. Sebelius*, 746 F.3d

468 (D.C. Cir. 2014) ("*AAPS*"), the plaintiffs challenged an interim rule which had since been

"superseded by a [final] rule." *Id.* at 472; *see* Dkt. 52-1 at 27 (citing *AAPS*). Thus, the *AAPS*

plaintiffs' challenge was moot. *Id.* at 472–73. In contrast, R-CALF challenges an existing agency

action — the MOUs — not a since-superseded agency action. There is no suggestion that R-

CALF's challenge is moot, so *AAPS* has no bearing here.

Next, USDA cites *Whitmore v. Arkansas*, 495 U.S. 149 (1990), for the proposition that

"[i]t is just not possible for R-CALF to prove in advance that the judicial system will lead to any

particular result in a future case," Dkt. 52-1 at 27–28 (cleaned up), and *Lujan*, 504 U.S. at 569,

for the proposition that it is not "appropriate to resolve an issue of law . . . in connection with a

threshold standing inquiry." *Id.* (cleaned up). But R-CALF need not "prove," *Whitmore*, 495

U.S. at 159, nor "resolve," *Lujan*, 504 U.S. at 569, whether it would prevail on a First

Amendment challenge absent the MOUs. Again, R-CALF need only show that absent the

MOUs, the Checkoff would "*allegedly* be illegal." *ALDF*, 154 F.3d at 440 (emphasis added); *see*

*also Orangeburg*, 862 F.3d at 1083 (finding standing where third party's conduct "might be"

unlawful absent agency authorization). Moreover, *Whitmore* held that the plaintiff's injury was

too speculative, 495 U.S. at 156–61, and *Lujan* held the injury too speculative and not

redressable, 504 U.S. at 562–71. Neither case rejected standing on causation. Here, in contrast,

R-CALF has established a present-day competitive injury-in-fact, *see* Part I.A, not a speculative

harm. And as addressed in Part I.C, that injury is redressable.

R-CALF easily surpasses the requirement it show "it is at least plausible" that absent the

MOUs, generic Checkoff advertising would be unconstitutional. *Orangeburg*, 862 F.3d at 1082.

After all, one district court has already found that R-CALF was likely to succeed on its claim to

that effect. *R-CALF v. Perdue*, No. CV-16-41, 2017 WL 2671072, at *7 (D. Mont. June 21,

2017), *aff'd*, 718 F. App'x 541 (9th Cir. 2018). That court went on to hold, in the context of a fee

petition, that USDA's contrary position was not even "substantially justified" by governing law.

*R-CALF v. Vilsack*, No. CV-16-41, 2021 WL 461691, at *4–6 (D. Mont. Feb. 9, 2021)

(unchallenged magistrate judge's decision).

True, R-CALF claims no First Amendment injury in *this* case. *See* Dkt. 52-1 at 27 ("R-

CALF has no 'First Amendment injury.'" (quoting *R-CALF v. USDA*, 573 F. Supp. 3d 324, 338

(D.D.C. 2021))). But that misunderstands the standing theory. The MOUs cause a competitive

economic injury, *see* Part I.A, by authorizing conduct that would *otherwise allegedly* be illegal

under the First Amendment. *ALDF*, 154 F.3d at 440. That is enough to establish causation here.

3.  Causation is Measured by Comparing What the Agency Did and Should Have Done

To dodge the foregoing caselaw, the agency tries to rewrite R-CALF's theory as being

that the MOUs simply do not help its members, not that the MOUs hurt its members. Dkt. 52-1

at 26. This argument is "founded on a false premise": that the MOUs' failure to impose

substantive regulations on Checkoff advertising has not "changed [the] status quo," and so does

not cause any injury. *ALDF*, 154 F.3d at 441. To the contrary, under *ALDF*, "[t]he proper

comparison for determining causation is not between what the agency did and the status quo

before the agency acted. Rather, the proper comparison is between what the agency did and what

the plaintiffs allege the agency should have done under the statute." *Id.*

Here, that comparison is between what the agency did — issue MOUs that permit generic Checkoff advertising, which homogenizes consumer perceptions of domestic and imported beef and suppresses willingness to pay; and what the agency should have done — use the MOUs to require Checkoff advertising to distinguish between imported and domestic beef. Thus, R-CALF's theory is not that the MOUs "furnish no cure" to a preexisting injury, Dkt. 52-1 at 26 (cleaned up), but that the failure of the MOUs to require Checkoff advertising to distinguish between domestic and imported beef (a requirement the agency could have and chose not to impose) causes the injuries described in Part I.A.

Thus, the agency's contention that absent the MOUs, *i.e.*, "the status quo before the agency acted," *ALDF*, 154 F.3d at 441, QSBCs might voluntarily submit advertising copy to USDA for pre-approval, is irrelevant. Dkt. 52-1 at 12, 28. The point is that the agency could have used the MOUs to require Checkoff advertising to distinguish between domestic and imported beef — *i.e.*, "what the plaintiffs allege the agency should have done." *ALDF*, 154 F.3d at 441; *see also Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 14–15 (D.D.C. 1999).

From its misunderstanding of how to determine causation, USDA makes an astonishing argument: that R-CALF's members lack standing because they could file a petition for rulemaking. *See* Dkt. 52-1 at 25–26 (arguing R-CALF lacks standing because "R-CALF could lobby USDA to" impose substantive standards for ads); *id.* at 26–27. Of course, one can always ask an agency to change or adopt a rule. *See* 5 U.S.C. § 553(e). If that defeated standing, it is hard to imagine a plaintiff who *would* be able to sue for failure to provide notice and comment.

The only case USDA cites for this startling proposition, *Brown v. Department of Education*, 600 U.S. 551 (2023), says nothing of the sort. *See* Dkt. 52-1 at 26–27 (citing *Brown*). *Brown* rejected a challenge to the Biden administration's student loan forgiveness program. The

plaintiffs argued that if the agency had observed proper procedures, they "might have used those opportunities to convince the Department . . . that it should adopt a different loan-forgiveness plan . . . instead, one that is more generous to them than the [existing] plan that they allege is unlawful." *Brown*, 600 U.S. at 563. *Brown* makes the straightforward point that a person should try to convince the government to adopt a benefits program by asking the government to do so, not by challenging the validity of a wholly "independent" program. *Id.* at 565.

This is not a case like *Brown* in which the government has chosen not to help a plaintiff, but one in which an agency has authorized third-party conduct injuring that plaintiff. In other words, R-CALF's members have standing not because USDA has chosen "not [to] adopt[] a lawful benefits program under which they would qualify for assistance." *Id.* at 564. Rather, the government has *already* adopted an unlawful program injuring R-CALF's members — the MOUs, which authorize a system of generic Checkoff advertising that homogenizes consumer perceptions of domestic and imported beef and reduces consumer willingness to pay. Causation exists because the agency should have instead enacted a rule forbidding that injurious conduct. *ALDF*, 154 F.3d at 441. *Brown* does not contradict this well-established standard. It certainly does not foreclose standing wherever a plaintiff could ask an agency to change its ways.

C.  *R-CALF's Members' Injuries Are Redressable*

In a procedural injury case like this one, courts "relax the redressability . . . requirements for a plaintiff." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013). All a plaintiff must show is that "if the [agency] is required to adequately consider [the plaintiff's] concern, it could change its mind about authorizing the" allegedly injurious conduct. *Id.* at 305. Here, if USDA were required to proceed through rulemaking, R-CALF's members would have the opportunity to submit comments urging the MOUs to require that Checkoff advertising distinguish between domestic and imported beef, and the agency could change its mind.

1.  R-CALF's Members Would See At Least Partial Relief from a Win on the Merits

Rather than grapple with the standard for redressability in procedural injury cases, USDA argues that various other actors or circumstances could mitigate the effects of a win on the merits. The agency asserts that concentration in the meatpacking injury may capture some of the gains that Checkoff advertising that distinguishes domestic and imported beef might generate, *see* Dkt. 52-1 at 35, 38–39; that current country-of-origin labelling policies ("COOL") could reduce any benefit by causing consumers trouble identifying domestic beef at the grocery store, *id.* at 38; and that "organizations promoting foreign beef" might "react to those [adjusted] checkoff-funded ads . . . by issuing their own ads promoting foreign beef as superior," *id.* at 37.

These objections run headlong into the well-established rule that "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). USDA simply points to other things that might reduce the benefits R-CALF's members would achieve through rewritten MOUs. But that does not change the fact that requiring Checkoff advertising to distinguish between domestic and imported beef would "relieve a discrete injury" to those members. *Id.*

To avoid this conclusion, USDA accuses R-CALF of misreading *Larson*. Dkt. 52-1 at 38. Relying on *Delta Construction Co. v. EPA*, 783 F.3d 1291 (D.C. Cir. 2015), the agency explains that *Larson* does not provide standing where "a favorable decision would remove one of [the injury's] multiple regulatory causes, even if the decision would fail to actually redress the injury." *Id.* at 1297; Dkt. 52-1 at 38. But *Delta Construction* does not save the agency's argument. That case involved two rules, one by the EPA and one by NHTSA, which were "substantially identical." 783 F.3d at 1296. Thus, the two rules "jointly" created the "benefits and costs" imposed on petitioners. *Id.* But the petitioners challenged "only EPA's portions of the two

rules." *Id.* They thus lacked standing because whether or not the court vacated EPA's rule, "the [substantially identical] NHTSA standards would still" impose the *exact same* costs. *Id.*

In short, *Delta Construction* holds that where a fully independent and sufficient cause of a plaintiff's injury is unchallenged, that injury is not redressable. *See Nat'l Ass'n of Mut. Ins. Cos. v. HUD*, __ F. Supp. 3d __, 2023 WL 6142257, at *6 (D.D.C. Sept. 19, 2023) (describing *Delta Constr.* as a case "in which a plaintiff lacks standing because two independent government actions produce the same harm but only one is challenged"); *Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*, 311 F. Supp. 3d 187, 219 (D.D.C. 2018) (similar). *Delta Construction* does not undercut *Larson*'s holding that partial relief is relief. It certainly says nothing to support USDA's notion that it can immunize its rules from suit by hypothesizing other injuries to a plaintiff.

This case resembles not *Delta Construction*, but *Massachusetts*, in which the Court held that the state's injury was redressable even though the domestic automotive emissions at issue contributed only a fraction of the greenhouse gases causing the state to experience sea-level rise. 549 U.S. at 525–26. Just as various sources of greenhouse gases contributed to sea-level rise in *Massachusetts*, various factors — such as the ones USDA identifies — could contribute to R-CALF's members' economic wellbeing. And as in *Massachusetts*, even if judicial relief "cannot provide full redress . . . the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

Under a proper application of *Larson*, none of USDA's other posited injuries holds up. USDA's contention that the meatpacking industry is so concentrated that it may simply capture any gains from distinguishing domestic and imported beef before they are passed on to R-CALF's members, Dkt. 52-1 at 35, 38–39, ignores that earlier in the production chain,

R-CALF's members sell directly to packers. And as noted above, if consumers see no difference between imported and domestic beef, packers have an incentive to source cheaper imported cattle rather than R-CALF's members' domestic cattle. Dkt. 45-2 at 10, 27; *Nat. Res. Def. Council*, 755 F.3d at 1017 (explaining that it is "a hardly-speculative exercise in naked capitalism" to predict that firms will "take advantage of" opportunity to source cheaper input products (cleaned up)). By reducing this incentive for packers to procure cattle from R-CALF's members' competitors, a favorable decision would provide at least partial redress.

Moreover, although concentration in the meatpacking industry is a problem, the agency forgets it has chosen not to dispute a study finding that "increases in retail beef demand are transferred to the farm level prices, *even though meat packer . . . concentration* [*has*] *increased*." Dkt. 45-1 at 3 (Pl.'s SUF ¶ 13) (emphasis added); Dkt. 51-1 at 5 (Defs.' Resp. to Pl.'s SUF ¶ 13) ("Undisputed."). USDA cannot argue in its brief what it has conceded on the facts.[9]

The agency also argues that consumers' inability to find beef labelled "domestic" at the grocery store will blunt any gains R-CALF's members might receive from a favorable decision. Dkt. 52-1 at 38. But as Dr. Dimofte explained, consumer behavior research demonstrates "that when consumers seek out specific products this 'in turn incentivizes sellers to pursue differentiation efforts along the respective attribute.'" *See* Dkt. 45-1 at 39 (Pl.'s SUF ¶ 221) (quoting Dkt. 43-1 at 30 (Dimofte Rep. ¶ 119)). USDA does not dispute the existence of this phenomenon — *i.e.*, that if consumers demand identifiably domestic beef, the market will provide. *See* Dkt. 51-1 at 97 (Def.'s Resp. to Pl.'s SUF ¶ 221) (not disputing that Dr. Dimofte

---

[9]    It bears mention that Congress tasked USDA with preventing anticompetitive behavior in the packing industry. *See generally* 7 U.S.C. §§ 182(2), 192–95. The agency's position is apparently that it has been so derelict in its duties that the big four packing companies have accumulated such overwhelming market power as to be above the law of supply and demand.

identified this effect). Thus, although a lack of labeling requirements also independently injures R-CALF's members, those members would still see some benefit from a change in the MOUs.

Finally, USDA predicts that proponents of foreign or imported beef might respond to a favorable decision by flooding the airwaves with countervailing advertisements, Dkt. 52-1 at 37–38, and that one QSBC might, for reasons unknown, decide not to execute a rewritten MOU and forego Checkoff money, *id.* at 36–37. Maybe, maybe not. But if those events happen, they will be "discrete injur[ies]." *Larson*, 456 U.S. at 243 n.15. Such prognostications cannot defeat standing. *See Teton Hist. Aviation Found. v. Dep't of Def.*, 785 F.3d 719, 726 (D.C. Cir. 2015) ("[A] plaintiff need not negate speculative and hypothetical possibilities in order to demonstrate the likely effectiveness of judicial relief." (cleaned up)).

2.  USDA's Remaining Redressability and Reviewability Arguments Fail

The agency also suggests that any injury is not redressable because the QSBCs are not defendants to this lawsuit. *See* Dkt. 52-1 at 28 n.5. But as USDA notes, the QSBCs *cannot* be sued under the APA because they are not federal agencies. *Id.* at 36. If the agency is correct that an injured party lacks standing to challenge an agency action simply because the agency found a non-governmental co-signer, then any agency will be able to immunize its actions from suit simply by involving a private actor. The agency provides no authority for this radical position.

To the contrary, plaintiffs regularly challenge agency actions involving third parties without naming those third parties as defendants. *See, e.g.*, *Waterkeepers Chesapeake v. FERC*, 56 F.4th 45 (D.C. Cir. 2022) (vacating FERC license); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) (invalidating oil and gas leases); *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7 (D.D.C. 1999) (invalidating agreement delegating authority to private actor). True, the relevant third parties sometimes intervene after the case is filed, but "standing is assessed at the time of filing." *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012).

Like the licenses or leases in those cases, USDA does not contest that the MOUs are an "agency action" subject to review under the APA. *See* 5 U.S.C. § 702. And vacatur of that agency action would provide at least partial redress, whether or not the QSBCs are parties here.

Finally, USDA hints that some MOUs in general are "unreviewable by courts." Dkt. 52-1 at 17. Whether or not the agency envisions this as a redressability argument, it does not argue *these* MOUs are unreviewable because some statute precludes judicial review. *See* 5 U.S.C. § 701(a)(1). Nor does it assert that the MOUs are not a "final agency action" under 5 U.S.C. § 704, nor that the MOUs are unreviewable as committed to agency discretion by law under 5 U.S.C. § 701(a)(2). In any case, these latter two arguments would go to the merits, not standing, which is the only issue the parties have been asked to present here. *See Trudeau v. FTC*, 456 F.3d 178, 183–85 (D.C. Cir. 2006) ("final agency action" requirement is not jurisdictional); *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) (5 U.S.C. § 701(a)(2) is not jurisdictional).

## II.     R-CALF Has Standing Because the Checkoff Funds Corporate Advocacy Contrary to Its Members' Interests

USDA's argument that the Court should overlook that the MOUs enable transfers of Checkoff funds to the industrial meat advocacy organizations NCBA and USMEF is nothing short of a request that this Court endorse a circuit split. Moreover, its few factual disputes are undermined by its admissions elsewhere. Thus, this Court can independently hold for R-CALF because the MOUs allow the QSBCs to fund NCBA and USMEF and those funds have increased competition against R-CALF's members.

The agency argues the Court should ignore NCBA's and USMEF's receipt of QBSCs' checkoff dollars because those organizations do not "sell cattle." Dkt. 52-1 at 39. But the Federal Circuit has held evidence the government distributes funds to an industry group — there the

North Dakota Wheat Commission — that "*does not itself sell* wheat," but "*promotes the sale*" of a specific type of wheat, established competitor standing for producers of other types of wheat to challenge those transfers. *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1334 (Fed. Cir. 2008) (emphasis in original). The court explained that "it is quite rational to infer that [the government], by distributing money to an entity that aims to take away market share from Canadian wheat and has already been somewhat successful in that effort, is likely to inflict further economic injury on" Canadian wheat producers. *Id.*

Although USDA paints *Canadian Lumber* as not a "textbook" application of the competitor standing doctrine, Dkt. 52-1 at 42, the Federal Circuit went out of its way to state "fewer inferences are required to find injury-in-fact in this case than in most 'competitor standing' cases." 517 F.3d at 1334. Moreover, to reach its holding, the Federal Circuit drew from D.C. Circuit caselaw. *Id.* at 1333 (citing authority). The D.C. Circuit, in turn, has itself relied on *Canadian Lumber*. *See Sherley*, 610 F.3d at 72.

With this background, if the Court accepts the premise R-CALF's members produce beef consumers could recognize as distinct from other beef, the Court should conclude R-CALF has standing. USDA admits that NCBA and USMEF use the funds they receive pursuant to the MOUs for the "generic promotion of U.S. beef." Dkt. 52-1 at 43. This includes by funding nationwide generic beef advertising. Dkt. 45-1 at 25 (Pl.'s SUF ¶ 132); Dkt. 51-1 at 54 (Defs.' Resp. to Pl.'s SUF ¶ 132) (disputing materiality but not accuracy). Thus, as in *Canadian Lumber*, an advocacy group is using the money at issue to increase competition.

USDA also takes issue with the relevance of additional evidence R-CALF provides demonstrating that NCBA's and USMEF's lobbying activities increase competition against R-CALF's members. Given that NCBA and USMEF use Checkoff money to run generic beef

advertising, these additional facts are unnecessary to hold in R-CALF's favor. But USDA's disputes here amount to advocating for a distinct divergence from the Federal Circuit.

The agency claims that to establish standing based on these lobbying activities, R-CALF needed to trace NCBA's and USMEF's use of the Checkoff dollars directly to lobbying. Dkt. 52-1 at 40. Yet, the Federal Circuit explained the North Dakota Wheat Commission relied on multiple allocations of funds, only one of which was at issue in *Canadian Lumber*. 517 F.3d at 1330. And nothing in *Canadian Lumber* turned on how particular dollars were used. Indeed, despite the Commission having "yet to spend any of the money" at issue, producers of wheat other than that endorsed by the Commission faced an "imminent" competitive injury. *Id.* at 1334. The court did not require any further tracing.

This follows as "money is fungible." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 317 n.6 (2012). Indeed, courts have explained that even where an entity received ostensibly restricted funds, the existence of those funds necessarily "free[s] up other funds to be spent for political purposes." *Id.*; *see also*, *e.g.*, *Simon v. Republic of Hungary*, 77 F.4th 1077, 1119 (D.C. Cir. 2023) (because "money is fungible" it would be inappropriate to require a plaintiff to prove specific funds were tied to a specific act to establish jurisdiction (cleaned up)). Thus, far from the Federal Circuit's and R-CALF's reasoning being "strained" in concluding the Checkoff funds enable harmful lobbying, Dkt. 52-1 at 40, it is only economically logical to conclude funds distributed to an organization that previously "cause[d] an economic injury" would enable that organization to perpetuate that economic harm, regardless of whether or how the specific dollars at issue are spent, *Canadian Lumber*, 517 F.3d at 1334.

Moreover, even with all their rhetoric, USDA admits Checkoff funds pay for NCBA's and USMEF's "overhead expenses." Dkt. 52-1 at 40. The agency also does not dispute that the *vast*

majority of NCBA's and nearly a quarter of USMEF's funding come from the Checkoff. *See* Dkt. 51-1 at 60–61, 64–65 (Defs.' Resp. to Pl.'s SUF ¶¶ 148–49, 159). These organizations are dependent on the Checkoff, so all their operations can be attributed to the Checkoff's support.[10]

The agency also argues that NCBA's and USMEF's opposition to mandatory COOL does not cause injury; this is directly undermined by their suggestion elsewhere that current labeling allows beef to be lumped together, so any homogenization in the market can have no competitive effect. Dkt. 52-1 at 38. It cannot be both that R-CALF's members suffer no harm from generic advertising because of the absence of mandatory country-of-origin labels, and also that successful advocacy against requiring such labels causes R-CALF's members no harm.

To the extent USDA argues NCBA and USMEF do not oppose all labeling, just mandatory labeling, *see*, *e.g.*, Dkt. 51-1 at 62–63 (Defs.' Resp. to Pl.'s SUF ¶ 154), that is also irrelevant in light of the agency's reliance on the fact that the absence of mandatory COOL harms R-CALF's members through increased competition. Dkt. 52-1 at 38. More importantly, R-CALF only needs to establish NCBA and USMEF have increased competition against its members, not that they have acted to the most extreme detriment of R-CALF's members imaginable. *Cf. supra* at 36–39.

USDA's effort to insulate NCBA and USMEF by arguing they are only successful if legislatures act ignores the record and asks this Court to assume a remarkably naïve position. The absence of mandatory labeling is the status quo. NCBA and USMEF do not need to obtain

---

[10]    R-CALF also notes that, despite the prohibition on using Checkoff money for lobbying, NCBA has previously been caught violating that rule. *See* Pl.'s Resp. to Defs.' SUF at 4, 23 (¶¶ 8, 57). Thus, while this Court should not pretend money is not fungible, NCBA has also shown it cannot be trusted to abide by restrictions on the use of Checkoff funds for lobbying.

additional third-party action to cause harm. They merely need to slow down any possible action, which by definition their lobbying will do.

Moreover, under USDA's theory, these groups are shoveling their lobbying budgets into a metaphorical bonfire, with no possibility of influencing policy. But the record reflects that these groups are not so irrational as to spend their money for nothing. *See, e.g.*, Dkt. 45-1 at 7 (Pl.'s SUF ¶ 38) ("Dennis Sweat, Vaughn Meyer, David Wright, and Gary Hendrix believe they are harmed by transfers of Checkoff funds to third parties [such as NCBA] who promote policies, such as defeating [COOL]," that injure them); Dkt. 45-4 at 32 (Meyer Decl. ¶ 13) ("NCBA has lobbied against COOL, [Congress's repeal of] which . . . has caused substantial injuries to my business and other domestic producers."). Thus, just as in *Canadian Lumber*, at least one group to whom the government transfers R-CALFs' members' Checkoff dollars "has already been somewhat successful in" its efforts to harm R-CALF's members. 517 F.3d at 1334.[11]

This track record of lobbying success distinguishes *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006). *See* Dkt. 52-1 at 42 (citing *DaimlerChrysler*). That case denied standing where redressability depended on "a hypothesis" about how a state legislature *might* respond to the court's decision. *DaimlerChrysler*, 547 U.S. at 349–50. *DaimlerChrysler* thus differs from this case, in which Congress has *already* shown itself to be responsive to NCBA's concerns, and its response has injured R-CALF's members. *Compare* Dkt. 51-1 at 62–63 (Defs.' Resp. to Pl.'s SUF ¶ 154) (conceding NCBA has opposed mandatory COOL), *with* Consol. Appropriations

---

[11] USDA contends that the beliefs of R-CALF members like Mr. Meyer do not matter. *See* Dkt. 51-1 at 12 (Defs.' Resp. to Pl.'s SUF ¶ 38). But as a member of R-CALF, Dkt. 45-1 at 4 (Pl.'s SUF ¶ 24), a former member of the Beef Board, Pl.'s Resp. to Defs.' SUF at 25 (Pl.'s Add'l Facts ¶ 1) (citing Dkt. 45-4 at 28–29 (Meyer Decl. ¶ 3)), and an experienced businessman attuned to policy debates impacting his industry, Mr. Meyer could testify that NCBA's lobbying contributed to Congress's repeal of mandatory COOL and caused him economic injury.

Act, 2016, Pub. L. No. 114-113, § 759, 129 Stat. 2242, 2284–85 (2015) (repealing mandatory COOL), *and* Dkt. 45-4 at 32 (Meyer Decl. ¶ 13) (explaining that NCBA's lobbying against COOL requirements has injured him financially).

### III.    Conclusion

For the foregoing reasons, this Court should grant R-CALF's motion for partial summary judgment and deny USDA's cross-motion for partial summary judgment.

Dated   12th day of January, 2024.              Respectfully submitted,

                                                FarmSTAND

                                                */s/ Nathan Leys*

                                                NATHAN D. LEYS (DC 90018987)
                                                DAVID S. MURASKIN (DC 1012451)
                                                JESSICA L. CULPEPPER (DC 988976)
                                                712 H Street, NE Suite 2534
                                                Washington, D.C. 20002
                                                (202) 630-3095
                                                David@farmstand.org
                                                Jessica@farmstand.org
                                                Nathan@farmstand.org


                                                *Counsel for Plaintiff*