**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

RANCHERS-CATTLEMEN ACTION
LEGAL FUND, UNITED
STOCKGROWERS OF AMERICA,

       *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

       *Defendants.*

Civil Action No. 20-2552 (RDM)

---

**<u>MEMORANDUM OPINION</u>**

Ranchers-Cattlemen Action Legal Fund ("R-CALF") brings this action against the U.S.

Department of Agriculture and the Secretary of Agriculture (collectively, "USDA"), alleging that

the USDA violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, by

entering into a series of Memoranda of Understanding ("MOUs") with various Qualified State

Beef Councils ("QSBCs") without conducting a notice-and-comment rulemaking and without

otherwise complying with the APA.  Dkt. 1.  Those MOUs commit the QSBCs to submit their

promotional plans and proposed contracts to the USDA for review and pre-approval, but they

include no substantive requirements.

Although the challenge is a narrow one, it relates to a larger dispute in which R-CALF

has long objected to the use of the one-dollar-per-head-of-cattle assessments collected pursuant

to the Beef Promotion and Research Act of 1985 ("Beef Act" or "Act"), 7 U.S.C. § 2901 *et seq.*,

to fund generic promotional activities authorized by the Act.  R-CALF achieved some initial

success in that effort in 2017 when the U.S. District Court for the District of Montana issued a

preliminary injunction precluding the USDA from allowing the Montana Beef Council (which is a QSBC) from using assessments to fund advertisements without first obtaining affirmative consent from those paying the assessments, *R-CALF v. Perdue*, 2017 WL 2671072 (D. Mont. June 21, 2017) ("*R-CALF I*"), an order which the Ninth Circuit upheld, *R-CALF v., Perdue*, 718 F. App'x 541 (9th Cir. 2018) (mem.) ("*R-CALF II*"). The central question posed in the Montana litigation was whether the Beef Act's promotional activity constituted government speech, which the United States is free to fund with government-imposed assessments, *see Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), or private speech, which the United States cannot typically compel unwilling members of the public to fund. Because the district court was persuaded (among other things) that R-CALF was likely to succeed on the merits in showing that the promotional activities of the Montana Beef Council were not subject to sufficient oversight by the USDA to qualify as government speech, the court granted R-CALF's motion for a preliminary injunction. *See R-CALF I*, 2017 WL 2671072 at *6, *8. The Ninth Circuit agreed, noting that the USDA did "not have pre-approval authority over the . . . advertising." *R-CALF II*, 718 F. App'x at 542.

R-CALF's initial success came to an end, however, after the USDA and intervenor-QSBCs in the Montana litigation brought to the district court's attention the MOUs that are at issue in this case. These MOUs require the type of USDA oversight of checkoff program promotional activities that the district court concluded, at the preliminary injunction stage of the proceeding, is necessary to satisfy the standard for government speech. The MOUs require, for example, the QSBCs to obtain pre-approval from the USDA for their budgets (including "anticipated expenses and disbursements" for "probable costs of promotion"), for "any and all promotion, advertising, research, and consumer information plans and projects," and for "any

and all potential contracts or agreements to be entered into by [the QSBC] for the implementation or conduct of plans or projects funded by checkoff funds." *See* Dkt. 52-9 at 23–24.  After the USDA and intervenor-QSBCs invoked the MOUs, the district court granted summary judgment in favor of the USDA.  The court held, among other things, that the Beef Act, the overall structure of the checkoff program, and the Montana MOU conferred "significant discretion" on the USDA "to approve or reject QSBC speech" and that, consistent with the Supreme Court's decision in *Johanns*, this control was sufficient to sustain the program under the government speech doctrine.  *R-CALF v. Perdue*, 449 F. Supp. 3d 944, 955 (D. Mont. 2020) ("*R-CALF III*").  The Ninth Circuit, once again, agreed.  *See R-CALF v. Vilsack*, 6 F.4th 983 (9th Cir. 2021) ("*R-CALF IV*").

After the district court issued its decision in *R-CALF III* but before the Ninth Circuit affirmed that decision, R-CALF brought the instant lawsuit in this Court, challenging twenty MOUs between the USDA and various QSBCs, including the Montana Beef Council.  Dkt. 1 at 4 (Compl. ¶ 9); *but see* Dkt. 44-1 at 3–4 (listing 21 MOUs).  On November 20, 2020, the USDA moved to dismiss the present action, arguing (among other things) that R-CALF lacked standing to challenge the MOUs.  *See* Dkt. 11.  This Court denied that motion on the ground that the complaint included allegations that were sufficient to meet R-CALF's minimal burden at the pleading stage; determined that the Court needed to resolve the question of Article III standing before reaching the merits; and, to that end, permitted the parties to take jurisdictional discovery.  *See generally R-CALF v. U.S. Dep't of Agriculture*, 573 F. Supp. 3d 324 (D.D.C. 2021) ("*R-CALF V*").  The parties have now completed discovery, including substantial expert discovery, and are back before the Court on the question of Article III standing.

For the reasons explained below, the Court concludes that R-CALF has failed to carry its burden. Notably, unlike in the Montana litigation, R-CALF does not rely on an alleged First Amendment injury to support its standing to sue, and it, instead, relies solely on the contention that the MOUs have caused—and will continue to cause—one or more of its members some concrete financial harm based on two separate theories. Neither line of argument is persuasive.

R-CALF first argues that the MOUs have caused R-CALF's members a cognizable injury because the MOUs do not mandate that any future QSBC-sponsored advertisements laud the unique quality of domestic beef. For present purposes, the Court is prepared to assume that one or more of R-CALF's members would benefit financially if the MOUs required QSBCs to promote domestic over imported beef. The question before the Court, however, is not whether the USDA could have exercised its discretion to do more to help the domestic beef industry. Rather, the question is whether the action that the USDA took in entering into the challenged MOUs—or any action that it was legally required to take in those MOUs but failed to take—has caused or is likely to cause any identified member of R-CALF a concrete financial injury. Understood in this light, R-CALF cannot overcome the fact that the MOUs say nothing, expressly or implicitly, about the *substance* of the QSBCs' promotional activity but, instead, merely establish *procedures* for QSBCs to obtain USDA approval before using checkoff funds for any specific "plan" or "project." It is a stretch too far to maintain that the USDA caused R-CALF's members financial losses by entering into these purely procedural agreements without simultaneously mandating, as a matter of substance, that the QSBCs limit their promotional activity to ads that distinguish between the qualities of domestic and imported beef. As the Supreme Court has observed, "[o]rdinarily, a party's recourse to induce an agency to take a

4

desired action is to file not a lawsuit, but a 'petition for the issuance, amendment, or repeal of a rule.'" *Dep't of Educ. v. Brown*, 600 U.S. 551, 565 (2023) (quoting 5 U.S.C. § 553(e)).

R-CALF's second theory of standing fares no better. It posits that one or more of R-CALF's members has suffered a cognizable injury because the MOUs save the QSBCs' promotional activities from what would otherwise constitute a compelling constitutional challenge. Once again, the Court is prepared to accept the minor premise of R-CALF's argument; for present purposes, it will assume that if the MOUs were invalidated, that would permit R-CALF to bring a new challenge to the QSBCs' use of Beef Act funds in Montana or elsewhere and to argue in that future litigation that the QSBCs' promotional activity no longer qualifies as government speech. But even putting aside the uncertain questions of how the QSBCs might proceed were the MOUs invalidated (including whether they would, even without the MOUs, continue to submit their proposed advertisements to the USDA for review) and how a future court might decide a renewed First Amendment challenge to the program, Plaintiffs have not shown that any hypothetical future advertisements *promoting* the virtues of beef are likely to *decrease* demand for the beef that R-CALF's members produce. Once again, although R-CALF has offered evidence that alternative advertising, which lauds domestic beef's unique qualities, might help some of its members, it has failed to offer any concrete evidence that elimination of the current QSBC promotional activity would financially benefit any beef producer—domestic or foreign.

This is not to say that R-CALF was without recourse. Unlike in this case, it asserted standing based on the First Amendment rights of its members in the Montana litigation. And, based on that standing, it raised the same challenge to the MOUs in that litigation that it seeks to raise here. Notably, the Ninth Circuit rejected that challenge on the merits, holding that, "[e]ven

assuming that R-CALF preserved [its notice and comment argument] by raising it below, an MOU is not a legislative rule for which notice and comment is required."  *R-CALF IV*, 6 F.4th at 991 n.8.  Although this Court has declined to reach the USDA's preclusion defense without first determining whether R-CALF has Article III standing, *see R-CALF V*, 573 F. Supp. 3d at 344–45, the availability of this alternative (albeit unsuccessful) forum for directly challenging the MOUs on First Amendment grounds highlights just how indirect and speculative R-CALF's theory of injury and causation is in this case.

Because R-CALF has failed to meet its burden of demonstrating that it has Article III standing to challenge the MOUs under the APA, the Court will **GRANT** the USDA's motion for summary judgment and will **DENY** R-CALF's cross-motion for partial summary judgment on standing.

## I. BACKGROUND

### A.    Legislative and Regulatory Background

1.    *Beef Checkoff Program*

In 1985, Congress enacted the Beef Promotion and Research Act, Pub. L. No. 99-198, § 1601, 99 Stat. 1354, 1597–1606 (codified at 7 U.S.C. §§ 2901–2911).  The Beef Act "announces a federal policy of promoting the marketing and consumption of 'beef and beef products,'" *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005) (quoting 7 U.S.C. § 2901(b)), with the aim of "maintain[ing] and expand[ing] domestic and foreign markets and uses for beef" and "strengthen[ing] the beef industry[]" more generally, 7 U.S.C. § 2901(b).  To accomplish these goals, the Act directs the USDA to issue a "beef promotion and research order," 7 U.S.C. § 2903(b), which USDA promulgated in July 1986, *see* Beef Promotion and Research Order ("Beef Order"), 51 Fed. Reg. 26,132 (July 18, 1986) (codified at 7 C.F.R. pt.

6

1260); *see also* 7 U.S.C. § 2904 (setting forth the "required terms" of the beef promotion and research order). Together, the Beef Act and the Beef Order establish the Beef Checkoff Program, which imposes a mandatory one-dollar-per-head-of-cattle "checkoff" or assessment, 7 U.S.C. § 2904(8)(A); 7 C.F.R. § 1260.172(a), "on all cattle sold in the United States and on cattle, beef, and beef products imported into the United States," 7 U.S.C. § 2901(b). The funds the assessment raises are "used to fund beef-related projects, including promotional campaigns," *Johanns*, 544 U.S. at 554 (citing 7 U.S.C. § 2904(4)(B), (C)).

The Beef Checkoff Program is administered by two national entities: the Cattlemen's Beef Promotion and Research Board ("Beef Board") and the Beef Promotion Operating Committee ("Operating Committee"). 7 U.S.C. § 2904(1)–(5); 7 C.F.R. §§ 1260.141, 1260.161. The Beef Board is comprised of a geographically representative group of beef producers and importers, nominated by trade associations. 7 U.S.C. § 2904(1); 7 C.F.R. § 1260.141; *Johanns*, 544 U.S. at 553. The Beef Board, in turn, "elect[s] from its membership ten members to serve on the Beef Promotion Operating Committee, which [is] composed of ten members of the Board and ten producers elected by a federation that includes as members the [QSBCs]." 7 U.S.C. § 2904(4)(A). The Operating Committee is responsible for developing "plans or projects of promotion and advertising, research, consumer information, and industry information, which [are] paid for with assessments collected by the Board." 7 U.S.C. § 2904(4)(B); *Johanns*, 544 U.S. at 554; 7 C.F.R. §§ 1260.168, 1260.169.

Twenty years ago, the constitutionality of the Beef Checkoff Program was tested. In *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), two trade associations representing ranchers brought suit on behalf of their members, claiming that the Beef Checkoff Program violated their members' First Amendment rights. The plaintiffs challenged the way that

the Beef Board and the Operating Committee were spending the checkoff funds because the

advertising they sponsored "promote[d] beef as a generic commodity, which . . . impede[d] [the

trade associations'] efforts to promote the superiority of [] American beef, grain-fed beef, or

certified Angus or Hereford beef." *Id.* at 556.  According to the *Johanns* plaintiffs, the Beef

Checkoff Program operated as a compelled subsidy that violated the ranchers' First Amendment

right not to subsidize speech with which they disagreed. *Id.* at 557–58.

The Supreme Court disagreed.  The Court first concluded that a compelled subsidy of

government speech poses no First Amendment concern. *Id.* at 559.  Then, applying that rule, the

Court determined that the generic advertising that the Beef Board and the Operating Committee

funded was government speech. *Id.* at 560–62.  Writing for the Court, Justice Scalia explained:

> The message set out in the beef promotions is from beginning to end the message
> established by the Federal Government.   Congress has directed the
> implementation of a "coordinated program" of promotion, "including paid
> advertising, to advance the image and desirability of beef and beef products." 7
> U.S.C. §§ 2901(b), 2902(13).  Congress and the Secretary have also specified,
> in general terms, what the promotional campaigns shall contain, *see, e.g.*,
> § 2904(4)(B)(i) (campaigns "shall . . . take into account" different types of beef
> products), and what they shall not, *see, e.g.*, 7 CFR § 1260.169(d) (2004)
> (campaigns shall not, without prior approval, refer "to a brand or trade name of
> any beef product").   Thus, Congress and the Secretary have set out the
> overarching message and some of its elements, and they have left the
> development of the remaining details to an entity whose members are
> answerable to the Secretary (and in some cases appointed by him as well).
>
> Moreover, the record demonstrates that the Secretary exercises final approval
> authority over every word used in every promotional campaign.  All proposed
> promotional messages are reviewed by Department officials both for substance
> and for wording, and some proposals are rejected or rewritten by the
> Department.  Nor is the Secretary's role limited to final approval or rejection:
> Officials of the Department also attend and participate in the open meetings at
> which proposals are developed.

*Id.* at 560–61 (some citations omitted).  Because Congress defined the substance of the speech, in

general, and because the Secretary retained ultimate authority to control specific messaging, the

Court held that the advertising constituted government speech, even though the Secretary "solicits assistance from nongovernmental sources in developing specific messages." *Id.* at 562. The Supreme Court, accordingly, rejected the plaintiffs' First Amendment challenge to the Beef Checkoff Program.

      2.    *Qualified State Beef Councils*

Here, R-CALF does not seek to resurrect the claims raised and rejected in *Johanns*. Instead, it challenges a different facet of the program. Although the Beef Board is ultimately responsible for collecting the one-dollar-per-head assessment, it relies on the QSBCs to receive the assessments and to forward them to the national organization. 7 U.S.C. § 2904(8)(A); 7 C.F.R. § 1260.172(a). A QSBC is a "beef promotion entity" that (1) is either "authorized by State statute" or "organized and operating within a State;" (2) "receives voluntary assessments or contributions;" (3) "conducts beef promotion, research, and consumer and industry information programs;" and (4) is "certified by the [Beef Board] . . . as the beef promotion entity in such State." 7 C.F.R. § 1260.115; *see also id.* § 1260.181 (setting forth the requirements for the Beef Board to certify a QSBC). In addition to receiving assessments, QSBCs also perform several other functions in support of the Beef Checkoff Program, such as serving as liaisons between the Beef Board and state cattle producers, 7 U.S.C. § 2905, electing, as a group, half the members of the Operating Committee, 7 C.F.R. § 1260.161(a); *id.* § 1260.112, and conducting beef promotion, research, and consumer and industry information programs, *id.* § 1260.181(a).

To foster the QSBCs' operations, the Beef Act and Beef Order permit cattle producers to divert up to fifty cents per head of cattle from their checkoff assessment to their local QSBC. 7 U.S.C. § 2904(8)(C); 7 C.F.R. § 1260.172(a)(3). In practice, this diversion operates as the default. The USDA permits QSBCs to retain fifty cents of every checkoff dollar that they collect

and to forward the rest to the Beef Board, *see* Beef Promotion and Research, 84 Fed. Reg. 20,765, 20,766 (May 13, 2019), although cattle producers are permitted to opt out of this arrangement and to elect to have their entire assessment sent to the federal program,[1] *id.* at 20,767.  To opt out, the rancher must submit a QSBC-1 form that is postmarked by the 15th day of the month following the month the cattle were sold.  The QSBC must then review and process the paperwork within sixty days.  *Id.*  A rancher who opts out will have his entire checkoff redirected to the Beef Board; a rancher who does not opt out, in contrast, will contribute half of his checkoff to his QSBC and half of his checkoff to the Beef Board.

QSBCs are limited in how they spend the funds they receive from the Beef Checkoff Program.  Specifically, QSBCs must conduct or fund "plans or projects for promotion, research, consumer information and industry information, with respect to beef and beef products," 7 C.F.R. § 1260.169(a); *see also id*. § 1260.181(b)(1) (QSBCs must "[c]onduct activities as defined in § 1260.169), that are intended to "strengthen the beef industry's position in the marketplace," *id.*  QSBCs may "[n]ot use council funds collected pursuant to [the Beef Checkoff Program] for the purpose of influencing governmental policy or action, or to fund plans or projects which make use of any unfair or deceptive acts or practices including unfair or deceptive acts or practices with respect to the quality, value or use of any competing product." *Id.* § 1260.181(b)(7).  Moreover, as relevant here, QSBCs are required to use checkoff funds "to strengthen the beef industry's position in the marketplace and to maintain and expand domestic

---

[1] This option is not available to every rancher.  Some states require their ranchers to contribute to the state QSBC.  *Id.* at 20,768.  In those states, a rancher cannot opt out and request that fifty cents of their dollar assessment be redirected to the Beef Board.  *Id.*  Those states are Arizona, California, Georgia, Louisiana, Michigan, Oregon, Washington, and Wyoming, *id.*—none of which have an MOU at issue in this case.  Because all ranchers implicated by R-CALF's claims can redirect their entire dollar assessment to the Beef Board, the Court will not consider whether its analysis would be any different for a rancher that is required to contribute to the QSBCs.

*and* foreign markets and uses for beef and beef products." 7 C.F.R. §§ 1260.169(a), 1260.181(b)(1) (emphasis added).

The Beef Board certifies the QSBCs and exercises general oversight authority over their use of checkoff funds. 7 C.F.R. §§ 1260.150(n), 1260.181(a). USDA Agricultural Marketing Service ("AMS") aids the Beef Board in performing this function. Dkt. 52-7 at 3–4 (Snyder Decl. ¶¶ 6, 7). As part of the USDA's oversight and independent review, the Beef Board receives each QSBC's annual marketing plan and financial audit report to ensure compliance with the Beef Act and Beef Order, and "AMS ensures that the Beef Board has conducted compliance reviews of QSBCs." Dkt. 52-7 at 4 (Snyder Decl. ¶ 8); *see also* 7 C.F.R. § 1260.181. In addition, "AMS . . . participates in all Beef Board Executive Committee meetings, during which AMS receives regular reports on the submission of QSBC marketing plans, audited financial statements, and other required submissions." Dkt. 52-7 at 4 (Snyder Decl. ¶ 8). "If the Beef Board determine[d] that a QSBC [was] engaging in an activity that [did] not comply with the Beef Act or the Beef Order, the Beef Board [would] work with the QSBC to halt the activity." *Id.* (Snyder Decl. ¶ 9). "[R]epeated infractions can, with AMS's concurrence, result in disqualification[] of the QSBC by the Beef Board." *Id.*

The Beef Board and AMS also exercise ad hoc oversight over QSBC campaigns if either entity is alerted to potentially violative behavior by a QSBC. *Id.* at 5 (Snyder Decl. ¶¶ 11–12). For example, in February 2014, Bill Bullard, the Chief Executive Officer of R-CALF, sent a letter to the Secretary of Agriculture requesting that AMS "investigate whether the Montana Beef Council's promotional campaign involving Wendy's, and in particular, its reference to North American Beef, was consistent with the Beef Act and Beef Order." *Id.* (Snyder Decl. ¶ 12). "AMS investigated the matter and determined that the advertisements complied with the

requirements of the Beef Checkoff Program." *Id.* Had AMS reached a different conclusion and determined that the QSBC had run an advertisement "that was not consistent with the Government's message or AMS policy, the Beef Board or AMS would [have] work[ed] with the QSBC to remove the advertisement from circulation." *Id.* (Snyder Decl. ¶ 11). That said, prior to execution of the MOUs, "AMS did not as a practical matter review every expenditure, marketing plan, or financial audit report that QSBCs submitted to the Beef Board." *Id.* (Snyder Decl. ¶ 13).

3.      *Montana Litigation and the MOUs*

In 2016, R-CALF sued the USDA and the Secretary in the U.S. District Court for the District of Montana, alleging that the Beef Checkoff Program violated the First Amendment to the extent that it permitted the Montana Beef Council to retain a portion of cattle producers' checkoff assessments and to use those assessments to fund speech with which R-CALF's members disagreed. *See* Complaint, *R-CALF v. Perdue*, No. 16-cv-41 (D. Mont. May 2, 2016) (Dkt. 1). Early in the litigation, R-CALF obtained a preliminary injunction based, in part, on the district court's conclusion that "[t]he Government's statutorily authorized control over the [Montana QSBC] appears inadequate to transform [QSBC] advertising into government speech." *R-CALF I,* 2017 WL 2671072, at *7. Concluding that the mandatory assessments were, accordingly, used at least in part to fund private speech, the district court "enjoined [the USDA] from continuing to allow the Montana Beef Council to use the assessments that it collects under the Beef Checkoff Program to fund its advertising campaigns, unless the payer provides prior affirmative consent authorizing the [QSBC] to retain a portion of the payer's assessment," *id.* at *8. The Ninth Circuit affirmed, holding that the district court had not abused its discretion in granting the preliminary injunction. *R-CALF II,* 718 F. App'x at 542.

In reaching this conclusion, however, neither the district court nor the Ninth Circuit addressed the USDA oversight required under the Montana MOU, which was executed months before the district court granted R-CALF's motion for a preliminary injunction. *See* Dkt. 52-9 at 23 (effective Dec. 22, 2016). The Montana MOU and the other 19 MOUs (which were entered into later) are not identical, but they follow a similar template; each requires the relevant QSBC to submit its budget (including anticipated expenses) and its planned promotional plans to the AMS for pre-approval. Taking the Montana MOU as an example, the MOU requires the Montana Beef Council to "prepare and [to] submit to the Secretary . . . for approval on a fiscal-period basis, an annual budget outlining and explaining [the QSBC's] anticipated expenses and disbursements in the administration of its responsibilities, including probable costs of promotion, research, consumer information and industry information plans or projects," along with "a general description of the proposed promotion" activities contemplated in the budget. *Id.* The MOU further requires the Montana Beef Council to "submit to AMS for pre-approval any and all promotion, advertising, research, and consumer information plans and projects" and "any and all potential contracts or agreements to be entered into by [the QSBC] for the implementation and conduct of plans or projects funded by checkoff funds." *Id.* at 24. And it requires the Montana Beef Council to "make its books and records available to AMS for inspection and audit." *Id.* None of the MOUs, including the Montana MOU, contains any provision addressing the *substance* of the promotional activity; rather, the MOUs simply establish *procedures* for USDA review and pre-approval of promotional activities and the expenditure of checkoff funds.

Although the MOUs were not addressed at the preliminary injunction stage of the Montana litigation, they were addressed at summary judgment, when the USDA and defendant-intervenor QSBCs argued that, as a result of the MOUs, the federal government exercised

sufficient control over the QSBCs' speech to satisfy the government speech doctrine.  *See R-CALF III*, 449 F. Supp. 3d at 951–56.  The district court agreed, concluding that the MOUs provide the USDA with "significant discretion to approve or reject QSBC speech . . . such that QSBC speech constitutes government speech."  *Id.* at 955.

The Ninth Circuit reached the same conclusion.  Invoking the Supreme Court's decision in *Johanns*, the court concluded that QSBC speech financed using checkoff funds qualifies as government speech because it is "effectively controlled" by the USDA.  *R-CALF IV*, 6 F.4th at 988 (quoting *Johanns*, 544 U.S. at 560).  It held, in particular, that "[p]romotional campaigns by QSBCs and contracted third parties subject to the Secretary's pre-approval are . . . plainly government speech" because the MOUs ensure that the USDA has "final approval authority over every word used in every promotional campaign."  *Id.* at 989 (quoting *Johanns*, 544 U.S. at 561).  The Ninth Circuit also held that the payments QSBCs make to third party organizations are "effectively controlled" by the government, even though they are not subject to USDA pre-approval, because the USDA ultimately has the "ability to control [that] speech."  *Id.* at 989–90.

**B.    Procedural Background**

R-CALF brought this action against the USDA on September 11, 2020, only six months after the district court in Montana granted summary judgment in favor of the USDA and defendant-intervenor QSBCs, and before the Ninth Circuit affirmed that decision.  *See* Dkt. 1.  R-CALF alleges that the USDA violated the APA, 5 U.S.C. § 706(2)(D), by entering into the MOUs without conducting a notice-and-comment rulemaking.  Dkt. 1 at 19 (Compl. ¶ 73).  R-CALF also alleges that the MOUs are arbitrary and capricious, 5 U.S.C. § 706(2)(A), because the regulatory changes the MOUs introduced were "not the product of reasoned decisionmaking."

Dkt. 1 at 21 (Compl. ¶ 84). R-CALF seeks declaratory and injunctive relief, including an order vacating the MOUs as unlawful. *Id.* at 22 (Compl.).

In November 2020, the USDA moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim. Dkt. 11. In particular, the USDA posited that R-CALF lacks both associational and organizational standing to challenge the MOUs because neither R-CALF nor any of its members has sustained a cognizable injury that is traceable to the MOUs. Dkt. 11-1 at 14–22. It also argued that R-CALF's challenges to the MOUs are barred by claim preclusion because the organization's present challenge overlaps with the Montana litigation, where R-CALF should have asserted any challenge to the MOUs. *Id.* at 22–25. In response, R-CALF argued that it has standing and that its claims are not barred. Dkt. 13. The Court denied the motion without prejudice. *R-CALF V*, 573 F. Supp. 3d at 345.

As a threshold matter, the Court observed that the USDA's motion raised "only a facial challenge to R-CALF's standing allegations" and did not ask the Court to resolve any disputed questions of fact. *Id.* at 333. Against that backdrop, the Court concluded that R-CALF had "failed to plausibly allege organizational standing"—that is, that the MOUs have caused or are causing any cognizable injury to the organization itself. *Id.* at 341–44. The Court was also unpersuaded by R-CALF's contention that it has associational standing—that is, standing to sue on behalf of its members—based on the alleged "financial interest" of its members in ensuring the "proper administration" of a program that is funded, in part, through their contributions. *Id.* at 337–39. The Court saw greater promise, however, for R-CALF's contention that it has associational standing to the extent that "its members have suffered and will continue to suffer financial injury from the MOUs because money taken and used by the state councils due to the MOUs goes to speech (1) that promotes consolidation in the beef industry, which drives down

15

prices, . . . and (2) that makes no effort to distinguish . . . domestic beef from other beef, which harms domestic producers." *Id.* at 337 (cleaned up).

Drawing all inferences in R-CALF's favor, the Court concluded that the complaint adequately alleged associational standing and, accordingly, denied the USDA's motion to dismiss for lack of standing without prejudice. That Court did "so, however, with an important caveat: although R-CALF's allegations suffice[d] to survive a facial motion to dismiss, R-CALF w[ould] face a far more substantial hurdle at the next stage of the proceeding, when it w[ould] bear the burden of proving that at least one named member has suffered or will suffer a concrete injury in fact that is fairly traceable to the procedural wrongs alleged in the complaint." *Id.* at 341. The Court further cautioned that making this showing "may prove to be a tall order in the context of this case, where R-CALF does not allege that any of its members have suffered a constitutional injury and where it will not be easy to demonstrate that the challenged conduct has—or will—cause any of its members to suffer a nonspeculative, financial harm." *Id.*

Finally, the Court declined to reach the USDA's separate claim preclusion defense on the ground that the Court's Article III jurisdiction remained in dispute. As the Court explained, "[t]here is considerable uncertainty . . . about whether a federal court may resolve a *res judicata* defense before it is satisfied that it has Article III jurisdiction over a case." *Id.* at 344. Given that uncertainty, the Court concluded that it would be prudent to address standing first. *Id.* at 345.

At that point, the parties started the process of developing a factual record to support their respective positions on standing. In order "to narrow the issues and evidence relevant to this case," moreover, the parties stipulated that R-CALF would limit its theory of associational standing to a claim that "[t]he current terms of the MOUs have increased competition against R-

CALF's members' small, independent businesses" by (1) "allow[ing] advertising that suggests there is no difference between the domestic and specialty cattle and beef that the members produce and the cattle and beef products produced by others in the market, increasing competition against the members;" (2) "fail[ing] to distinguish between domestic/specialty and other beef," which, "in turn, encourages international meat processing companies to exploit international supply chains to import beef that competes with these members' domestic beef;" (3) "allow[ing] QSBCs to contract with, and thus ultimately support, entities such as the National Cattlemen's Beef Association and the U.S. Meat Export Federation who are aligned with these members' competitors and support policies that are harmful to the members and instead benefit their competitors;" and (4) "allow[ing] QSBCs to make financial expenditures that promote policies or practices, such as the Beef Quality Assurance program, that are more costly and less beneficial for small ranching operations to engage in and thus primarily benefit large meatpacking corporations and larger operations that can more easily gain such certifications." Dkt. 44-1 at 2–3.  R-CALF has agreed not to assert any alleged First Amendment injury in support of its claim of associational standing.

        Much of the parties' discovery focused on the opinions of the respective experts, Dr. Claudiu V. Dimofte for R-CALF, and Dr. Harry M. Kaiser for the USDA, both of whom prepared lengthy expert reports and critiques of the other side's expert reports.  After several extensions, jurisdictional discovery eventually closed in March 2023, *see* Min. Order (Feb. 23, 2023), and the Court set a schedule for cross-motions for summary judgment, *see* Min. Order (July 7, 2023).  The parties completed that briefing about seven months later, Dkt. 59, and the Court heard oral argument in September 2024, *see* Min. Order (Sept. 23, 2024).  The pending cross-motions are now ripe for decision.

## II. ANALYSIS

"Article III standing is an 'essential and unchanging part' of the Constitution's case-or-controversy requirement." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Although "standing doctrine includes various permutations," *Public Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 17 (D.D.C. 2018), "the irreducible constitutional minimum of standing contains three elements," *Lujan v. Defs. of Wildlife*, 504 U.S. 551, 560 (1992). First, the plaintiff bears the burden of demonstrating that it has suffered, or faces an imminent threat of suffering, an "injury in fact." *Id.* Conjectural or hypothetical threats of injury will not suffice. *Id.* Second, the plaintiff must establish a "causal connection between [that] injury and the" conduct or agency action that it challenges. *Id.* In other words, the injury must "be fairly traceable to the challenged action of the defendant." *Id.* (internal quotation marks, alterations, and citation omitted). Third, the injury must be redressable "by a favorable decision." *Id.* at 561. As explained below, this requirement is relaxed in cases, like this one, that raise procedural challenges to agency action, but the requirement applies—in one form or another—in all cases brought in federal court.

"When an association seeks to invoke the jurisdiction of a federal court, it can establish standing in one of two ways." *Public Citizen*, 297 F. Supp. 3d at 17. It can assert "organizational standing" to sue on its own behalf. *See People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). Or it can assert "associational standing" to sue on behalf of its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, the Court held in *R-CALF V* that the complaint failed plausibly to allege organizational standing, 573 F. Supp. 3d at 344, and R-CALF has neither sought leave to amend its complaint nor otherwise sought to reassert its claim of organizational standing in light

18

of facts developed during discovery.  As a result, for purposes of the pending cross-motions, R-CALF relies exclusively on a theory of associational standing.

As the Supreme Court has explained, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court set forth the criteria for associational standing.  432 U.S. 333.  Under the *Hunt* test, the plaintiff-association must show (1) that the association has at least one member who "would otherwise have standing to sue in [her] own right;" (2) that "the interests" the association "seeks to protect are germane to [its] purpose;" and (3) that "neither the claim asserted nor the relief requested requires the participation of [the] individual members in the lawsuit."  *Id.* at 343.  In the present case, the USDA does not dispute that R-CALF has satisfied the second and third elements of the *Hunt* test, and the Court, which must satisfy itself that it has jurisdiction, agrees that neither factor poses a hurdle.

The parties, instead, devote their attention to the question whether R-CALF has carried its burden with respect to the first element—that is, whether it has shown that at least one member of the association would have standing to sue in its own right.  The question presented is further narrowed, moreover, by the parties' stipulation, which precludes R-CALF from relying on any alleged First Amendment injury to carry this burden.  *See* Dkt. 44-1.  For good reason, *see R-CALF V*, 573 F. Supp. 3d at 336–37, R-CALF has agreed not to argue, for example, that its members object to the Beef Checkoff Program on First Amendment grounds, and, if they are successful in setting aside the MOUs, they might be able to overcome the USDA's government speech defense and to bring a successful First Amendment challenge to the program.  Instead, the only substantial question before the Court is whether any identified R-CALF members have

suffered or will imminently suffer a nonspeculative, financial injury that is fairly traceable to the USDA's decision to enter into the MOUs and, if so, whether a favorable decision would redress that injury. And the question is narrowed even further by the parties' agreement "to focus on the activities of [four] QSBCs"—Oklahoma, Nebraska, South Dakota, and Texas—"[f]or purposes of establishing the factual bases," if any, "for standing." Dkt. 45-2 at 6 n.1.

In resolving that narrow question, the Court must consider "the manner and degree of evidence required at the [relevant] stage[] of the litigation," *Lujan*, 504 U.S. at 561—here, the summary judgment standard. Thus, although the Court concluded at the motion to dismiss stage that the allegations contained in R-CALF's complaint, if accepted as true and if all inferences were drawn in R-CALF's favor—sufficed to *allege* standing, the Court must now consider whether, in seeking partial summary judgment on standing, Dkt. 45, R-CALF has carried its burden of demonstrating that the undisputed evidence establishes that it has standing to sue. Moreover, because R-CALF bears the burden of establishing standing, the USDA is entitled to summary judgment if it can show that R-CALF "cannot establish the required elements of Article III standing based on the record evidence." *Public Citizen v. Trump*, 435 F. Supp. 3d 144, 152 (D.D.C. 2019); *see also id*. at 159. That is particularly true in a case, like this one, in which the parties have engaged in many months of jurisdictional discovery; have proffered extensive expert reports and supplemental reports, along with numerous exhibits; and have devoted hundreds of pages of briefing to the question of standing. At this point, it is safe to conclude that R-CALF has done all that it can to establish standing. The question before the Court is whether that is enough.

## A.

R-CALF's principal claim in this case is that the MOUs altered the regulatory framework for the Beef Checkoff Program and that, as result, the USDA was required to, but did not, proceed by way a notice-and-comment rulemaking.  Because the case, accordingly, asserts a procedural injury, "the normal standards for redressability and immediacy" are relaxed.  *Lujan*, 504 U.S. at 572 n.7; *see also Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007).  The Supreme Court has recognized, for example, that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years."  *Lujan*, 504 U.S. at 572 n.7.  But because redressability is one of "the 'irreducible' elements of standing," "the particular nature of a case does not—and cannot— eliminate" the requirement altogether.  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996).

"The injury-in-fact and causation requirements, in contrast, are not relaxed and apply just as they would in any other case."  *California v. Trump*, 613 F. Supp. 3d 231, 243 (D.D.C. 2020); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005).  Thus, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  "There is no doubt, for example, that a plaintiff that is able to establish that an agency failed to comply with the notice and comment procedures of the APA would, nonetheless, have no recourse in an Article III court absent a showing that it suffered or will suffer a concrete injury as a result of policy produced through the

allegedly flawed process."  *California*, 613 F. Supp. 3d at 243; *see also Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 239, 244–46 (D.C. Cir. 2015).

Here, R-CALF argues that it has "competitor standing" to sue because "generic [c]heckoff advertising causes consumers to view [its] member's products as homogenous with imported beef and reduces consumers' willingness to pay for beef."  Dkt. 55 at 6–7.  And it argues that this injury is traceable to the challenged MOUs—and the USDA's failure to conduct a notice-and-comment rulemaking—because the MOUs "authorize harmful conduct that would otherwise allegedly be illegal as unconstitutionally compelled speech."  *Id.* at 7.  In particular, according to R-CALF, the injury to its members resulting from "the homogen[ous] advertising" is traceable to the "USDA's failure to impose any substantive guardrails on the content of the [c]heckoff advertising" in the MOUs.  *Id.* (emphasis omitted).  Finally, R-CALF argues that this injury is redressable under the relaxed standard that applies in procedural injury cases because "if USDA were required to proceed through rulemaking, R-CALF's members would have the opportunity to submit comments urging the MOUs to require that [c]heckoff advertising distinguish between domestic and imported beef, and the agency could change its mind."  *Id.* at 40.

Although R-CALF does not clearly distinguish between them, its arguments take two distinct forms.  First, it argues that, had the USDA provided an opportunity for notice and comment, R-CALF members might have convinced the agency to include "guardrails" or terms in the MOUs, which would have required the QSBCs to distinguish between domestic and imported beef in any promotional materials.  *Id.* at 7. As R-CALF's expert proposed in his market survey, for example, the promotional activity might include a tagline asserting: "Beef that is produced domestically uses high quality feed, advanced standards of care, and a limited carbon

footprint." Dkt. 43-1 at 14 n.42. Including a tagline of that sort, on R-CALF's telling, would prevent the "homogenization" of domestic and imported beef and the competitive harm that "homogenization" entails. Second, it argues—or at least suggests—that if its members are given the opportunity to comment on the MOUs, they might convince the USDA to abandon the MOUs entirely. If so, R-CALF's members would then stand a better chance of persuading a court to declare that the use of checkoff funds to engage in promotional activity violates the First Amendment. And, although R-CALF has agreed not to premise its standing arguments on any asserted First Amendment injury, it contends that the existing checkoff promotional activity is causing its members competitive injury by "homogenizing" domestic and imported beef in the eyes of consumers.

The Court will consider each theory in turn.

### 1.

R-CALF first argues that, had the USDA proceeded by way of notice-and-comment rulemaking, the organization's members might have persuaded the agency to include in the MOUs "substantive safeguards on the content of [c]heckoff-funded advertising" and that their asserted competitive injury is traceable to the absence of those safeguards. Dkt. 55 at 33–34. In support of this theory, R-CALF relies on the report of its marketing expert, Dr. Claudiu Dimofte, who compared "two types of ads"—the "'current' ads promoting beef as a generic product typical of those funded by QSBCs" and an "adjusted" advertisement that mirrors the "current ads" but also includes an additional statement highlighting the virtues of domestic beef. Dkt. 45-2 at 15; *see id.* at 10–18. Although disputed by the USDA's expert witness, *see* Dkt. 43-2 at 19, Dr. Dimofte posits that "domestic and higher-quality beef producers 'fac[e] more competitive

pressure" when QSBCs use the "current ads" than they would face if, instead, the QSBCs were to use the "adjusted ads," Dkt. 45-2 at 17.

The Court is unpersuaded by this theory of standing for several reasons, none of which requires the Court to resolve the debate between the parties' competing experts. Most importantly, the central question for purposes of determining whether R-CALF has standing to challenge the USDA's issuance of the MOUs is not whether ads that highlight the high quality of domestic beef would do more to help domestic ranchers than the current ads, but, rather, whether the MOUs have caused, or are likely to cause, any identifiable member of R-CALF a cognizable injury. Making that showing in the current context is a tall order, however, because the MOUs say nothing about the content of the promotional activity—they do not favor the "current ads" over Dr. Dimofte's "adjusted ads" or favor generic over branded promotions. Rather, they are entirely procedural, and they merely require covered QSBCs to submit their budgets and proposed promotional activities to the AMS for pre-approval. The question, then, is whether R-CALF can demonstrate that one or more of its members has suffered or will imminently suffer a cognizable Article III injury that is "fairly traceable" to the USDA's decision to enter into a series of MOUs that impose these procedures, while saying nothing about the "substantive safeguards" that R-CALF members might have sought had the agency provided them with an opportunity to comment.

The Supreme Court's recent decision in *Department of Education v. Brown*, 600 U.S. 551 (2023), provides significant guidance on this question. In that case, the Secretary of Education exercised his authority under the Higher Education Relief Opportunities for Students Act ("HEROES Act"), 20 U. S. C. § 1070 (note), to implement a loan-forgiveness plan. *Id.* at 555–56. Two individuals who did "not qualify for the maximum relief available under the [p]lan"

brought suit challenging the Secretary's action and arguing, as R-CALF argues here, that the agency action should be set aside for failure to comply with the APA's notice-and-comment requirements. *Id.* at 556. In response, a unanimous Supreme Court held that the *Brown* plaintiffs lacked Article III standing. Although the *Brown* plaintiffs' theory of standing was deficient in several respects, the Court focused on the plaintiffs' failure to "show that their purported injury" was "fairly traceable to the Department's (allegedly unlawful) decision to grant loan relief under the HEROES Act." *Id.* at 564.

Applying many of the same legal principles relevant here, the Supreme Court explained that the redressability and immediacy requirements were relaxed in that case, as they are here, because the plaintiffs sought to enforce a procedural right. *Id.* at 561–62. But the Court was quick to add that the procedural nature of the plaintiffs' claims did not excuse them "from demonstrating that [they had] a 'concrete interest that [was] affected by the deprivation' of the claimed right." *Id.* at 562 (quoting *Summers*, 555 U.S. at 496–97)). Nor did the procedural nature of the plaintiffs' claim relieve them of need to establish "a causal relationship" between the agency action and their alleged injuries. *Id.* at 565–66. The difficulty with the plaintiffs' theory of standing, then, was that it failed to tie their alleged injury to the Secretary's decision to adopt the specific loan-forgiveness plan at issue. Or put differently, the plaintiffs' alleged injury—their inability to obtain loan relief under the Higher Education Act ("HEA"), 20 U.S.C. § 1082(a)(6)—was not fairly traceable to the Secretary's separate decision to grant loan forgiveness to others under the HEROES Act. *Id.* at 565. To be sure, had the Secretary proceeded by notice and comment rulemaking, the plaintiffs might have had the opportunity to urge the Secretary to grant relief under the HEA as well. But the Secretary's decision to grant the relief that he did under the HEROES Act was not the cause of the plaintiffs' asserted injuries.

*Id.* As the Supreme Court stressed, "[o]rdinarily, a party's recourse to induce an agency to take a desired action is to file not a lawsuit, but a 'petition for the issuance, amendment, or repeal of a rule.'" *Id.* (quoting 5 U.S.C. § 553(e)).

*Brown* goes on to offer a helpful explanation of the distinction between the relaxed redressability rules and the ordinary traceability rules that apply in procedural injury cases. *Id.* The classic example of the relaxed redressability requirement comes from the Supreme Court's *Lujan* decision, where it hypothesized a proposal to construct "a federally licensed dam." *Lujan*, 504 U.S. 572 n.7. As the Court explained in *Lujan*, and reaffirmed in *Brown*, an individual "living adjacent to the site for the proposed" dam would have "standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Id.* Under that hypothetical, "[w]hile it might be uncertain whether undertaking an environmental impact statement would prevent the dam from being built, it is clear that building the dam would directly injure the landowner." *Brown*, 600 U.S. at 566. In other words, the hypothetical plaintiff's asserted injury—the construction of a dam adjacent to his home—is *fairly traceable* to the agency action-granting a license to construct the dam. All that is uncertain is whether requiring the preparation of an environmental impact statement might *redress* that injury.

Although *Brown* and this case are not on all-fours, the same essential reasoning controls in both cases—and indeed, if anything, this case is even clearer. Putting aside for the moment R-CALF's separate argument that the challenged MOUs effectively resurrected a program that the organization opposes, which is discussed in Part A.2. below, USDA's decision to enter into the MOUs has not caused any R-CALF member a cognizable injury. The MOUs are purely

procedural and merely require QSBCs to obtain pre-approval from the AMS before implementing their promotional programs.  They say nothing, moreover, about the substance of any promotional activity.  That is, simply put, a different topic for a different day.  Returning to the example in *Lujan*, this is like a case in which the hypothetical homeowner sought to challenge a guidance document issued by the licensing agency directing field offices or others to obtain approval from the main office before issuing licenses on the grounds that (1) the guidance was subject to the APA's notice-and-comment requirements, and (2) if the homeowner had received an opportunity to comment, he would have urged the agency to require the field offices or others to prepare environmental impact statements for all proposed dams.  The problem, as in *Brown*, is that the concrete injury that R-CALF invokes—the financial loss, if any, resulting from the USDA's failure to require QSBCs to extol the unique quality of domestic beef in their ads—cannot be fairly traced to the agency action that R-CALF seeks to challenge—entering into purely procedural agreements with QSBCs, which, as the USDA observes, "do not 'authorize' anything."  Dkt. 56 at 33 (quoting Dkt. 52 at 24–26).

R-CALF resists this comparison to *Brown* and argues that the MOUs' "*failure . . . to impose any substantive safeguards on the content of* [c]heckoff-funded advertising [has] cause[d] R-CALF-s members' injuries."  *Id.* at 33–34 (emphasis in original).  The "distinction" between an agency action that "'authorize[s]' something" and "choosing not to forbid it," according to R-CALF, is "a distinction without a difference."  *Id.* at 34.  Noting that "[a] sign saying 'no trucks over 2,500 pounds on bridge,' authorizes a 2,400-pound truck to cross," R-CALF maintains that this case is no different and, as a result, the MOUs are properly understood to "authorize" generic checkoff promotions.

Merely repeating that analogy, however, highlights where R-CALF's argument goes wrong.  Here, unlike in R-CALF's truck-crossing analogy, the MOUs do not authorize anything—either expressly or by implication.  A closer analogy would imagine an agreement between the Department of Transportation ("DOT") and various local jurisdictions, committing the local jurisdictions to obtain DOT approval before posting tonnage limitations on bridges.  Like the MOUs at issue here, those hypothetical agreements would not authorize anything, and like the USDA's failure to include "substantive safeguards" in the MOUs, the DOT's failure to specify a 2,500-pound limitation would not cause any cognizable harm that is fairly traceable to the DOT's purely procedural agreements.

Nor do any of the cases that R-CALF cites support a contrary view.  R-CALF relies first and foremost on the D.C. Circuit's *en banc* decision in *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) ("*ALDF*").  On R-CALF's reading, that decision stands for the "common-sense conclusion that declining to impose substantive restrictions on injurious third-party conduct causes injury" for purposes of Article III.  Dkt. 56 at 34.  *ALDF*, however, differs from the present case in dispositive respects.  Most significantly, the plaintiffs in that case challenged the lawfulness of USDA regulations on the ground that the regulations failed to set the minimum requirements for the humane treatment of primates that were "mandated" by the Animal Welfare Act ("AWA"), 7 U.S.C. § 2143(a).  *ALDF*, 154 F.3d at 431.  As the D.C. Circuit explained, "the plaintiffs allege that the AWA *require*[*d*] the USDA to adopt specific, minimum standards to protect primates' psychological well-being, and the agency failed to do so."  *Id.* at 430 (emphasis added).  It was only in this sense—in the sense that the regulations incorrectly defined the minimum requirements for the humane treatment of primates—that the D.C. Circuit

held that the USDA's alleged "misinterpret[ation]" of the AWA, and adoption of unlawfully permissive standards, effectively authorized conduct that the AWA prohibited.  *Id.* at 441-42.

Here, in contrast, R-CALF does not allege that the Beef Act or any other statute or rule required the USDA to enter into MOUs that *mandate* or *require* QSBCs to promote (or even to acknowledge) the distinct qualities of domestic beef.  Nor do the MOUs set "minimum standards" or otherwise prescribe the permissible content of the QSBC ads in a manner that might plausibly be understood to "implicitly permit[,]" *Am's Cmty. Bankers v. FDIC*, 200 F.3d 822, 827 (D.C. Cir. 2000), any particular substantive content.  Accordingly, *ALDF* offers no support for R-CALF's expansive view of Article III standing.

The three additional cases that R-CALF cites in support of its argument offer no greater comfort.  In both *Consumer Federal of America v. FCC*, 348 F.3d 1009 (D.C. Cir. 2003), and *Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017), the D.C. Circuit held that the petitioners' alleged injuries were traceable to the challenged agency actions.  In *Consumer Federation*, the FCC had approved a license transfer that was required to consummate a merger, which in turn permitted one of the parties to the merger to engage in conduct that allegedly injured an individual consumer.  348 F. 3d at 1010, 1012.  And, similarly, in *Orangeburg*, the FERC approved a "Joint Dispatch Agreement" ("JDA") between two companies, and the JDA incorporated certain state regulatory conditions that "thwarted" the petitioner's deal to acquire wholesale power.  862 F.3d at 1073,1076, 1080.  In both cases, the challenged agency action authorized the conduct that injured the petitioners.  Here, in contrast, the MOUs do not authorize any QSBC ads and, instead, merely establish a process for review by the USDA.

The final case that R-CALF relies upon—*Massachusetts v. EPA*, 549 U.S. 497 (2007)— is even less on point.  According to R-CALF, *Massachusetts v. EPA* stands for the proposition

that a party suffers a traceable injury in fact where "the absence of any regulations . . . permit[s] the injurious . . . third-party conduct."  Dkt. 56 at 36.  But, unlike in this case, the agency action that was challenged in *Massachusetts v. EPA* was the agency's denial of a rulemaking petition on grounds that, according to the petitioners, were contrary to law.  549 U.S. at 511–12.  As the Supreme Court observed in *Brown*, that is the "ordinar[y] . . . recourse" for a party seeking "to induce an agency to take a desired action," 600 U.S. at 565, and, if the agency denies such a petition for reasons that are contrary to law, a party that is injured by the agency's failure to take *that* action may typically seek judicial review.  That does not mean, however, that a party has standing to challenge a *different* agency action, merely because it was denied the opportunity— through the notice-and-comment process—to urge the agency also to address its separate or additional concern.  *Brown*, 600 U.S. at 567.

The Court, accordingly, rejects R-CALF's first theory of standing.

### 2.

In the alternative, R-CALF argues that one or more of its members has suffered a cognizable injury because the MOUs save the QSBC promotional activities from what would otherwise constitute a strong constitutional challenge.  R-CALF maintains, in short, that without the MOUs, it has a good chance of convincing a federal court to grant the organization and its members permanent and more sweeping relief along the same lines as the preliminary relief that the *Montana* district court granted in *R-CALF I*, 2017 WL 2671072 (D. Mont. June 21, 2017), and that the Ninth Circuit affirmed in *R-CALF II*, 718 F. App'x 541 (9th Cir. 2018).  Under this theory, the injuries-in-fact are the financial losses allegedly suffered by R-CALF's members due to the homogenizing effect of generic advertising, and those losses are fairly traceable to adoption of the MOUs because, without the MOUs, R-CALF would likely prevail in future

litigation challenging QSBC generic advertising on the ground that it constitutes compelled, private speech.

Before turning to the merits of this argument, it bears emphasis that R-CALF has stipulated that it is not relying on any alleged First Amendment injury to any of its members. *See* Dkt. 44-1.  That concession makes sense because, far from redressing a First Amendment injury, the relief that they seek here would, if anything, give rise to a First Amendment problem. And that, of course, is the point.  R-CALF objects to the checkoff program and, if it can successfully set aside the MOUs, it can then argue that the QSBCs' speech is not government speech and that any requirement that R-CALF members fund that speech through their assessment violates their First Amendment rights.  That theory of standing faces a host of difficulties, including the lack of authority supporting the dubious proposition that an organization has standing to manufacture a constitutional infirmity in a government program merely to permit the organization to argue, in a subsequent proceeding, that the program must be set aside.  It is also far from clear that the extensive and speculative chain of events that R-CALF seeks to rely upon to support this theory of standing can withstand scrutiny.  To take just one example, R-CALF simply assumes that, if the MOUs are set aside, QSBCs—fully aware of the Ninth Circuit's decision in *R-CALF II*—would not voluntarily submit their promotional materials to AMS for approval.

The Court need not, however, wrestle with these potentially thorny questions because, even assuming that R-CALF's theory is correct, it has failed to meet its burden of proffering evidence sufficient to support its central premise—that is, that any of the R-CALF members that it has identified have suffered, or are likely to suffer, any financial loss caused by generic QSBC promotional activities.  Indeed, far from offering any meaningful evidence that the "current ads"

harm any R-CALF members, R-CALF's expert, Dr. Dimofte, opines "[t]he current, generic [b]eef [c]heckoff program advertising has been successful at increasing primary consumer demand for beef." Dkt. 43-1 at 29 (Dimofte Report); *see also id.* at 17 (explaining that "[b]eef [c]heckoff campaigns render beef more salient . . . and therefore have [a] positive impact on category consumption levels"). Moreover, even crediting Dr. Dimofte's supposition that the increased demand resulting from generic advertising "is likely not to have benefitted all producers equally," *id.* at 29–30 (Dimofte Report), and is likely to benefit "low quality firm[s] more than high quality firm[s]," *id.* at 2829 (Dimofte Report), a benefit is a benefit, and not a harm. Nor do any of the individual R-CALF members that the organization has identified to support its claims of standing—David Wright, Dennis Sweat, Vaughn Meyer, and Gary Hendrix, Dkt. 45-4—offer any evidence that they have suffered financial losses due to the "current ads" and the resulting *increased* demand for beef. Absent any evidence to the contrary, the Court cannot help but conclude that, in a currently undifferentiating market, *see* below, a rising tide lifts all boats—even if it might lift some boats more than others. And the Court certainly cannot conclude, absent any evidence, that this undisputed overall increase in demand for beef has caused Wright, Sweat, Meyer, or Hendrix any financial harm.

Although R-CALF does not press the point, the Court pauses to note that the organization does point to an article that asserts that "some authors have *argued* that generic advertising *may* harm branded products in a market characterized by both branded and generic goods," Dkt. 45-13 at 8 (Ex. 10) (emphasis added); *see also* Dkt. 45-1 at 36 (Pl.'s SUMF ¶ 203). But even assuming that R-CALF intends to press the point, that assertion fails to advance its claim to standing for several reasons. First, it goes without saying that an *argument* is not evidence and *may* does not mean will. Second, the referenced authors were not addressing the market for beef

or the QSBC ads and, of course, had nothing to say about the effects of the "current ads" on demand for Wright, Sweat, Meyer, or Hendrix's cattle.  Third, and of particular importance, the referenced authors addressed only the effects of generic advertising "in a market which is characterized by both branded and generic goods," and, here, there is no evidence that the market for beef is characterized as "branded" in relevant respects.  Dkt. 45-13 at 8 (Ex. 10).  To the contrary, as R-CALF concedes, "consumers [currently] view the beef market as having little differentiation."  Dkt. 45-2 at 24.  Although R-CALF argues that the absence of market differentiation is likely the result of years of checkoff program advertising, Dkt. 45-2 at 23, it offers little support for that contention, and, in any event, the Court's task is to determine whether R-CALF has standing—based on the current state affairs—to assert a claim that seeks purely prospective relief, *see Narragansett Indian Tribal Hist. Pres. Off. v. FERC*, 949 F.3d 8, 12 (D.C. Cir. 2020).  That current state of affairs includes, among other things, Congress's 2016 repeal of the mandatory Country of Origin Label ("COOL"), which eliminated the principal means of differentiating domestic from imported beef across the market.  *See* Dkt. 45-1 at 13, 15 (Pl.'s SUMF ¶¶ 76, 81); *see also Ranchers-Cattlemen Action Legal Fund v. USDA*, 2018 WL 2708747, at *4 (E.D. Wash. June 5, 2018).  The record, moreover, is devoid of evidence that any of the "Big Four" meat packing companies, which sell the vast majority of both domestic and imported beef to retailers, Dkt. 45-1 at 2–3 (Pl.'s SUMF ¶¶ 8–12), or any other meat packing company that sells significant quantities of beef to retailers, has an interest in voluntarily returning to the COOL regime.[2]

---

[2]  Hendrix, who both "hold[s] a small number of cattle each year to process and sell to customers," and who also owns the "No Spinal Cord (NSC) Beef Processing" company, attests that he is "working to attach a label that reads 'NSC Technology' on every product that used [his company's] processing method."  Dkt 45-4 at 43–45 (Hendrix Decl. ¶¶ 2, 9).  He says nothing,

In response to all of this, R-CALF suggests that a market that distinguishes between domestic and imported beef would likely emerge, if the USDA were only to require QSBCs to call out the unique qualities of domestic beef in their ads.  R-CALF points to *Air Excursions LLC v. Yellen*, 66 F. 4th 272, 280 (D.C. Cir. 2023), a competitor standing case in which the D.C. Circuit held that, when the government authorizes "new entrants into a fixed regulated market," actors already competing in that market have standing to challenge that authorization.  R-CALF argues that the generic advertising here expands the pool of competitors by "homogenizing" the market.  Article III standing, however, requires more than unadorned speculation, and, here, R-CALF makes a far more ambitious and counterintuitive argument than the argument embraced in *Air Excursions*; it maintains that advertising that *promotes* the product that its members produce and sell *reduces* their bottom line by failing to laud the unique qualities of domestic beef.  That theory of standing requires actual evidence, and R-CALF offers none.  It fails, for example, to identify any nascent private advertising campaign promoting the virtues of domestic beef that the "current ads" has squelched, much less any evidence that they would be financially better off if the QSBC promotional activities were enjoined.  Its argument, instead, hinges on the proposition that, even if the "current ads" are marginally helpful, ads that distinguish between domestic and foreign speech would be better.  To establish Article III standing, however, a plaintiff must identify an injury-in-fact that is "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (cleaned up); *see also Humane Soc'y of the United States v. Perdue ("Humane Soc'y II")*, 935 F.3d 598, 602 (D.C. Cir. 2019) (holding that plaintiff failed to offer sufficient evidence at summary judgment stage of "a diminished return on investment, a reduced bottom

however, about COOL and does not attest that his plan to attach the labels has reached fruition. Nor is there any evidence that the QSBC promotional activity conflicts with or would harm his efforts to promote this unique form of processing.

line, or any similar economic injury" and failed to "provide evidence that the Board's alleged misadventures reduced the price of pork"). Although the parties have gone to enormous lengths to develop their respective records on standing and offered extensive expert reports, R-CALF offers no actual evidence that the "current ads" have caused, or will cause, Wright, Sweat, Meyer, or Hendrix any financial harm.

The Court, accordingly, rejects R-CALF's second theory of standing.

## B.

R-CALF also argues that it has standing to challenge the MOUs because they "authoriz[e] QSBCs" to use Beef Act assessments to fund the National Cattlemen's Beef Association ("NCBA") and the U.S. Meat Export Federation ("USMEF"). Dkt. 45-2 at 37. The "NCBA is a national trade association for U.S. cattle producers," which includes a division, "the Federation of State Beef Councils," that receives checkoff funds from QSBCs. Dkt. 45-1 at 27 (Pl.'s SUMF ¶¶ 142–44). QSBCs "use [c]heckoff funds to contract with [the] NCBA to carry out [c]heckoff activities including generic advertising for beef," *id.* (Pl.'s SUMF ¶ 146), and they also transfer funds to the NCBA to use in its "discretion" for purposes "consistent with Beef Checkoff [Program] objectives," *id.* (Pl.'s SUMF ¶ 147). According to R-CALF, the QSBCs' contracts with the NCBA permit the association to use funds to cover both "direct costs" and "implementation" costs, including "salaries, benefits, overhead expense, and other expenses." *Id.* at 28 (Pl.'s SUMF ¶¶ 150–51). The USMEF is another "industry trade association" that receives checkoff funds from QSBCs, both directly from QSBCs and indirectly through "the Federation of Beef Councils, which contracts with USMEF." *Id.* at 29 (Pl.'s SUMF ¶¶ 159–61).

As with the NCBA, R-CALF asserts that "these contracts" permit the USMEF to use a portion of the funds for purposes of "implementation." *Id.* (Pl.'s SUMF ¶ 162).

R-CALF argues that the use of checkoff funds for these purposes harms its members by promoting "competition against [them]." Dkt. 45-2 at 37. In particular, it maintains that the NCBA and the USMEF "use the funds they receive pursuant to the MOUs for 'the generic promotion of U.S. beef'" and "for lobbying activities [that] increase competition against R-CALF's members." Dkt. 55 at 46. Perhaps most significantly, R-CALF objects to funding these trade associations because both have, at least in the past, lobbied against mandatory COOL requirements, Dkt. 45-1 at 28–29 (Pl.'s SUMF ¶¶ 153–58, 162–63), and the NCBA has also supported "replacing the USDA's Food Safety and Inspection 'Product of USA' label with a 'Processed in the USA' label, *id.* at 29 (Pl.'s SUMF ¶ 157), which runs counter to R-CALF's efforts to create a distinct market for beef *raised* in the United States.

This argument suffers from many of the same problems as R-CALF's challenges to the QSBCs' direct expenditures. For present purposes, for example, it makes no difference whether the generic checkoff ads are developed by the QSBCs themselves or whether they contract with others to develop the ads. Either way, R-CALF has failed to carry its summary judgment burden of demonstrating that these ads—which indisputably *increase* overall demand for the product that R-CALF's members sell—has or will cause any R-CALF member to suffer a *decreased* "return on investment" or "a *reduced* bottom line," *Humane Soc'y II*, 935 F.3d at 602 (emphasis added). Moreover, although R-CALF maintains that "the MOUs *permit* distribution of funds to the NCBA and USMEF," even though their "prior political and lobbying activities have harmed R-CALF's members," Dkt. 45-2 at 39 (emphasis added), and that they "*authorize*" the QSBCs to transfer funds to the NCBA and USMEF to fund lobbying activity, *id.* at 37 (emphasis added), as

explained above, the MOUs are wholly procedural in nature and do not "permit" or "authorize" anything.  The MOUs, of course, make no mention of the NCBA or the USMEF, and they merely require QSBCs to submit their annual budgets to AMS and to obtain pre-approval for "any and all potential contracts or agreements . . . for the implementation and conduct of plans or projects funded by checkoff funds."  *See, e.g.*, Dkt. 52-9 at 23–24 (Montana MOU); *cf.*, *e.g.*, *id.* at 2–3 (Colorado MOU) (requiring AMS to review and approve or reject budget within thirty . . . days of submission).  Accordingly, for all the reasons discussed above, R-CALF's reliance on QSBC transfers to the NCBA and the USMEF is unavailing.

Although this resolves the question, it bears at least brief mention that R-CALF's reliance on QSBC payments to the NCBA and the USMEF to support its standing suffers from a number of additional difficulties as well.  Most notably, as R-CALF acknowledges, the governing USDA regulations prohibit the use of any checkoff funds for policy or lobbying activities.  *See* Dkt. 45-2 at 11 (citing 7 C.F.R. § 1260.181(b)(7)) (QSBCs must "[n]ot use council funds collected pursuant to this subpart for the purpose of influencing governmental policy or action[.]").  Thus, far from "authorizing" activity that might harm R-CALF's members, the MOUs provide an opportunity for AMS to prevent a QSBC from entering into a contract permitting the NCBA or the USMEF from using checkoff funds to "influenc[e] governmental policy or action;" before entering into such a contract, the QSBC would need to obtain AMS approval, and there is no evidence that a QSBC has ever entered into such a contract or that AMS would ever approve such an unlawful proposal.

R-CALF does not take issue with this line of reasoning and, instead, argues that money is fungible and that, since QSBCs have permitted the NCBA and the USMEF to use checkoff funds to cover certain overhead expenses, they have enabled the associations to spend more of their

non-checkoff-funded budget to engage in conduct that is adverse to the interests of R-CALF's members.  The record, however, contains no evidence that would permit this inference; there is no evidence, for example, that the overhead costs that the QSBCs have supported with checkoff funds are disproportionate to the costs borne by the associations to further the permissible purposes of the Beef Checkoff Program.  But even beyond that deficiency, R-CALF's argument asks the Court to extend the chain of causal inferences to the snapping point; the Court would need to assume that the existence of the MOUs (or a lack of a generally applicable restriction in the MOUs themselves, rather than restrictions imposed in the contractual review process) somehow enables QSBCs to transfer funds to the associations to cover certain overhead expenses; that the QSBCs would not otherwise do so; that these funds cover more than the overhead associated with the authorized Beef Checkoff Program activity; that the associations use these extra funds to engage in lobbying activity that they would not otherwise engage in; and that the additional lobbying activity will cause R-CALF members to suffer some financial harm.  R-CALF cites no authority even suggesting that such a remote and speculative series of events is sufficient to support the organization's standing to challenge the MOUs, which say nothing about the NCBA or the USMEF and, certainly, do not purport to authorize those associations to use checkoff funds for impermissible purposes.

Finally, R-CALF reliance on the Federal Circuit's decision in *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319 (Fed. Cir. 2008), offers no respite from these difficulties.  According to R-CALF, that case stands for the proposition that a "plaintiff injured by a transfer of funds to an entity that is not itself a competitor but that engages in 'promotional activities' that 'have helped to take back market share'" nonetheless has competitor standing to sue.  Dkt. 45-2 at 37 (quoting *Canadian Lumber*, 517 F.3d at 1334).  But even assuming that

competitor standing reaches actions that assist non-competitors, so long as the actions of the non-competitors favor an actual competitor, that principle does not address R-CALF's other difficulties.  It does not address R-CALF's lack of evidence that generic, promotional activity, which increases overall demand for beef, causes financial harm to R-CALF members.  It does not explain how an MOU that says nothing about the substance of any promotional activity or about the propriety of any contract can cause the injuries that R-CALF alleges.  It does not overcome the regulatory prohibition on the use of checkoff funds for purposes of lobbying or policy advocacy.  And it does not address the remote and speculative chain of inferences necessary to support R-CALF's contention that the availability of checkoff funds for legitimate purposes frees up other funds, which can then be used for purposes prohibited by the USDA's regulations.

\*    \*    \*

For all of these reasons, the Court concludes that R-CALF has failed to present evidence sufficient to prove that any of its identified members has suffered a cognizable injury-in-fact, that is fairly traceable to the USDA's decision to enter into the challenged MOUs, and that would be redressed by a favorable decision from this Court.  Because the Court has previously held that R-CALF lacks organizational standing, and because its claim of associational standing requires that at least one identified member of the organization have standing to sue, the Court concludes that R-CALF lacks the requisite Article III standing to pursue its procedural challenge to the MOUs.

**CONCLUSION**

The Court, accordingly, will **GRANT** the USDA's motion for summary judgment and will **DENY** R-CALF's cross-motion for partial summary judgment.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 28, 2025